Douglas L. Honnold
Timothy J. Preso
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
dhonnold@earthjustice.org
tpreso@earthjustice.org
jharbine@earthjustice.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, HUMANE SOCIETY OF THE UNITED STATES, CENTER FOR BIOLOGICAL DIVERSITY, JACKSON HOLE CONSERVATION ALLIANCE, FRIENDS OF THE CLEARWATER, ALLIANCE FOR THE WILD ROCKIES, OREGON WILD, CASCADIA WILDLANDS, WESTERN WATERSHEDS PROJECT, WILDLANDS NETWORK, and HELLS CANYON PRESERVATION COUNCIL | CASE NO.  CV-09-77-M-DWM |
| Plaintiffs, | |
| vs. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| KEN SALAZAR, Secretary of the Interior; ROWAN GOULD, Acting U.S. Fish and Wildlife Service Director; and UNITED STATES FISH AND WILDLIFE SERVICE, | |
| Defendants. | |

**INTRODUCTION**

1.      This case challenges the decision of the U.S. Fish and Wildlife

Service ("FWS") to designate the northern Rocky Mountain gray wolf a "distinct

population segment" and then delist it, despite significant threats to wolves'

survival and a lack of regulatory mechanisms to ensure that the wolf population

does not plummet well below sustainable levels.  See Final Rule To Identify the

Northern Rocky Mountain Population of Gray Wolf as a Distinct Population

Segment and To Revise the List of Endangered and Threatened Wildlife, 74 Fed.

Reg. 15,123 (Apr. 2, 2009) ("Delisting Rule").

2.      Four separate federal district courts have invalidated FWS's prior

attempts to reduce or remove protections for gray wolves in the United States

under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et seq.  Most

recently, this Court enjoined FWS's 2008 attempt to eliminate protections for gray

wolves in the northern Rockies.  See Defenders of Wildlife v. Hall, 565 F. Supp.

2d 1160 (D. Mont., July 18, 2008).  Notwithstanding FWS's consistent inability to

achieve legitimate wolf recovery, FWS's drive to remove gray wolves from the

federal list of Endangered Species remains unrelenting.

3.      A mere two weeks after this Court remanded FWS's 2008 northern

Rockies delisting decision at the agency's request, FWS reopened the public

comment period on the same delisting proposal that resulted in FWS's unlawful

2008 delisting decision.  The resulting 2009 wolf delisting rule, like its predecessor, is fraught with legal infirmities.  While repeating many of the errors of the 2008 rule, the 2009 Delisting Rule creates entirely new violations.  Among other things, the 2009 Delisting Rule unlawfully delisted a portion of the northern Rockies wolf population while retaining endangered status for wolves in Wyoming, failed to ensure that the northern Rockies wolf population exhibits genetic connectivity essential to its survival, and will allow the wolf population in Idaho and Montana to decline dramatically on the basis of outdated and inadequate wolf population recovery targets.  As a result, the delisted northern Rockies wolf population will never achieve true recovery as envisioned by Congress when it enacted the ESA.

4.      In light of these deficiencies, this Court should set aside the Delisting Rule and order that wolves in the northern Rockies be returned to the federal list of threatened and endangered species until their long-term viability is assured.

## JURISDICTION, VENUE, AND ADMINISTRATIVE REMEDIES

5.      Plaintiffs bring this action pursuant to the ESA citizen-suit provision, 16 U.S.C. § 1540(g), which waives defendants' sovereign immunity, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.  This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§

2201-02.

6.     Venue is proper in this District under 28 U.S.C. § 1391 because one or more Plaintiffs reside in the District of Montana; land affected by the challenged action is within the District of Montana; and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Venue is proper in the Missoula Division because every county within the Missoula Division is also within the northern Rocky Mountain gray wolf's range that is affected by the challenged action.

7.     Plaintiffs have attempted to resolve their claims administratively by commenting on the proposed delisting rule that appeared in the Federal Register and by providing Defendants with notice of Plaintiffs' intent to sue on April 2, 2009.  See 72 Fed. Reg. 6,105 (Feb. 8, 2007); 72 Fed. Reg. 36,939 (July 6, 2007); 73 Fed. Reg. 63,926 (Oct. 28, 2008); 16 U.S.C. § 1540(g).

**PARTIES**

8.     Plaintiff Defenders of Wildlife ("Defenders") is a national non-profit conservation organization headquartered in Washington, D.C., with offices in Missoula, Montana; Bozeman, Montana; and Boise, Idaho.  Defenders has more than one million members and supporters nationwide, including 29,974 in the northern Rockies states of Idaho, Montana, and Wyoming as of January 2008. Defenders is a science-based advocacy organization focused on conserving and

restoring native species and the habitat upon which they depend, and has been

involved in such efforts since the organization's establishment in 1947.  Over the

last three decades, Defenders has played a leading role in the recovery of wolves in

the northern Rockies.  Defenders administers The Bailey Wildlife Foundation Wolf

Compensation Trust, which has reimbursed ranchers in the region more than

$900,000 since the program was founded in 1987, and The Bailey Wildlife

Foundation Carnivore Conservation Fund, which assists family ranchers and

farmers with non-lethal, proactive methods that help reduce or prevent livestock

losses to wolves.  Defenders' efforts have also included the 2007 publication of a

report, *Places for Wolves*.

9.     Plaintiff Natural Resources Defense Council ("NRDC") is a non-

profit conservation organization that uses law, science, and the support of roughly

429,000 members (including approximately 1,800 members in Montana, 2,000

members in Idaho, and 850 members in Wyoming), to protect the planet's wildlife

and wild places, and to ensure a safe and healthy environment.  NRDC maintains

an office in Livingston, Montana.  NRDC and its members have a longstanding

interest in conserving threatened and endangered species, including wolves, and

NRDC scientists, advocates, and attorneys have worked on wolf conservation

issues in the region for years.

10.     Plaintiff Sierra Club is a nationwide conservation organization with

4

more than 750,000 members, 2,200 of whom belong to the Montana Chapter, 1,000 of whom belong to the Wyoming Chapter, and 2,500 of whom belong to the Idaho Chapter.  The Sierra Club also has 19,000 members in Oregon, 25,000 members in Washington, and 4,000 members in Utah.  The Sierra Club is America's oldest, largest and most influential grassroots environmental organization.  The mission of the Sierra Club is:  "To explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments."

11.    Plaintiff The Humane Society of the United States ("The HSUS") is a non-profit charitable organization incorporated in 1954 and is headquartered in Washington, D.C., with eight regional offices located throughout the country, including a Northern Rockies Regional Office.  The HSUS is the largest animal protection organization in the world, with more than 11 million members and constituents.  The HSUS's mission is to promote the humane treatment of animals and to foster respect, understanding, and compassion for all creatures.  The HSUS has been actively involved in the preservation of wildlife and endangered and threatened species and supports efforts aimed at the protection and recovery of such species and their habitats.  In particular, the HSUS has been a long-standing advocate for wolf protection and recovery.

12.     Plaintiff Center for Biological Diversity is a nonprofit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems.  The Center was founded in 1989, and is based in Tucson, Arizona with offices in California, Oregon, New Mexico, Montana, and Washington, D.C.  The Center has more than 40,000 members, including many who reside in, explore, and enjoy the northern Rockies.

13.     Plaintiff Jackson Hole Conservation Alliance is a non-profit organization based in Jackson, Wyoming with more than 1,800 members.  The Jackson Hole Conservation Alliance is dedicated to responsible land stewardship, and to ensuring that human activities are in harmony with the area's irreplaceable wildlife, scenery, and other natural resources.

14.     Plaintiff Friends of the Clearwater, a recognized non-profit organization since 1987, defends the Idaho Clearwater Bioregion's wildlands and biodiversity through a Forest Watch program, litigation, grassroots public involvement, outreach, and education.  The Wild Clearwater Country, the northern half of central Idaho's Big Wild, contains many unprotected roadless areas and wild rivers, and provides crucial habitat for countless rare plant and animal species. Friends of the Clearwater strives to protect these areas, restore degraded habitats, preserve viable populations of native species, recognize national and international wildlife corridors, and to protect our public lands.

15.     Plaintiff Alliance for the Wild Rockies ("AWR") is a tax-exempt, non-profit public-interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plants, fish, and animal life, and its naturally functioning ecosystems.  AWR has over 2,000 individual members and more than 500 member businesses and organizations.

16.     Plaintiff Oregon Wild, formerly Oregon Natural Resources Council, is a non-profit corporation with approximately 4,500 members, headquartered in Portland, Oregon.  Oregon Wild is dedicated to protecting and restoring Oregon's wildlands, wildlife, and waters, including fully functioning forest ecosystems with a full complement of native species like the wolf.  Oregon Wild has appealed numerous timber sales that could affect the wolf and its habitat.  Delisting the wolf will preclude or greatly delay the possibility of full recovery of the wolf in Oregon. The northern Rockies population must be maintained at relatively high numbers so it can act as a source population and enable wolves to recolonize abundant suitable habitat in the wolf's former range to the west and south of the currently occupied areas.

17.     Plaintiff Cascadia Wildlands is a 501(c)(3) non-profit organization based in Eugene, Oregon, that is dedicated to defending the forests, waters, and wildlife of the Pacific Northwest.  Cascadia Wildlands works to protect and restore wildlife populations to bring balance back to wild ecosystems of the Cascadia

7

Bioregion.  In 2005, Cascadia Wildlands worked cooperatively with the State of Oregon to develop a wolf management plan that may, in the future, help provide for a viable population of gray wolves in the northwest.  The interests of Cascadia Wildlands and its members are harmed by gray wolf delisting due to the adverse impact delisting has on wolves' ability to disperse to and recolonize their native Oregon landscapes.

18.    Plaintiff Western Watersheds Project ("Western Watersheds") is an Idaho non-profit conservation group, headquartered at the Greenfire Preserve located on the East Fork Salmon River, near Clayton in Custer County, Idaho.  The Greenfire Preserve is a former cattle ranch, which Western Watersheds manages to promote the restoration of native habitats and protection of wildlife species there; to educate the public about native habitat restoration, wildlife protection, and other environmental issues; and to carry out science-based advocacy in the region. Western Watersheds has over 1,400 members plus additional volunteers and supporters, located in Idaho and around the United States, as well as professional staff in Montana, Idaho, Utah, and Wyoming.  Western Watersheds, as an organization and on behalf of its members, is concerned with and active in seeking to protect and improve the wildlife, riparian areas, water quality, fisheries, and other natural resources and ecological values of watersheds throughout the West.

19.    Plaintiff Wildlands Network is a non-profit organization working

across North America to protect, restore, and connect networks of natural areas so that all native species, including top predators, can exist in healthy populations across their historic range.  Wildlands Network, relying on the biological and ecological sciences, recognizes that predators such as wolves are essential to healthy ecosystems on which all species, including humans, depend.  Of Wildlands Network's approximately 5,000 members, 285 live in Montana, Idaho, and Wyoming and another 489 live in Washington and Oregon.  The organization's board, staff and many of its members recreate in the northern Rockies and personally enjoy the presence of wolves in addition to believing they are ecologically important and that their right to exist is entitled to respect.

20.     Plaintiff Hells Canyon Preservation Council ("HCPC") is a non-profit organization based in La Grande, Oregon with over 1,000 members.  HCPC works to protect and restore the wildlands, waters, unique habitats and biodiversity of the Hells Canyon-Wallowas and Blue Mountains ecosystems through advocacy, education and collaboration, advancing science-based policy, and protective land management.  HCPC has been actively involved in regional wolf recovery issues and played a key role in developing the 2005 Oregon Wolf Plan.  As part of its organizational mission, HCPC is working to maintain and enhance crucial wildlife connectivity corridors linking the Rockies and Cascades ecosystems, in large part for wolves seeking to recolonize in Oregon.

21.    All Plaintiffs have long-standing interests in the preservation and recovery of gray wolves in the northern Rockies, because Plaintiffs and their members place a high value on preserving wolves and their critical role in the functioning of healthy ecosystems.  Plaintiffs seek to protect and recover the gray wolf through a wide array of actions including public education, scientific analysis, and advocacy promoting healthy ecosystems in the region.

22.    Members of each of the Plaintiff conservation groups use public land in the northern Rocky Mountains for recreational pursuits, including hiking, camping, backpacking, cross-country skiing, wildlife viewing, and aesthetic enjoyment.  Members of the plaintiff groups seek to view wolves and signs of wolf presence in the wild throughout the northern Rockies, and defendants' challenged action will reduce their opportunity to do so.  The decision to eliminate ESA protections for gray wolves in the northern Rockies will also cause irreparable ecological harm to the ecosystems where wolves are now found.  The legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of Plaintiff organizations and their members.

23.    Plaintiffs' aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests have been, are being, and, unless their requested relief is granted, will continue to be adversely and irreparably injured by

10

defendants' failure to comply with federal law.  These are actual, concrete injuries, traceable to Defendants' conduct that would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

24.    Defendant Ken Salazar is the United States Secretary of the Interior. In that capacity, Secretary Salazar has supervisory responsibility over the U.S. Fish and Wildlife Service.  Defendant Salazar is sued in his official capacity.

25.    Defendant Rowan Gould is the Acting Director of the U.S. Fish and Wildlife Service.   Defendant Gould is sued in his official capacity.

26.    Defendant United States Fish and Wildlife Service is a federal agency within the Department of Interior.  FWS is responsible for administering the ESA with respect to terrestrial wildlife such as gray wolves.

## THE ENDANGERED SPECIES ACT

27.    The ESA was enacted to "provide a program for the conservation of … endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."  16 U.S.C. § 1531(b).  To receive the full protections of the Act, a species must first be listed by the Secretary as "endangered" or "threatened" pursuant to ESA section 4.  Id. § 1533.

28.    The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."  Id. §

11

1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  Id. § 1532(20).  The term "species" is defined to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  Id. § 1532(16).

29.    Under these definitions, the FWS can list a distinct population segment ("DPS") of a vertebrate species, even when the species as a whole is neither endangered nor threatened.  See 61 Fed. Reg. 4,722, 4725 (Feb. 7, 1996). By extending the protections of the ESA to locally vulnerable populations of vertebrate fish or wildlife, DPSs are meant to "protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."  Id.

30.    In 1996, FWS and the National Marine Fisheries Service jointly adopted a policy for determining when DPSs can be designated under the Act ("DPS Policy").  Id.  In determining whether a DPS designation is appropriate, the DPS policy directs FWS to consider the proposed DPS's discreteness, significance to the species, and conservation status.  Id.  A proposed DPS is "discrete" if it is "markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors" or if it "is delimited by international governmental boundaries within which [significant] differences in

control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist." Id.  The "biological and ecological significance" of a DPS is determined by evaluation of the proposed DPS's "importance to the taxon to which it belongs." Id.

31.    In making decisions to list or delist a species, including a DPS, as "endangered" or "threatened," the ESA requires the Secretary to "determine whether [the] species is an endangered species or a threatened species because of any of the following factors:

(A)    the present or threatened destruction, modification, or curtailment of its habitat or range;

(B)    overutilization for commercial, recreational, scientific, or educational purposes;

(C)    disease or predation;

(D)    the inadequacy of existing regulatory mechanisms; or

(E)    other natural or manmade factors affecting its continued existence."

16 U.S.C. § 1533(a)(1); see also 50 C.F.R. § 424.11(d) (providing grounds for delisting).  The Secretary must make these determinations "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species."  16 U.S.C. § 1533(b)(1)(A).

32.    Once a species is listed as "endangered" or "threatened" under the

ESA, "all Federal departments and agencies shall seek to conserve [that] species and shall utilize their authorities in furtherance of the purposes of [the ESA]." Id. § 1531(c).

33.     ESA section 10 allows the Secretary to "authorize the release … of any population … of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conservation of such species." 16 U.S.C. § 1539(j)(2)(A). The ESA deems any such population an "experimental population… but only when, and at such times as, the population is wholly separate geographically from nonexperimental populations of the same species." Id. § 1539(j)(1).

## GRAY WOLVES IN THE NORTHERN ROCKIES

34.     The gray wolf (*Canis lupus*) is the largest wild member of the dog family (Canidae). Wolves' fur ranges from white to shades of gray to coal black. Wolves prey primarily on medium and large mammals. In the northern Rockies, wolves' most common prey are elk, white-tailed deer, mule deer, moose, pronghorn antelope, and bison. Although wolves prefer their native prey of wild ungulates, wolves in the northern Rockies occasionally prey on domestic livestock, including sheep and cattle. Wolf predation on livestock represents a minor source of total livestock mortality in Montana, Idaho, and Wyoming. Many livestock owners have successfully avoided or reduced conflicts with wolves through non-

14

lethal methods, including the use of fladry (strips of fabric tied to line or electrical line to form a barrier), fencing, range riders, livestock guard dogs, and changed livestock husbandry practices.

35.     Wolves are social animals that normally live in packs of 2 to 12 animals that form strong social bonds.  Wolf packs are usually family groups consisting of a breeding pair (the "alpha male" and the "alpha female"), their offspring from previous years, and an occasional unrelated wolf.  In general, only the alpha male and alpha female of a wolf pack breed, which, along with territorial instincts that limit the number of packs in any given region, serves to naturally limit wolf numbers.  Litters are generally born in April and range from 1 to 11 pups.  All pack members help feed, protect, and play with the pups as they grow. Wolf pups are weaned at 5 to 6 weeks of age, and are mature enough to begin traveling with the pack by around October, a critical period for wolf survival.

36.     Research demonstrates that when one alpha wolf is removed from a pack, the probability that the pack will successfully breed the following year is approximately halved.  When both alpha wolves are killed, the short-term reproductive potential of the pack is generally destroyed.  This impact is exaggerated for smaller or less concentrated wolf populations, as an alpha wolf that is eliminated from a pack generally must be replaced by a mature wolf from another pack to allow the pack to persist and produce pups the following year.  The

chances of reproduction and pup survival after the loss of one or both alpha wolves

are greatly influenced by pack size and distribution.

37.     More than 350,000 gray wolves once inhabited the American West.

With the European settlement of North America, "superstition and fears … led to

widespread persecution of wolves."  68 Fed. Reg. 15,804, 15,805 (Apr. 1, 2004).

According to FWS, "wolves were hunted and killed with more passion and zeal

than any other animal in U.S. history."  U.S. Fish and Wildlife Service, Gray Wolf,

http://training.fws.gov/library/Pubs/graywolf.pdf (last checked May 15, 2009).

This hunting, together with an active eradication program sponsored and carried

out by FWS and its predecessor agency, resulted in the extirpation of wolves from

more than 95 percent of their range in the lower-48 states.  See 68 Fed. Reg. at

15,805; 72 Fed. Reg. 6,106, 6,125 (Feb. 8, 2007).  In Montana, Idaho, Wyoming,

and adjacent southwestern Canada, wolves were exterminated by the 1930s.  See

74 Fed. Reg. at 15,123.

38.     Gray wolves were among the first species to be listed by the Secretary

of Interior as endangered when, alarmed by the pace of extinctions, Congress

enacted the ESA in 1973—"the most comprehensive legislation for the

preservation of endangered species ever enacted by any nation."  Tennessee Valley

Auth. v. Hill, 437 U.S. 153, 180 (1978).

39.     Long before wolf reintroduction efforts in the northern Rockies, FWS

developed a 1987 wolf recovery plan that established a northern Rockies wolf recovery goal of at least 10 breeding pairs and 100 wolves for three consecutive years in each of three recovery areas:  northwestern Montana, central Idaho, and the Greater Yellowstone area.  FWS's 1994 EIS for wolf reintroduction in the northern Rockies states that these criteria require a minimum of "thirty or more breeding pairs … comprising some 300+ wolves in a metapopulation … with genetic exchange between subpopulations."  74 Fed. Reg. at 15,130-31.  FWS has stated repeatedly that gray wolves will not be recovered in the northern Rockies until wolves in the Greater Yellowstone, central Idaho, and northwestern Montana recovery areas are genetically linked.  See Defenders of Wildlife, 565 F. Supp. 2d at 1170; 74 Fed. Reg. at 15,131-32.

40.     In 1995, FWS embarked on an ambitious plan to recover wolves in the northern Rockies by relocating and releasing 66 gray wolves from Canada into Yellowstone National Park and central Idaho.  See 72 Fed. Reg. at 36,943.

41.     In the years following reintroduction, wolves reproduced and established packs.  Since returning to their native landscape, wolves have restored a more natural balance to northern Rockies ecosystems.  Wolves benefit the health of elk and deer populations by virtue of their selection of prey animals, as they primarily take the old, the very young, the injured, and the diseased, leaving the healthiest animals to produce the next generation.  In Yellowstone National Park,

the renewed presence of wolves has altered the behavior of elk, which now tend to avoid browsing in areas where they are most vulnerable to predation, and in turn have reduced destruction of young aspen and willow shoots.  The restoration of shrubs and trees in riparian areas controls stream erosion, and supports native bird communities, beavers, and other wildlife.  Wolves aggressively prey on coyotes within wolves' home territories.  By reducing the number of coyotes in the area, the presence of wolves has also benefited populations of small rodents, birds of prey (who feed on the rodents), and pronghorn antelopes (who are often preyed upon by coyotes).

42.    According to a 2006 study, roughly 151,000 people visit Yellowstone National Park each year to see and hear wolves in the wild, and bring in $35 million in direct spending annually to Montana, Idaho, and Wyoming.

43.    At the end of 2008, FWS estimated that the northern Rockies wolf population numbered approximately 1,650.  See 74 Fed. Reg. at 15,137.  If the population continues to grow, it will soon reach the numbers and geographic distribution that will ensure its long-term viability.  Numerous independent scientists—many as part of FWS's own reviews of its wolf recovery goals—have informed FWS that a connected population of 2,000-5,000 wolves is necessary to ensure a genetically viable northern Rockies wolf population over the long term. Further, the current wolf population must expand geographically to achieve the

18

level of necessary connectivity and genetic exchange between the three core wolf recovery areas in the northern Rockies.  To date, sufficient connectivity has not been achieved.

FWS'S PRIOR ESA LISTING ACTIONS

**A.      Development of Recovery Standards**

44.      FWS established a recovery goal for gray wolves in the northern Rockies in its 1987 northern Rocky Mountain gray wolf recovery plan of 10 breeding pairs living in each of three separate areas for at least three consecutive years.

45.      FWS reaffirmed these recovery goals in 1994 for the EIS prepared in connection with the introduction of an experimental population of wolves into the region.  At that time, FWS determined that northern Rockies wolves must also form a metapopulation, with genetic exchange between subpopulations.  Even with genetic exchange, however, FWS acknowledged that then-current scientific literature showed that long-term viability for wolf populations would require an effective population size ($N_e$) of at least 500 wolves.  Effective population size refers to the numbers of mature individuals in a population that breed and pass on genetic material.  Because usually only an alpha male and alpha female in a wolf pack breed, an effective population of 500 wolves requires a total population of 2,000-5,000 wolves.  FWS dismissed this science suggesting the necessity of a

19

large wolf population as unachievable stating, "[c]learly, finding an area to support

[an effective population of] 500 of wolves in the lower 48 states is very unlikely,

as this would equate to a total population in the low thousands." See FWS, Final

Environmental Impact Statement: The Reintroduction of Gray Wolves to

Yellowstone National Park and Central Idaho, App. 9, at 38 (Apr. 1994).

46.     In 2001, FWS selected its preferred group of scientists to review the

agency's definition of a viable northern Rockies wolf population.  Many of FWS's

hand-picked scientists commented at the time that FWS's scientific review process

was biased to elicit views consistent with FWS's preferred outcome.  Scientific

reviewers were presented with three alternative definitions of a viable wolf

population and asked to rank the definitions in order of scientific accuracy.

Reviewers were also offered a fourth possibility of creating their own definition.

One reviewer described the presentation as "artificial and misleading" (Reed

Noss).  Another reviewer noted, "By limiting the choices to those 3 options

approved by the Service, plus a category of 'other', it may unfairly bias the results"

(Brian Miller).

47.     The Service proceeded with its preferred definition of a viable wolf

population despite dissent from a considerable number of scientific experts.

Numerous scientific reviewers criticized FWS's determination of population

viability as lacking quantitative analysis or modeling with life history data.  One

reviewer noted that "a definition of viability without quantify-able [sic] data to back it up is problematic and will be difficult to defend because it is subjective" (Brian Kelly).  Another reviewer suggested that it might be "generally inappropriate to conduct an opinion poll, even from experts, when no quantitative analyses have been conducted to assess the issues at hand" (John Vucetich).

48.     Some of the reviewers specifically noted that genetic problems were likely to present a threat to wolves without greater attention to connectivity in the northern Rockies.   For example, one reviewer stated that "the recovery goal of at least 300 wolves is too small to avoid genetic problems in the foreseeable future….Therefore, a population of this size should not considered [sic] to be 'recovered'….Thus, the recovery criteria need to require some gene flow into this population" (Fred Allendorf).

49.     More recently, FWS's western gray wolf recovery coordinator, Ed Bangs, said about the recovery goal, "I, personally, think it is too low."  Virginia Morell, Wolves at the Door of a More Dangerous World, <u>Science</u>, at 891 (Feb. 15, 2008).

**B.     2003 Downlisting**

50.     On April 1, 2003, FWS issued the Final Rule to Reclassify and Remove the Gray Wolf from the List of Endangered and Threatened Wildlife in Portions of the Conterminous United States.  <u>See</u> 68 Fed.Reg. 15,804 (April 1,

2003). Essentially, FWS created three gray wolf DPSs—Eastern, Western, and Southwestern—and reclassified, or "downlisted," the gray wolf from "endangered" to "threatened" in the Eastern and Western DPSs. In 2005, two federal district courts struck down the 2003 downlisting rule due to FWS's arbitrary treatment of the wolf's historic range and failure to analyze the threats to the wolf outside of the core recovery areas. See Defenders of Wildlife v. Sec'y, U.S. Dep't of Interior, 354 F. Supp. 2d 1156 (D. Or. 2005); Nat'l Wildlife Fed. v. Norton, 386 F. Supp. 2d 553 (D. Vt. 2005). Following these court rulings, the gray wolf retained its listing status as endangered throughout the conterminous United States except Minnesota, where the gray wolf remained listed as threatened.

### C.    2008 Delisting

51.    In preparation for delisting in the northern Rockies, FWS requested that the states of Montana, Idaho, and Wyoming prepare wolf management plans specifying how they would manage wolves once wolves were no longer listed as endangered. FWS determined that state plans must each provide for at least 100 wolves in 10 breeding pairs in order to meet the agency's (inadequate) numeric recovery standard developed in 1987. In a January 2004 letter, FWS determined that the Montana and Idaho wolf management plans would be adequate to maintain these minimal wolf population levels. While FWS initially rejected Wyoming's proposed wolf management scheme, in December 2007, FWS approved

Wyoming's wolf management statute and plan.  Wyoming's wolf management

scheme would classify wolves as predators—subject to unregulated killing and

persecution—across nearly 90% of the state.  <u>See</u> Wyo. Stat. Ann. §§ 11-6-

302(a)(ix), 23-1-101(a)(viii)(B).

52.    In February, 2008, FWS designated a Northern Rocky Mountain DPS

of wolves and eliminated ESA protections for wolves throughout the DPS, turning

management over to the states.  <u>See</u> 73 Fed. Reg. at 10,514, 10,517.  The DPS

encompassed all of Montana, Idaho, and Wyoming; and eastern Washington,

eastern Oregon, and northeastern Utah.  <u>See</u> 73 Fed Reg. at 10,516.  Wolf packs

are known to occupy only a small portion of the DPS—areas limited to

northwestern Montana, central Idaho, and the Greater Yellowstone area.  <u>See</u> <u>id.</u> at

10,518.

53.    The 2008 delisting rule would have permitted the states of Montana,

Idaho, and Wyoming to eliminate all but 100-150 wolves each, a mere fraction of

the current northern Rockies wolf population.

54.    Plaintiffs challenged the 2008 delisting in federal court.  Plaintiffs'

complaint included claims that gray wolves remain threatened in the northern

Rockies by virtue of their small population size, lack of genetic exchange, and

inadequate regulatory mechanisms.  Plaintiffs also alleged that FWS failed to

assess threats to gray wolves over a significant portion of their range (including

unoccupied historic range), that FWS established arbitrary DPS boundaries, and that the 2008 Delisting Rule arbitrarily departed from FWS's 1978 determination that wolves are endangered throughout the lower-48 states, except Minnesota, where wolves were listed as threatened.

55.    Plaintiffs sought a preliminary injunction of delisting based on a subset of these claims.  This Court granted Plaintiffs' preliminary injunction motion on July 18, 2008.  This Court found that Plaintiffs were likely to succeed on the merits of their claim that FWS arbitrarily departed from the FWS recovery standard requiring genetic exchange among wolves in the northwestern Montana, central Idaho, and greater Yellowstone recovery areas.  See Defenders of Wildlife, 565 F. Supp. 2d at 1171-72.  Because wolves had not achieved the genetic exchange FWS had determined was necessary for wolf recovery, FWS's determination that the wolf population had recovered was arbitrary.  See id.

56.    This Court also ruled that Plaintiffs were likely to succeed on their claim that FWS arbitrarily determined that regulatory mechanisms were adequate to maintain a recovered wolf population.  See id. at 1175-76.  Because Wyoming's wolf management laws and plan designated wolves as predators throughout the vast majority of the state, failed to provide for 15 breeding pairs in the state, and failed to protect against excessive human-caused mortality in defense of property, FWS's approval of Wyoming's wolf management scheme was arbitrary.  See id.

57.     In the four months between the time delisting went into effect and subsequently was enjoined, more than 100 wolves were killed.  Wolf mortality due to all causes in Idaho approximately doubled in 2008 over the previous year.  Before delisting was enjoined, Montana, Idaho, and Wyoming had all proposed wolf hunts.  The Montana Department of Fish, Wildlife and Parks set a tentative wolf harvest quota of 75 wolves.  Idaho's Fish and Game Commission established a 2008 mortality quota—including hunting mortality and all other causes of death—of 428 wolves.

58.     Rather than defend the delisting rule on the merits, FWS moved for a voluntary remand and vacatur of the rule.  On October 14, 2008, this Court granted FWS's motion and remanded and vacated the 2008 delisting rule for northern Rockies gray wolves.

59.     Also in 2008, the United States District Court for the District of Columbia vacated FWS's regulation delisting gray wolves in the western Great Lakes region.  See Humane Soc'y of the U.S. v. Kempthorne, 579 F. Supp. 2d 7 (D.D.C. 2008).  In that case, the court determined that FWS acted arbitrarily by simultaneously designating and delisting the western Great Lakes DPS when the ESA "quite strongly suggests—consistent with common usage—that the listing of any species … is a precondition to the delisting of that species."  See id. at 17 (emphasis in original).

25

## THE 2009 DELISTING DECISION

60.     Two weeks after this Court vacated FWS's 2008 northern Rockies wolf delisting regulation, FWS announced the reopening of the comment period on the February 8, 2007, proposed rule to delist the northern Rocky Mountain DPS— the same proposal that launched the illegal February 2008 delisting.  See 73 Fed. Reg. 63,926, 63,928-29 (Oct. 28, 2008); 72 Fed. Reg. 6,106 (Feb. 8, 2007).  With its announcement, FWS offered no new information indicating that the region's wolf population was suitable for delisting.  FWS provided a draft, unsigned memorandum of understanding which made vague representations about post-delisting state management to address the wolf population's lack of genetic connectivity.  See 73 Fed. Reg. at 63,930.  In response to this Court's determination that FWS arbitrarily deemed Wyoming regulatory mechanisms adequate to maintain a recovered wolf population, FWS proposed to retain ESA protections for wolves in the northwest corner of Wyoming while delisting the remainder of the newly designated northern Rockies DPS.  See id. at 63,926-29; 72 Fed. Reg. at 6,131.

61.     The 2009 Delisting Rule was made final through publication in the Federal Register on April 2, 2009 and took effect on May 4, 2009.  See 74 Fed. Reg. at 15,123.  The 2009 Delisting Rule relied on the same flawed biological conclusions, and repeated nearly all of the same legal errors, of the 2008 rule and

26

committed new violations, all of which render the rule unlawful.  The 2009 Delisting Rule retained its predecessor's undue reliance on inadequate, two-decades-old wolf population recovery targets and inadequate regulatory mechanisms.  While the Delisting Rule asserts that the population may remain above 1,000 wolves under state management, FWS did not seek or obtain commitments from Montana and Idaho to manage for any more than 100-150 wolves in each state.  Thus, the Delisting Rule does not assess any regulatory mechanisms that could maintain a wolf population larger than 300-450 wolves in Idaho, Montana, and Wyoming.

62.    In perpetuating meager wolf population targets under which adequate natural genetic exchange cannot possibly occur, the Delisting Rule failed to meaningfully address this Court's determination that FWS had not given due consideration to the separate wolf recovery criterion requiring genetic exchange.

63.    Further, by delisting only a portion of the northern Rockies DPS and retaining ESA-listed status for Wyoming wolves, FWS violated the plain language of the ESA which prohibits such piecemeal listing actions.  For these and other reasons, set forth below, the Delisting Rule is arbitrary and capricious and violates the ESA.

64.    Montana and Idaho each plan to allow public hunting of wolves in Fall 2009.  The Montana Fish, Wildlife and Parks Commission has proposed a

2009 wolf harvest quota of 26-165 wolves, and plans to adopt a final harvest quota in July 2009.  The Idaho Fish and Game Commission has approved 2009 wolf hunting season dates, but has not yet established a 2009 mortality quota.

65.     The day the Delisting Rule was published, Plaintiffs sent FWS a 60-day notice of intent to challenge the new delisting rule, pursuant to the ESA's citizen-suit provision, 16 U.S.C. § 1540(g).

## FIRST CAUSE OF ACTION

### (Violation of ESA §§ 3, 4(a): Listing/Delisting Portion Of DPS)

66.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 65.

67.     The Delisting Rule violates the ESA by eliminating protections for wolves throughout only a portion of the newly designated DPS while retaining wolves' ESA-protected status in Wyoming.  See 74 Fed. Reg. at 15,182-83, 15,187.

68.     The ESA does not permit a piecemeal approach to listing and delisting species.  The plain language of the ESA commands FWS to list a species (meaning a species, subspecies or DPS) as endangered if the "species ... is in danger of extinction throughout all or a significant portion of its range" (with a similar definition for "threatened species").  16 U.S.C. § 1532(6), (20); see id. § 1533(a).  "Listing distinctions below that of subspecies or a DPS of a species are not allowed

under the ESA." <u>Alsea Valley Alliance v. Evans</u>, 161 F. Supp. 2d 1154, 1162 (D.

Or. 2001), <u>appeal dismissed for lack of jurisdiction</u>, 358 F.3d 1181 (9th Cir. 2004).

69.     FWS properly determined that Wyoming constitutes a significant

portion of the wolf's northern Rockies range and that wolves remain endangered

within Wyoming.  <u>See</u> 74 Fed. Reg. at 15,182-83.  FWS's conclusion that the gray

wolf is imperiled "throughout … a significant portion of its range" in Wyoming

required FWS to list the entire northern Rockies DPS as threatened or endangered.

16 U.S.C. § 1532(6)(20); <u>see id.</u> §§ 1532(16), 1533(a).  Contrary to this legal

requirement, FWS asserts that it may lawfully list a species, including a DPS,

within <u>only</u> the significant portion of the range in which it is currently threatened

or endangered.  <u>See</u> 74 Fed. Reg. at 15,152-53, 15,184.  Because FWS's position

cannot be sustained under the ESA's plain language, the Delisting Rule violates the

ESA, <u>see</u> 16 U.S.C. §§ 1532, 1533(a), and the APA, 5 U.S.C. § 706(2), and should

be set aside.

## SECOND CAUSE OF ACTION

### (Violation of ESA § 4(a), (b): Arbitrary Reliance On Out-Dated, Unscientific Recovery Targets)

70.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 69.

71.     FWS arbitrarily concluded that the northern Rockies wolf population

is not threatened or endangered due to "the inadequacy of existing regulatory

mechanisms" on the basis of outdated and inadequate wolf population recovery targets.  <u>See</u> 16 U.S.C. § 1533(a)(1)(D).

72.     FWS's determination that regulatory mechanisms in Idaho and Montana are adequate was based primarily on FWS's conclusion that Idaho and Montana had made "commitments to manage wolves safely above minimum recovery levels."  74 Fed. Reg. at 15,167.  FWS "recovery levels" are only 30 breeding pairs and 300 wolves in the northern Rockies.  <u>See</u> <u>id.</u> at 15,132.  Because FWS determined that Montana and Idaho have committed to manage wolves consistent with this standard, FWS found that regulatory mechanisms are adequate. <u>See</u> <u>id.</u> at 15,179.

73.     FWS's two-decades-old, pre-reintroduction wolf recovery criteria fail to account for new scientific information, widely accepted international protocol, and FWS recovery standards for similar wildlife populations—all of which demonstrate that a much larger northern Rockies wolf population is required for long-term viability.

74.     FWS's wolf population recovery targets also fail to consider that a wolf population much larger than 300 is required before a wolf metapopulation, with sufficient genetic connectivity between sub-populations, is established. FWS's failure to consider these important factors bearing on the adequacy of its wolf population recovery targets renders the agency's assessment of regulatory

mechanisms arbitrary, capricious, and not based upon the best available scientific information in violation of the ESA, see 16 U.S.C. § 1533(a), (b), and the APA, 5 U.S.C. § 706(2).

### THIRD CAUSE OF ACTION

**(Violation of ESA § 4(a), (b): Arbitrary Assessment of Genetic Connectivity)**

75.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 74.

76.     In order to delist the northern Rocky Mountain gray wolf DPS, FWS was required to find that the population is not threatened or endangered by "natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1)(E). FWS adheres to a recovery goal that calls for "[t]hirty or more breeding pairs comprising some 300+ wolves in a metapopulation … with genetic exchange between subpopulations." See 74 Fed. Reg. at 15,134. FWS arbitrarily concluded that northern Rockies gray wolves have met that recovery goal, and thus are not threatened by a current or foreseeable lack of genetic exchange. See id. at 15,175-78.

77.     FWS arbitrarily determined that the northern Rockies wolf population currently satisfies FWS's recovery standard and exhibits adequate levels of genetic connectivity between wolves in the three core recovery areas. See id. at 15,134-35. FWS fails to cite sufficient evidence to support its reversal of the agency's prior

31

conclusion that wolves in the Greater Yellowstone Area are genetically isolated. See id. at 15,176.

78.    FWS arbitrarily determined that the northern Rockies wolf population will achieve and/or maintain adequate genetic connectivity in the foreseeable future.  See id. at 15,134-35, 15,177-78.  Because Idaho and Montana have not made enforceable commitments to manage for wolf population levels above 100-150 in each state, FWS was required to assess potential future genetic exchange based on a wolf population consisting of only 100-150 wolves in each of Idaho and Montana.  FWS's "belie[f]" that the northern Rockies wolf population will be managed for over 1,000 wolves cannot form the basis for FWS's determination that the population will not suffer from a lack of genetic connectivity in the foreseeable future.  74 Fed. Reg. at 15,133.  By failing to consider the potential for genetic connectivity in the much smaller, future wolf population, FWS omitted consideration of a critical factor in assessing whether the northern Rockies wolf population will be threatened by a lack of genetic exchange in the foreseeable future.  See 16 U.S.C. § 1533(a)(1)(E).

79.    FWS conceded that maintenance of a viable wolf population will depend "on long-term future management to … maintain genetic connectivity among population segments."  74 Fed. Reg. at 15,132.  FWS's failure to ensure that state laws are in place to ensure future population connectivity undermines its

determination that regulatory mechanisms are adequate.  <u>See</u> 16 U.S.C. §

1533(a)(1)(D).

80.    Accordingly, FWS's determination that the northern Rockies wolf

population is not threatened by current or foreseeable lack of genetic exchange and

inadequate regulatory mechanisms is arbitrary, capricious, and not based upon the

best available scientific information in violation of the ESA, 16 U.S.C. § 1533(a),

(b), and the APA, 5 U.S.C. § 706(2), and should be set aside.

## FOURTH CAUSE OF ACTION

### (Violation of ESA § 4(a), (b): Arbitrary Reliance On Non-Regulatory State Representations In Assessment Of Regulatory Mechanisms)

81.    Plaintiffs hereby reallege and incorporate Paragraphs 1 through 80.

82.    FWS arbitrarily relied on non-regulatory state representations,

including statements contained in state wolf management guidance documents, a

memorandum of understanding, and other non-binding state representations in

assessing the adequacy of state regulatory mechanisms.  In particular, FWS's great

reliance upon Montana's and Idaho's unenforceable wolf management guidance

documents evinces a failure to distinguish between regulatory and non-regulatory

mechanisms.

83.    Accordingly, FWS's assessment of regulatory mechanisms was

arbitrary, capricious, and not based upon the best available scientific information in

violation of the ESA, 16 U.S.C. § 1533(a), (b), and the APA, 5 U.S.C. § 706(2), and should be set aside.

## FIFTH CAUSE OF ACTION

### (Violation of ESA § 4(a): Failure to Consider Loss of Historic Range)

84.    Plaintiffs hereby reallege and incorporate Paragraphs 1 through 83.

85.    When determining whether to list a species under the ESA, including a Distinct Population Segment, the ESA requires the Secretary to determine whether a species is imperiled due to "destruction, modification, or curtailment of its habitat or range."  16 U.S.C. § 1533(a)(1)(A).  The purpose behind this provision is to identify species that are likely to become extinct because of dramatic declines in their distribution across their historic range, as well as to fulfill the Act's mandate to conserve the ecosystems upon which threatened and endangered species depend.

86.    In designating the northern Rockies DPS and deciding to delist much of the DPS, FWS failed to consider the loss of historic gray wolf habitat and range, either within the lower-48 states or within the northern Rockies DPS.  Instead, FWS relied on a much narrower analysis of the wolf's current distribution within the northern Rockies.  This approach is contrary to the ESA, which recognizes that the loss of historically occupied habitat or range—by itself—may be sufficient to warrant listing under the Act.

87.     The agency decision is thus arbitrary, capricious, and not in accordance with the ESA, and must be set aside.  See 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1533.

## SIXTH CAUSE OF ACTION

### (Violation of ESA § 4 and APA: Treatment of Lower-48 Wolves)

88.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 87.

89.     The DPS violates the ESA and the APA by arbitrarily disregarding the status of gray wolves throughout the lower-48 states—i.e., the entity listed as endangered in 1978.  See Reclassification of the Gray Wolf in the U.S. and Mexico with Determination of Critical Habitat in Michigan and Minnesota, 43 Fed. Reg. 9,607 (Mar. 9, 1978).  In its 1978 listing determination, FWS determined that "the entire species *Canis Lupis* is Endangered or Threatened to the south of Canada." Id.  The Delisting Rule arbitrarily fails to explain FWS's *de facto* determination that the lower-48 United States is no longer the appropriate measure of the gray wolf's condition.

90.     The Delisting Rule violates the ESA, 16 U.S.C. § 1533(a)-(c), to the extent that it "revise[s]" the 1978 listing of the gray wolf in the lower-48 states. See 74 Fed. Reg. at 15,144.  The ESA requires that revisions to the list of endangered and threatened species be made in accordance with ESA section 4(a), which sets forth five factors that FWS must assess in determining whether a

species is threatened or endangered, and ESA section 4(b), which requires FWS to publish proposed revisions for public comment.  See 16 U.S.C. § 1533(a)(1), (b)(5)-(6), (c)(1).  Because FWS has not evaluated the status of the gray wolf in the lower-48 states in relation to the ESA listing factors or offered an opportunity for public comment, FWS's purported revision to the lower-48 gray wolf's listing status was arbitrary.

91.     Likewise, the Delisting Rule violates the ESA, 16 U.S.C. § 1533(a), (b), to the extent that it creates a newly-listed entity consisting of the gray wolf in the lower-48 states outside of the northern Rocky Mountain and western Great Lakes DPS areas.  See 74 Fed. Reg. at 15,144.  The ESA requires that listings of endangered and threatened species be made in accordance with ESA section 4(a), which sets forth five factors that FWS must assess in determining whether a species is threatened or endangered, and section 4(b), which requires notice to the public and opportunity for comment on the listing.  See 16 U.S.C. §§ 1533(a)(1), (b)(5)-(6), (c)(1).  Because FWS did not undertake the requisite analysis of the status of the newly-listed gray wolf in the lower-48 states and did not follow the public notice and comment procedural requirements outlined in section 4 for listing a species as endangered or threatened, FWS's listing of the gray wolf in the lower-48 states outside of the northern Rocky Mountain and western Great Lakes DPS areas was arbitrary.

92.    Because FWS arbitrarily departed from FWS's 1978 determination that gray wolves are endangered or threatened throughout a significant portion of their range in the lower-48 United States and failed to evaluate threats to wolves in this area or in the area outside the northern Rocky Mountain and western Great Lakes DPS, the Delisting Rule violates ESA section 4, 16 U.S.C. § 1533(a)-(c), and the APA, 5 U.S.C. § 706(2), and must be set aside.

## SEVENTH CAUSE OF ACTION

### (Violation of ESA § 4: DPS Designation)

93.    Plaintiffs hereby reallege and incorporate Paragraphs 1 through 92.

94.    In simultaneously designating the northern Rockies DPS and delisting a portion of that DPS, FWS has declared the DPS recovered without ever having made the prerequisite findings that the DPS is threatened or endangered, in violation of the ESA.  See 16 U.S.C. §1533(c)(2)(B); Humane Soc'y of the U.S. v. Kempthorne, 579 F. Supp. 2d 7 (D.D.C. 2008).

95.    Because FWS failed to list the northern Rockies DPS in compliance with the ESA, 16 U.S.C. § 1533(a), FWS's decision to delist the northern Rockies DPS is arbitrary, capricious, and must be set aside.  See 16 U.S.C. § 1533(a), (c); 5 U.S.C. § 706(2).

/ / /

/ / /

## EIGHTH CAUSE OF ACTION

## (Violation of Endangered Species Act, § 2, And DPS Policy: DPS Boundaries)

96.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 95.

97.     The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  The ESA defines "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  Id. § 1532(16).

98.     The DPS Policy was developed to carry out the ESA's conservation mandate, and to this end provides that DPSs be designated "to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."  61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996).

99.     Under the DPS Policy, FWS may designate DPSs that are discrete and significant in relation to the species to which they belong.  Id.   The DPS Policy emphasizes that, "[i]t is important in light of the Act's requirement to use the best available scientific information in determining the status of species that this interpretation [of the meaning of a DPS] follows sound biological principles" and,

necessarily, "[a]ny interpretation adopted should also be aimed at carrying out the purposes of the Act." Id. at 4,722.

100.   Rather than drawing a line around a wolf population with a conservation status different from that of other populations of the species, as required under the ESA, FWS established a northern Rockies DPS that includes large expanses presently unoccupied by wolves.  The Service's action, therefore, eliminates legal and habitat protections beyond the currently occupied range, though the wolf's conservation status in those areas has not changed from when the wolf was listed as endangered.  See 43 Fed. Reg. at 9,611.

101.   By including within the northern Rockies gray wolf DPS largely unoccupied portions of Montana, Idaho, Oregon, Washington, and Utah, and then delisting that DPS, the Service has essentially created a moat around existing wolf populations in core recovery areas that will ensure that wolves do not disperse to suitable habitat outside of the DPS where the wolf is still protected as endangered. Rather than promoting the continued recovery of wolves outside the DPS, therefore, the Service's action severs crucial dispersal corridors by eliminating federal protections for dispersing wolves and leaving them subject to inadequate state mechanisms and intensive federal, state and private predator-control actions.

102.   The Service's decision to eliminate crucial protections for wolves over an arbitrarily large northern Rockies gray wolf DPS violates the Service's

obligation to conserve endangered and threatened species and the ecosystems on which they depend, see 16 U.S.C. § 1531(b); 61 Fed. Reg. at 4,725, in violation of the APA, 5 U.S.C. § 706(2), and must be set aside.

## TENTH CAUSE OF ACTION

### (Violation of ESA § 10(j): Designating Wyoming Wolves As "Non-Essential, Experimental" Population)

103.   Plaintiffs hereby reallege and incorporate Paragraphs 1 through 102.

104.   In designating Wyoming wolves an "experimental" population, the Delisting Rule violates ESA section 10(j), 16 U.S.C. § 1539(j).  See 74 Fed. Reg. at 15,184, 15,187.  Wyoming wolves do not qualify for "experimental" status because they are not "wholly separate geographically" from non-Wyoming wolves in the northern Rocky Mountain wolf DPS.  16 U.S.C. § 1539(j)(1).

105.   Because Wyoming wolves cannot lawfully be designated "experimental" pursuant to ESA section 10(j), 16 U.S.C. § 1539(j), the Delisting Rule violates the ESA and the APA, 5 U.S.C. § 706(2), and should be set aside.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that FWS has violated the ESA and its implementing regulations in designating the northern Rockies gray wolf DPS;

2.     Declare that FWS has violated the ESA and its implementing regulations in delisting a portion of the northern Rockies gray wolf DPS;

3.     Set aside FWS's Delisting Rule, and issue an injunction reinstating ESA protections for gray wolves in the northern Rockies;

3.     Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys fees, associated with this litigation; and

4.     Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 2nd day of June, 2009.

 _/s/ Jenny K. Harbine_____
Douglas Honnold
Timothy J. Preso
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695
dhonnold@earthjustice.org
tpreso@earthjustice.org
jharbine@earthjustice.org

*Attorneys for Plaintiffs*