Douglas L. Honnold
Timothy J. Preso
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
dhonnold@earthjustice.org
tpreso@earthjustice.org
jharbine@earthjustice.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE, et al., | ) |
| | ) Case No.  CV-09-77-M-DWM |
| Plaintiffs, | ) Case No.  CV-09-82-M-DWM |
| | ) (Consolidated) |
| vs. | ) |
| | ) |
| KEN SALAZAR, et al., | ) |
| | ) **MEMORANDUM IN SUPPORT OF** |
| Defendants. | ) **PLAINTIFFS DEFENDERS OF** |
| | ) **WILDLIFE ET AL.'S  MOTION** |
| | ) **FOR PRELIMINARY** |
| | ) **INJUNCTION** |
| GREATER YELLOWSTONE | ) |
| COALITION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| KEN SALAZAR, et al., | ) |
| | ) |
| Defendants. | ) |

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................4

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF
THEIR CLAIMS ............................................................................6

    A.    The ESA Does Not Permit Delisting A Portion Of A Listed
DPS........................................................................................6

        1.    The Plain Language Of The ESA Does Not Permit Partial
Delisting ..................................................................7

        2.    The Delisting Rule Conflicts With FWS's Longstanding
Interpretation Of The ESA...................................11

        3.    The Purpose Of The ESA Is Thwarted By Piecemeal
Delisting ................................................................12

    B.    FWS's Assessment Of The Significance Of The Region's
"Unsuitable" And "Unoccupied" Habitat Was Arbitrary And
Unlawful.............................................................................13

    C.    FWS Arbitrarily Determined That Wolves Are Not Threatened
By A Foreseeable Lack Of Genetic Exchange....................16

        1.    Montana And Idaho Lack Regulatory Mechanisms To
Ensure Genetic Exchange .....................................17

            a.    *State regulatory mechanisms are inadequate to
maintain a wolf population large enough to ensure
genetic exchange*.........................................18

            b.    *State regulatory mechanisms to promote wolf
dispersal are lacking* ..................................21

        2.    FWS's Claim That Past Wolf Dispersals Guarantee
Future Genetic Exchange Is Arbitrary ...................23

        3.    FWS's Attempt To Declare Wolf Recovery Even In The
Absence of Genetic Exchange Is Unavailing ..........25

II.    A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT
       IRREPARABLE HARM ...............................................................................29

CONCLUSION ......................................................................................................32

CERTIFICATE OF COMPLIANCE .....................................................................34

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alsea Valley Alliance v. Evans,
    161 F. Supp. 2d 1154 (D. Or. 2001), appeal dismissed for lack of
    jurisdiction, 358 F.3d 1181 (9th Cir. 2004).....................................................7

Amoco Prod. Co. v. Village of Gambell,
    480 U.S. 531 (1987)...................................................................................30

Biodiversity Legal Found. v. Badgley,
    309 F.3d 1166 (9th Cir. 2002) ....................................................................5

Chevron U.S.A., Inc. v. Natural Res. Def. Council,
    467 U.S. 837 (1984)....................................................................................7

Defenders of Wildlife v. Hall,
    565 F. Supp. 2d 1160 (D. Mont. 2008) ................................................ *passim*

Defenders of Wildlife v. Norton,
    258 F.3d 1136 (9th Cir. 2001) ...................................................................14

Defenders of Wildlife v. Sec'y, U.S. Dep't of Interior,
    354 F. Supp. 2d 1156 (D. Or. 2005)........................................................3, 30

Fed'n of Fly Fishers v. Daley,
    131 F. Supp. 2d 1158 (N.D. Cal. 2000).......................................................28

Fund for Animals v. Clark,
    27 F. Supp. 2d 8 (D.D.C. 1998)..................................................................32

Fund for Animals v. Espy,
    814 F. Supp. 142 (D.D.C. 1993)..................................................................32

Greater  Yellowstone Coal. v. Flowers,
    321 F.3d 1250 (10th Cir. 2003) ..................................................................30

Humane Soc'y of the U.S. v. Kempthorne,
    579 F. Supp. 2d 7 (D.D.C. 2008)..................................................................4

Humane Soc'y of U.S. v. Kempthorne,
    481 F. Supp. 2d 53 (D.D.C. 2006), vacated as moot, 527 F.3d 181
    (2008)..............................................................................................30

Idaho Sporting Congress, Inc. v. Alexander,
    222 F.3d 562 (9th Cir. 2000) ........................................................30

Lolli v. County of Orange,
    351 F.3d 410 (9th Cir. 2003) ........................................................30

Marbled Murrelet v. Babbitt,
    83 F.3d 1068 (9th Cir. 1996) ..........................................................5

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,
    422 F.3d 782 (9th Cir. 2005) ..........................................................5

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,
    524 F.3d 917 (9th Cir. 2008) ........................................................11

Nat'l Wildlife Fed'n  v. Norton,
    386 F. Supp. 2d 553 (D. Vt. 2005) ...............................................3, 7

Nat'l Ass'n of Home Builders v. Norton,
    340 F.3d 835 (9th Cir. 2003) ........................................................10

Or. Natural Res. Council v. Daley,
    6 F. Supp. 2d 1139 (D. Or. 1998).............................................20, 22

Sierra Club v. Marsh,
    816 F.2d 1376 (9th Cir. 1987) ........................................................5

State Farm Mut. Auto Ins. Co. v. Motor Vehicle Mfrs. Ass'n,
    463 U.S. 29 (1983)...............................................................16, 25

Trout Unlimited v. Lohn,
    559 F.3d 946 (9th Cir. 2009) ........................................................28

Winter v. Natural Res. Def. Council, Inc.,
    -- U.S. --, 129 S. Ct. 365 (2008) ....................................................5

## DOCKETED CASES

Defenders of Wildlife v. Hall,
      Case No. 08-cv-00056-DWM........................................................................27


## STATUTES AND LEGISLATIVE MATERIALS

16 U.S.C. § 1531(b) ..............................................................................12, 28
      § 1531(c)(1) ............................................................................................4
      § 1532(6) .........................................................................................7-8, 14
      § 1532(16) .......................................................................................7, 10
      § 1532(20) ...........................................................................................14
      § 1533(a)(1) .....................................................................................7, 9
      § 1533(a)(1)(A) .................................................................................14
      § 1533(a)(1)(D) ...........................................................14, 17, 21, 23
      § 1533(a)(1)(E) .................................................................................14
      § 1533(b)(1)(A) ..........................................................................15-16, 25
      § 1533(c)(1) ..........................................................................................9
      § 1533(f) .................................................................................................4
      § 1536(a)(2) .......................................................................................8, 9
      § 1538(a)(1) ...........................................................................................8
      § 1539(a)(2)(B)(iv) ...........................................................................28

59 Fed. Reg. 34,273 (July 1, 1994)...................................................28

61 Fed. Reg. 4,722 (Feb. 7, 1996) ....................................................10

68 Fed. Reg. 15,804 (Apr. 1, 2003) ..................................................11

70 Fed. Reg. 1,286 (Jan. 6, 2005) .....................................................11

72 Fed. Reg. 6,106 (Feb. 8, 2007) ....................................................26

73 Fed. Reg. 63,926 (Oct. 28, 2008)....................................................2

73 Fed. Reg. 10,514 (Feb. 27, 2008) ................................................27

74 Fed. Reg. 15,123 (April 2, 2009) .............................................................. *passim*

**STATE STATUTES**

Mont. Code Ann. § 75-1-102 .....................................................................19

Admin. R. Mont. 12.9.1301 .....................................................................18

Admin. R. Mont. 32.2.238(4) ...................................................................19

## INTRODUCTION

Plaintiffs Defenders of Wildlife <u>et al.</u> seek a preliminary injunction to reinstate Endangered Species Act ("ESA") protections for gray wolves to prevent the intentional and unnecessary killing of 330 wolves that is scheduled to begin this fall.  Idaho has authorized a wolf hunt beginning September 1, 2009; Montana's wolf hunt commences September 15.  Idaho has authorized the killing of 255 wolves—30 percent of the state's most recently reported wolf  population estimate—via hunting and will issue an unlimited number of hunting tags to try to ensure that quota is filled.  The hunt threatens to virtually eliminate wolves from key connecting corridors between isolated subpopulations.  This extraordinarily high level of killing will fracture the northern Rocky Mountain gray wolf "metapopulation," greatly hindering wolf dispersal and, with it, the possibility of real wolf recovery.  Indeed, the best available science demonstrates that the region's wolf population, while rebounding, has not yet achieved recovery.  Reducing the population by such a significant amount will ensure that such recovery remains elusive.

This case follows directly from this Court's preliminary injunction ruling in <u>Defenders of Wildlife v. Hall</u>, 565 F. Supp. 2d 1160 (D. Mont. 2008).  There, this Court held that Plaintiffs were likely to succeed on the merits of their challenge to the U.S. Fish and Wildlife Service's ("FWS") 2008 rule designating a northern

Rocky Mountain distinct population segment ("DPS") of gray wolves and removing it from the federal endangered species list.  Only two weeks after this Court vacated FWS's 2008 northern Rockies wolf delisting regulation, FWS renewed its effort to delist wolves by reopening the comment period on the same invalidated rule.  See 73 Fed. Reg. 63,926 (Oct. 28, 2008).  The new Delisting Rule was finalized in April.  See 74 Fed. Reg. 15,123 (April 2, 2009) ("Delisting Rule"), and once again the wolf is subject to state management that threatens the species' survival.

The 2009 Delisting Rule answered this Court's ruling with legal contortions rather than new conservation measures to improve the wolf population's chances for recovery.  The Court held that delisting "appear[ed] to be arbitrary and capricious" because Wyoming's wolf management laws would have left "the continued existence of the wolf in Wyoming and outside of the National Park Units … in serious jeopardy."  Defenders, 565 F. Supp. 2d. at 1175.  In its haste to delist notwithstanding this finding, FWS simply carved out the Wyoming portion of the DPS and delisted the remainder.  In so doing, FWS violated the ESA's fundamental requirement to list or delist entire "species"—meaning species, subspecies, or DPSs—not just certain members of species.

In its 2008 ruling, this Court also determined that FWS arbitrarily delisted wolves when the population did not meet FWS's recovery criteria requiring genetic

exchange among subpopulations and FWS did "not provide[] adequate reasons for rejecting those criteria." Id. at 1172.  Instead of responding with steps to foster genetic exchange, FWS immediately revived the delisting effort and then undertook a frenzied search for proof that genetic exchange had already occurred. The Delisting Rule claimed "new" evidence of genetic exchange in the Greater Yellowstone Area ("GYA"), but in so doing, relied on two wolves that FWS itself artificially transplanted into the area shortly after wolf reintroduction.  FWS failed to support its conclusion that this minimal level of asserted genetic exchange is not jeopardized by projected reductions in wolf population size under state management, despite this Court's admonition that "the record … demonstrates genetic exchange is not likely to occur" at this level.  Id. at 1171-72.

FWS's new Delisting Rule marks the latest chapter in the agency's checkered history of administering programs that were designed by Congress to recover this iconic species.  While FWS originally listed wolves in the entire lower-48 states, it repeatedly failed to develop a comprehensive recovery program for wolves.  Instead, FWS has tried four times to devise a plan to reduce ESA protections for scattered subpopulations of wolves that would pass legal muster; each plan has been judicially invalidated.  See Defenders of Wildlife v. Sec'y, U.S. Dep't of Interior, 354 F. Supp. 2d 1156 (D. Or. 2005); Nat'l Wildlife Fed'n v. Norton, 386 F. Supp. 2d 553 (D. Vt. 2005); Defenders, 565 F. Supp. 2d 1160;

Humane Soc'y of the U.S. v. Kempthorne, 579 F. Supp. 2d 7 (D.D.C. 2008).  In the wake of those four legal defeats, FWS developed renewed delisting proposals for wolves in the northern Rockies and the Midwest.  The effect of FWS's actions was to draw boundaries around two gray wolf populations and "declare victory" under the ESA, again foreclosing any recovery across the broader area of wolf imperilment.  See 74 Fed. Reg. at 15,143 ("We never intended, nor do we think it is realistic, to recover the species across the entire lower-48 States.").  As a result, FWS has abandoned its ESA duty to conserve and recover the gray wolf over the vast majority of its range where it is still listed as endangered.  See 16 U.S.C. §§ 1531(c)(1), 1533(f).[1]

Plaintiffs challenged the 2009 wolf delisting rule as legally invalid, arbitrary and capricious, and not based on the best available science.  See Complaint [Doc. 1].  On the basis of this flawed rule, the states of Idaho and Montana have authorized the killing of 330 wolves in the first public wolf hunts in the northern Rockies since the 1930s.  Plaintiffs seek preliminary injunctive relief restoring ESA protections for wolves and preventing the wolf hunts until Plaintiffs' claims can be resolved through motions for summary judgment.

---

[1] A struggling population of approximately 52 Mexican gray wolves occupies the southwest United States.  See http://www.fws.gov/southwest/es/mexicanwolf/pdf/MW_radiocollars.pdf.

## ARGUMENT

This Court should enjoin the challenged Delisting Rule.  Generally, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Natural Res. Def. Council, Inc., --U.S. --, 129 S.Ct. 365, 374 (2008).  However, in cases arising under the ESA, "[t]he traditional preliminary injunction analysis does not apply."  Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 422 F.3d 782, 793 (9th Cir. 2005).  In such cases, "Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests."  Id. at 794 (quotations omitted).  Accordingly, where plaintiffs show a probability of success on the merits of ESA claims, an injunction is appropriate if it "is necessary to effectuate the congressional purpose behind the statute."  Id. at 795 (citing Biodiversity Legal Found. v. Badgley, 309 F.3d 1166, 1177 (9th Cir. 2002)); see also Sierra Club v. Marsh, 816 F.2d 1376, 1384 (9th Cir. 1987) (plaintiffs are "entitled to injunctive relief if the [agency] violated a substantive or procedural provision of the ESA"); Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1073 (9th Cir. 1996).

# I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

## A.   The ESA Does Not Permit Delisting A Portion Of A Listed DPS

In a misguided attempt to evade this Court's determination that the northern Rockies wolf DPS remains endangered by Wyoming's regulatory mechanisms, FWS delisted only the Idaho and Montana portion of the northern Rockies DPS, in violation of the ESA's clear direction that such partial listings and delistings are not allowed.  Prior to the Delisting Rule, gray wolves were listed as threatened or endangered across the lower-48 states.  In the Delisting Rule, FWS simultaneously found that (1) the wolves in the northern Rockies are a distinct population segment, 74 Fed. Reg. at 15,129; (2) "the Wyoming portion of the [wolf's] range represents a significant portion of range[,]" id. at 15,184; and (3) the wolf in Wyoming "remains in danger of extinction[,]" id.  Despite these findings, FWS nonetheless "remove[d] the Act's protections throughout the [northern Rockies] DPS except for Wyoming."  Id.  Instead of identifying biologically separate (i.e., "distinct") population segments for ESA protection, FWS carved up the sole existing wolf population in the region into two parts in order to delist just one of them.  FWS's piecemeal approach to delisting violates the plain language of the statute and reverses the agency's long-standing position that partial delisting of the northern Rockies DPS is unlawful.

1.     The Plain Language Of The ESA Does Not Permit Partial Delisting

The ESA does not permit FWS to subdivide the northern Rockies DPS into a "recovered" portion and an "endangered" portion.  Instead, the ESA authorizes only the listing and delisting of "species"—defined by 16 U.S.C. § 1532(16) to include species, subspecies, and DPSs—not portions of those species.  See 16 U.S.C. § 1533(a)(1) (instructing Secretary to "determine whether any species is an endangered species or a threatened species").  All judicial authority on this point confirms this conclusion.  See Nat'l Wildlife Fed'n, 386 F. Supp. 2d at 564, n.9 ("[T]he FWS cannot exclude portions of a DPS from listing a species.  Once a DPS is formed, it is treated uniformly throughout the DPS."); Alsea Valley Alliance v. Evans, 161 F. Supp. 2d 1154, 1162 (D. Or. 2001) ("listing distinctions below that of subspecies or a DPS of a species are not allowed under the ESA"), appeal dismissed for lack of jurisdiction, 358 F.3d 1181 (9th Cir. 2004).

FWS cannot overcome the plain language of the ESA that prohibits the agency's effort to delist only some of the northern Rockies wolves.  See Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").  An "endangered species" is defined by the ESA as "any species" which has certain characteristics—"in danger of extinction" either "in all" or "throughout a

significant portion of its range[.]"  16 U.S.C. § 1532(6) (emphasis added).

Regardless of whether a "species" consists of an entire biological species,

subspecies, or DPS, it is the whole "species"—because of threats throughout all or

just a significant portion of its range—that is an "endangered species."  Id.  Upon a

finding that a species is endangered or threatened, the ESA's protections then

apply to that species.  See § 1536(a)(2) ("Each Federal agency shall… insure that

any action … is not likely to jeopardize… any endangered species…") (emphasis

added); id. § 1538(a)(1) ( take prohibition applicable "to any endangered species of

fish or wildlife") (emphasis added).  Nowhere does the statutory text support

FWS's contention that the ESA's protections may be applied only to certain

members of a species or to a certain portion of the species' range.  Where, as here,

a DPS remains endangered throughout a significant portion of its range, the ESA

directs that the DPS as a whole must be protected.

        In sidestepping this plain statutory language, FWS attempted to rely on a

2007 Department of the Interior Solicitor's opinion.  See 74 Fed. Reg. at 15,152-

53, 15,184; AR 2009-039216.  The memorandum and the Delisting Rule argue that

the procedural requirement in section 4(c)(1) to publish Federal Register notice of

the imperiled portion of a species' range provides substantive authority for FWS to

limit the ESA's protective reach to only those portions.  See 74 Fed. Reg. at

15,152; AR 2009-039230.  This interpretation is baseless.  The text of section

4(c)(1) recognizes that the determination of whether a species is a threatened or endangered species is made pursuant to section 4(a), and promulgated pursuant to section 4(b).  See 16 U.S.C. § 1533(c)(1) ("The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b)."); see also id. § 1533(a)(1) ("The Secretary shall by regulation promulgated in accordance with subsection (b) … determine whether any species is an endangered species or a threatened species.").  Once FWS makes a listing determination pursuant to these substantive authorities, ESA section 4(c)(1) requires the Secretary to publish in the Federal Register "a list of all species determined to be endangered [or threatened] species" and to indicate on that list "with respect to each such species over what portion of its range it is endangered or threatened."  Id. § 1533(c)(1).  The list of endangered and threatened species is an important record of FWS listing determinations and provides the agency with a reference for those determinations as FWS fulfills its conservation responsibilities, including its consulting obligation under ESA section 7.  See 16 U.S.C. § 1536(a)(2).  However, this bookkeeping requirement cannot by itself provide authority for geographically constraining the ESA's substantive reach.

FWS's new interpretation of its ESA listing authority is at odds with the ESA's DPS language.  Congress adopted the DPS concept in order to allow FWS

to list population segments of species, rather than entire species or subspecies.  <u>See</u> 61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996) (DPS policy justified on basis that it would permit conservation measures to focus on smaller-scale wildlife populations than the species or sub-species level).  In <u>National Association of Home Builders v. Norton</u>, 340 F.3d 835, 841 n.7 (9th Cir. 2003), the Ninth Circuit identified the DPS Policy, not the significant portion of the range language, as the source of listing flexibility under the ESA.  "The ability to designate and list DPSs allows the FWS to provide different levels of protection to different populations of the same species."  <u>Id.</u> at 842.  FWS's new interpretation of the "significant portion of its range" language would eclipse the DPS provision as the authority for such finer-scale listings.  Further, and perhaps more tellingly, FWS's new interpretation— unlike the DPS authority—allows the agency to list plants and invertebrates below the species or subspecies level, a result that was explicitly rejected by Congress when it enacted the DPS provision for vertebrates only.  <u>See</u> 16 U.S.C. § 1532(16).  FWS's interpretation of ESA section 4 contradicts both the plain language of that provision and would allow the agency to achieve a substantive result—listings of plants and invertebrates below the subspecies level—that Congress explicitly foreclosed.

2.    The Delisting Rule Conflicts With FWS's Longstanding
      Interpretation Of The ESA

FWS's decision to delist only part of the northern Rockies DPS also flies in

the face of the agency's long-standing position that partial delisting of the DPS

would violate the ESA.  In its 2003 reclassification rule, FWS affirmed that

"[d]elisting can occur only when a <u>species (or subspecies or DPS)</u> is recovered,"

and further stated that "[t]he DPS boundaries must contain the biological grouping

and <u>cannot subdivide it</u>."  <u>See</u> 68 Fed. Reg. 15,804, 15,825 (Apr. 1, 2003)

(emphases added).  In responding to comments suggesting a state-by-state delisting

approach, FWS stated: "[W]e cannot use a boundary between States to subdivide a

single biological population in an effort to artificially create a discrete population."

<u>Id.</u> at 15,821.  In 2005, when FWS promulgated new wolf management

regulations, FWS reiterated, "<u>at this time the Act does not allow wolves to be</u>

<u>delisted on a State-by-State basis</u>."  70 Fed. Reg. 1,286, 1,296 (Jan. 6, 2005)

(emphasis added).  The ESA has not been amended since that time, and FWS's

decision to adopt an approach it previously determined to be illegal is entitled to

little, if any, deference.  <u>See</u> <u>Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.</u>,

524 F.3d 917, 928 (9th Cir. 2008) ("An agency interpretation of a relevant

provision which conflicts with the agency's earlier interpretation is entitled to

considerably less deference.") (quotation omitted).

3.      <u>The Purpose Of The ESA Is Thwarted By Piecemeal Delisting</u>

FWS's attempt to remove protections from a portion of a listed DPS also frustrates the ESA's fundamental purposes—to "provide a program for the conservation of … endangered species and threatened species," and "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." <u>See</u> 16 U.S.C. § 1531(b). FWS has repeatedly noted that, because recovery of the northern Rockies DPS requires it to function as a single "metapopulation," each component is equally necessary for ensuring adequate genetic exchange. <u>See</u> 74 Fed Reg. at 15,130-35, 15,172. FWS conceded that Wyoming is a significant portion of the wolf's range where the species remains in danger of extinction. <u>See id.</u> at 15,184. Even if FWS were correct that the non-Wyoming portions of the northern Rockies DPS are less imperiled, it would violate FWS's own conclusions, as well as the ESA, to leave some portions of the northern Rockies DPS unprotected. Denied ESA protection, the Montana and Idaho portions of the DPS will suffer significantly higher mortality, and fewer wolves will be able to disperse into Wyoming. <u>See id.</u> at 15,142 ("the planned reduction in overall population numbers could reduce dispersal and connectivity among subpopulations"). Thus, even with ESA protection, the Wyoming portion of the DPS will be starved of essential genetic exchange. <u>See id</u>. at 15,131. By removing protections from most of the DPS, the Service has weakened the

Wyoming portion's chances of survival and recovery—a clear frustration of the purposes of the ESA.

### B.   FWS's Assessment Of The Significance Of The Region's "Unsuitable" And "Unoccupied" Habitat Was Arbitrary And Unlawful

As FWS itself acknowledges in the Delisting Rule, Wyoming is not the only portion of the northern Rockies in which substantial threats to the wolf remain. FWS's failure to analyze whether identified threats to wolves in "unoccupied," but nonetheless significant, portions of their northern Rockies range outside of Wyoming justified an endangerment finding renders the Delisting Rule arbitrary and contrary to the ESA.

Across Idaho, Montana, Oregon, Utah, and Washington, human activity and intolerance continue to imperil wolves in vast sections of their range, inhibiting both pack establishment and individual dispersal. <u>See, e.g.</u>, 74 Fed. Reg. at 15,127, 15,157-58 (wolves remain imperiled across most of the northern Rockies by "high densities of livestock compared to wild ungulates, chronic conflict with livestock and pets, local cultural intolerance of large predators, and wolf behavioral characteristics that make them vulnerable to human-caused mortality in open landscapes"). Rather than evaluating whether these threats are sufficient to warrant an endangerment finding, the agency sought to dismiss such "unoccupied" habitat as unimportant to the species' conservation. According to FWS, the wolf's

"unoccupied" range outside of Wyoming—including "[t]he portion of Montana east of I–15 and north of I–90; the portion of Idaho south of I–84; and the portions of Oregon, Washington, and Utah within the … DPS"—is of no significance to the northern Rockies' population as it is "largely unsuitable habitat[]" and accordingly "does not meaningfully contribute" to the conservation of the DPS.  Id. at 15,183-84.  This conclusion is both arbitrary and irreconcilable with the ESA.[2]

First, in contending that areas rendered "unsuitable" for wolves by human activity and intolerance cannot form a "significant portion" of the wolf's northern Rockies range, see id. at 15,184, FWS turned the ESA on its head.  Under the ESA, a DPS must be afforded legal protection whenever it is threatened or endangered— "throughout all or a significant portion of its range"—as a result of "the present or threatened destruction, modification, or curtailment of its habitat or range," the "inadequacy of existing regulatory mechanisms," or "other … manmade factors affecting its continued existence."  16 U.S.C. §§ 1532(6), (20); 1533(a)(1)(A), (D), (E).  FWS's habitat assessment eviscerates these provisions, declaring large portions of the wolf's range "insignificant," and thus irrelevant to the agency's endangerment analysis, as a result of the very sorts of human-caused threats to the

_____

[2] Moreover, in asserting that a portion of a species' range can be "significant" only if it is part of the species' "current range," 74 Fed. Reg. at 15,180, FWS contravened Ninth Circuit authority holding that the agency must assess the significance of "historical range" in which a species "is no longer viable but once was," Defenders of Wildlife v. Norton, 258 F.3d 1136, 1145 (9th Cir. 2001).

species that the ESA was designed to address.  See, e.g., 74 Fed. Reg. at 15,127,

15,183-84; id. at 15,180 ("[I]f the Service determines that a portion of the range is

not significant, the Service need not determine whether the species is threatened or

endangered there[.]").

Second, as FWS acknowledges in a parenthetical, the "unoccupied" lands

written off as "insignificant" by the agency do, in fact, contribute to wolf

conservation by supporting an essential "life-history" function:  dispersal.  See id.

at 15,183-84 ("[T]he area … does not contain an important concentration of

habitats necessary to carry out life-history functions (a possible exception is the

ability to traverse these areas which may play a role in the conservation of the

species).");  see also id. at 15,162 (noting that areas of "unsuitable" habitat "may

contribute to a healthy wolf population by facilitating dispersal between core

recovery areas").  Indeed, according to the habitat model at the center of FWS's

habitat analysis, the "unoccupied" region of Montana deemed insignificant by the

agency holds potential dispersal corridors and could, therefore, facilitate essential

genetic exchange in the northern Rockies DPS.  See AR 2009-38170 (Oakleaf et

al. 2006, Fig. 3) (attached as Ex. 1) (identifying dispersal corridors east of I-15 and

north of I-90); 74 Fed. Reg. at 15,157-58 (adopting Oakleaf model).  In declaring

the DPS's "unoccupied" non-Wyoming range unimportant to wolf conservation,

FWS arbitrarily disregarded this science in violation of the ESA.  See 16 U.S.C. §

1533(b)(1)(A) (ESA listing determinations must be made "solely on the basis of the best scientific … data available"); see also State Farm Mut. Auto Ins. Co. v. Motor Vehicle Mfrs. Ass'n, 463 U.S. 29, 43 (1983) (action arbitrary where agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency").[3]

Finally, FWS's assertion that "unoccupied" regions outside of Wyoming are unimportant to wolf conservation is arbitrarily at odds with the agency's determination that all of Wyoming—not just its "suitable" and "occupied" areas—constitutes a significant portion of the DPS's range.  See 74 Fed. Reg. at 15,183.

### C.   FWS Arbitrarily Determined That Wolves Are Not Threatened By A Foreseeable Lack Of Genetic Exchange

Exacerbating FWS's failure to recognize the significance of "unoccupied" habitat for wolf dispersals, FWS again cast aside concerns about the genetic future of northern Rockies wolves.  Based on a handful of wolf dispersals, FWS speculated that genetic exchange among subpopulations will be adequate in the future.  Genetic exchange is an essential component of FWS's northern Rockies

---

[3] Recognizing that the ability of the northern Rockies wolves to "traverse" the "unoccupied portions" of their range "may play a role in the conservation of the species," FWS offered an alternative rationale for their delisting:  the adequacy of state laws classifying wolves as "game."  74 Fed. Reg. at 15,184.  As FWS elsewhere acknowledges, however, dispersing wolves classified as "game" under state law can be killed by hunting and trapping. Id. at 15,147.  Rather than protecting dispersing wolves, therefore, state hunting regulations will further inhibit wolf dispersal.

gray wolf recovery goal, yet was lacking at the time of FWS's first delisting effort just one year ago.  See Defenders, 565 F. Supp. 2d. at 70-71.  "[T]he chance of future genetic exchange is lessened considerably [by delisting] because more wolves will be killed under state management plans than under the ESA.  It stands to reason that fewer wolves means less opportunity for dispersal and hence less chance for genetic exchange."  Id. at 1171.

In its 2009 Delisting Rule, FWS failed to ensure that regulatory mechanisms are in place to foster future genetic exchange, failed to meaningfully analyze the potential for genetic exchange in a much-reduced post-delisting wolf population, and failed to justify its claim that genetic exchange is not a prerequisite to recovery.

       1.    Montana And Idaho Lack Regulatory Mechanisms To Ensure Genetic Exchange

Even while acknowledging that Idaho and Montana must maintain a wolf population well above FWS's minimum recovery levels and undertake intensive management activities to ensure connectivity in the northern Rockies wolf population after delisting, FWS failed to ensure that essential regulatory mechanisms are in place to accomplish this goal.  See 74 Fed. Reg. at 15,142.  In so doing, FWS violated the ESA.  See 16 U.S.C. § 1533(a)(1)(D).

a.   *State regulatory mechanisms are inadequate to maintain a wolf population large enough to ensure genetic exchange*

FWS arbitrarily determined that the northern Rockies wolf population will achieve or maintain adequate genetic connectivity in the foreseeable future.  FWS identifies no regulatory mechanisms that will ensure necessary genetic exchange. Instead, FWS relies on Idaho and Montana's "commit[ments]" to maintain only 15 breeding pairs and 150 wolves in each state.  See 74 Fed. Reg. at 15,179; AR 2009- 037330 (Idaho Wolf Conservation and Mgmt. Plan, at 5; AR 2009- 038317 (Idaho Wolf Population Plan, at 19); Admin. R. Mont. 12.9.1301.  While FWS determined that, "[i]f the population is managed to the minimum recovery target of 150 wolves per State, we expect dispersal to noticeably decrease," FWS failed to ensure that regulatory mechanisms are in place to maintain a higher population.  74 Fed. Reg. at 15,177 (emphasis added); see also id. at 15,172 ("Managing to minimal recovery levels also increases the chances of genetic problems developing in the GYA population and would reduce the opportunities for demographic and genetic exchange in the [Wyoming] portion [of] the GYA.").  Instead, the Delisting Rule states that FWS "believe[s]" that the northern Rockies wolf population "will be managed for over 1,000 wolves"—approximately three times the population required by FWS's numeric recovery goal.  Id. at 15,133 (emphasis added); see also id. at 15,177 ("If the population is managed for over a thousand wolves, as

18

expected, we believe the impact [of state management] on dispersal and connectivity will be negligible.").

FWS's optimistic "belief" on this critical point was arbitrary and capricious because it was based on nothing more than the states' projections or aspirational representations in unenforceable guidance documents.  In the case of Idaho, FWS relies on a "population goal" in Idaho's 2007 Wolf Population Management Plan of "maintaining the population near or above the 2005 levels (approximately 520 wolves)."  Id. at 15,169.  However, this "goal" (which is limited to a "5-year post-delisting period") is not a regulatory commitment.  See AR 2009- 038315 (Idaho Wolf Population Mgmt. Plan, at 17).

Similarly, FWS referenced a "predict[ion]" in the Montana plan that state management would result in a wolf population "between 328 and 657 wolves."  74 Fed. Reg. at 15,167.  This is not a regulatory mechanism, but rather a forecast of the potential environmental effects of wolf management.  See id. (citing Montana's Final Environmental Impact Statement, at 132).  This environmental review did not, and could not, commit Montana to maintaining a minimum number of wolves above that required in state law.  See Mont. Code Ann. § 75-1-102(1) (Montana environmental review statute is "procedural" in nature); Admin. R. Mont. 32.2.238(4) (Montana's environmental review process "does not define or affect the statutory decision making authority of the agency").

The ESA does not permit FWS to rely on nothing more than faith that politically appointed commissions in Idaho and Montana will maintain a wolf population well above the inadequate level required by state laws such that the population will not suffer from a lack of essential genetic connectivity in the foreseeable future.  To the contrary, the ESA prohibits reliance on "unenforceable efforts" or efforts that are not "currently operational" in deciding that ESA safeguards are unwarranted.[4]  Or. Natural Res. Council v. Daley, 6 F. Supp. 2d 1139, 1154-55 (D. Or. 1998).

FWS's failure to require state regulatory mechanisms to maintain a sufficiently large wolf population is particularly troubling because, as this Court noted, "genetic exchange is not likely to occur with these numbers [at least 150 wolves in 15 breeding pairs]."  Defenders, 565 F. Supp. 2d. at 1171-72.  FWS acknowledges that, "[i]f the population is managed to the minimum recovery target of 150 wolves per State, dispersal would be noticeably impacted, which could

---

[4] In establishing its 2009 wolf hunting quota, Idaho's Fish and Game Commission demonstrated why FWS may not rely upon aspirational statements to declare wolf recovery:  while FWS relied on Idaho's non-regulatory representations that "all known Idaho wolf mortality, including that related to defense of property, count against the total mortality quota for that hunting unit and would be removed from the allowable hunting harvest," 74 Fed. Reg. at 15,150, on August 17, 2009, the Commission adopted a wolf mortality quota that limits only hunting mortality.  See Resolution of the Idaho Fish and Game Comm'n (Aug. 17, 2009), attached as Ex. 2.  Idaho currently has no cap on defense-of-property wolf killings or agency control actions, and no requirement to reduce hunting if those other sources of wolf mortality skyrocket.

require costly and intensive management to mitigate."  74 Fed. Reg. at 15,142; <u>see</u>

<u>also</u> <u>id.</u> at 15,172 ("Managing to minimal recovery levels … would reduce the

opportunities for demographic and genetic exchange in the WY portion [of] the

GYA.").  Given the lack of state regulatory mechanisms to ensure genetic

exchange, FWS's determination that state regulatory mechanisms are adequate was

arbitrary and capricious.  <u>See</u> 16 U.S.C. § 1533(a)(1)(D).

> b. *State regulatory mechanisms to promote wolf dispersal*
> *are lacking*

While FWS acknowledged that the northern Rockies wolf population is not

likely to establish a metapopulation dynamic absent concerted management efforts

to foster natural dispersal, <u>see</u> 74 Fed. Reg. at 15,142, again, there are no

<u>regulatory</u> mechanisms that assure adequate wolf dispersal.

Instead, FWS rested its dispersal hopes on a Memorandum of Understanding

("MOU") signed by FWS and Idaho and Montana wildlife agencies.  <u>See</u> <u>id.</u> at

15,177.  The MOU establishes no concrete management actions or thresholds, does

not alter the statutory responsibilities of state wildlife managers, and "does not

obligate any … agencies to the expenditure of funds[.]"  AR 2009-037224.  More

fundamentally, the MOU is a voluntary agreement, not a regulatory mechanism

that can justify removal of ESA protections because, "[i]f the political winds

change, … nothing would prevent [the parties] from terminating the [agreement]

and not adopting [the conservation] measures" stated therein.  <u>Or. Natural Res.</u>

<u>Council</u>, 6 F. Supp. 2d at 1158.

FWS wrongly asserted that state management will promote genetic exchange

by limiting hunter-caused mortality during periods of peak wolf dispersal.  <u>See</u> 74

Fed. Reg. at 15,176.  Without citation, the Delisting Rule stated that peak dispersal

occurs December through April.  <u>Id.</u>  However, the best available science

establishes that wolves disperse in all months, with peak dispersal occurring late

fall to early winter (October-January).  AR 2009-037656-58 (Jimenez <u>et al.</u>

2008d); AR 2009-036335 (Boyd <u>et al.</u> 2007).  Idaho's wolf season will run

September 1 through March 31 in the Lolo and Sawtooth areas, and September 15

through December 31 in the rest of the state.  <u>See</u> Ex. 3.  Montana allows wolf

hunting September 15 through November 29.  <u>See</u> Ex. 4 at 4.  With this schedule,

wolf hunting will occur—and wolves will die—during the very times that are

critical for wolf dispersal.  Further, Idaho has identified management zones in

critical dispersal areas along the Montana-Idaho border as areas where the short-

term management strategy is to <u>decrease</u> wolf presence, rather than promote

dispersal.  <u>See</u> AR 2009-041112 (map depicting management units), 2009-041190,

041197 (direction to reduce wolf population in Southern Mountains and Salmon

wildlife management units); AR 2009-38170 (Oakleaf <u>et al.</u> 2006, Fig. 3) (attached

as Ex. 1) (identifying dispersal corridors).  These actions by Idaho and Montana

only underscore the point that FWS arbitrarily failed to ensure that regulatory

mechanisms for necessary connectivity exist.[5]  See 16 U.S.C. § 1533(a)(1)(D).

2.    FWS's Claim That Past Wolf Dispersals Guarantee Future
Genetic Exchange Is Arbitrary

While FWS failed to ensure adequate regulatory mechanisms to foster wolf

dispersal, it nonetheless speculated that necessary genetic connectivity will be

achieved in the future because a handful of wolves have successfully dispersed in

the past.  See 74 Fed. Reg. at 15,175-76.  However, FWS's claim that infrequent

genetic exchange occurred within the previously protected northern Rockies wolf

population cannot support its prediction that genetic exchange will be adequate

when ESA protections are lifted.

FWS asserted that "4 radio-collared non-GYA wolves have bred and

produced offspring in the GYA in the past 12 years."  Id. at 15,176.  While the

Delisting Rule contains no citation to record evidence of these reproduction

events—which were not mentioned in the 2008 delisting rule—FWS's statement

apparently refers to two "problem wolves" that were artificially relocated to the

GYA and produced offspring, and two wolves that naturally dispersed to and bred

---

[5] In adopting wolf hunts that overlap both spatially and temporally with critical
wolf dispersal areas and timeframes, Idaho and Montana already have violated
their agreement in the MOU to "apply … careful management and regulation of
the timing and location of human-caused mortality, to ensure natural dispersal."
AR 2009-037223.

in the GYA (in 2002 and 2008).  See AR 2009-001672 (email from FWS wolf

recovery coordinator Ed Bangs).[6]

First, FWS's physical translocation of two wolves into the GYA cannot

support the agency's theory that future wolf dispersals will occur naturally and

result in adequate genetic exchange.  Second, evidence of past natural wolf

dispersals into the GYA under fundamentally different demographic and

management conditions than those that will exist under state management cannot

satisfy FWS's requirement to ensure that the northern Rockies wolves will not be

threatened by a lack of genetic exchange in the foreseeable future.  As this Court

noted, "the chance of future genetic exchange is lessened considerably [by

delisting] because more wolves will be killed under state management plans than

under the ESA."  Defenders, 565 F. Supp. 2d at 1171.  The two purported breeding

events that resulted from natural dispersals occurred when the wolf population was

protected under the ESA—before wolves were subjected to public hunting and

more liberal "control" provisions.  Even at that time, wolves dispersing between

core refugia had to cross less suitable habitat and survive greater mortality risks.

See AR 2009-004870, 2009-038171.  Now that FWS has turned wolf management

over to the states, Idaho and Montana both will allow hunting of wolves that will

---

[6]  The "problem wolves" apparently were among ten pups moved to the GYA from
northwest Montana in 1997, the others of which died.  See AR 2009-041370; 74
Fed. Reg. at 15,137.

make wolf dispersal into the GYA even less likely.  Moreover, the referenced

dispersals apparently occurred when the northern Rockies wolf population was

increasing at an annual rate of approximately 22 percent, see 74 Fed. Reg. at

15,138, not decreasing due to high rates of human-caused mortality, as FWS

concedes will occur post-delisting, see id. at 15,142.  Dispersal rates are lower in

wolf populations that suffer high mortality, but FWS failed to consider this factor.

See, e.g., AR 2009-037053 (Fuller et al. 2003) ("Human-caused mortality,

especially when heavy, reduces food competition, which in turn reduces

dispersal.").  FWS's speculation that genetic exchange will be adequate, despite

uncontroverted record evidence that wolf dispersal will become even less likely

post-delisting, is arbitrary and contrary to the best available scientific evidence.

See State Farm, 463 U.S. at 43 (agency action arbitrary where agency "offered an

explanation for its decision that runs counter to the evidence before the agency");

16 U.S.C. § 1533(b)(1)(A).

> 3.   FWS's Attempt To Declare Wolf Recovery Even In The
>      Absence of Genetic Exchange Is Unavailing

Even while FWS argued that adequate genetic exchange has occurred in the

northern Rockies wolf population, FWS again backed away from its own recovery

standard requiring it.  See 74 Fed. Reg. at 15,177 (arguing that even if genetic

exchange does not occur, the "wolf population's currently high genetic diversity

would be slightly reduced, but not to the point the GYA wolf population would be

threatened").  The Delisting Rule repackaged FWS's arguments that genetic

exchange is not an essential component of recovery despite its inclusion in FWS's

own wolf recovery standard—arguments this Court has already rejected.  Just as in

the 2008 litigation, in the Delisting Rule, FWS "provide[d] no persuasive reasons

for this change of course that were not known in 1994, when the new [wolf

recovery] criteria were established, or in 2001 and 2002, when the criteria were

reaffirmed."  Defenders, 565 F. Supp. 2d at 1170.

As this Court recognized, FWS has long maintained that genetic

connectivity is essential to wolf recovery in the northern Rockies.  See id.; see also

72 Fed. Reg. 6,106, 6,107 (Feb. 8, 2007); AR 2009-034845 (1994 FEIS, App. 9 at

42).  Nonetheless, in the Delisting Rule, the agency argued that the wolf population

is recovered even without it.  See 74 Fed. Reg. at 15,177.  FWS's contention

directly contradicts the record before the agency and the best available science.

The agency argued that "throughout the world, truly isolated wolf populations that

are far smaller and far less genetically diverse than the GYA population have

persisted for many decades and even centuries."  Id.  FWS predicted that, without

genetic exchange, wolves in the GYA will have similar genetic health to an

allegedly healthy, small, and isolated wolf population on Alaska's Kenai

Peninsula.  See id.  At the same time, FWS asserted that GYA wolves will not

suffer deleterious effects of inbreeding depression like those afflicting the wolf

population on Isle Royale National Park in Michigan.  Id. (describing "congenital malformation in the vertebrae column [that] might eventually affect its population dynamics").

However, while FWS now labels the Isle Royale population an "extreme case [that] will not occur anywhere in the [northern Rockies] DPS," id., just last year, FWS submitted a declaration to this Court citing Isle Royale as an example of a healthy, isolated wolf population whose persistence allegedly supported a finding that the northern Rockies population was recovered.  See Defenders of Wildlife v. Hall, Case No. 08-cv-00056-DWM, Doc. 37 (Mech Declaration), ¶ 14; see also Defenders, 565 F. Supp. 2d at 1171; 73 Fed. Reg. 10,514, 10,553 (Feb. 27, 2008). Because FWS has not provided, or apparently evaluated, any current information on the genetic status of Kenai wolves, FWS's assertion that Kenai wolves are a valuable indicator of northern Rockies wolves' genetic future, while Isle Royale wolves are suddenly no longer relevant, is arbitrary and capricious.  See 74 Fed. Reg. at 15,177 (citing studies of Kenai wolves from 1994 and 1997).  Moreover, FWS was well aware of the persistence of small, isolated wolf populations when it established the recovery goal requiring genetic exchange.  See Defenders, 565 F. Supp. 2d at 1171.  FWS has not provided a persuasive reason for rejecting its recovery goal on this basis now.  See id.

FWS also asserted in the Delisting Rule that "wolf recovery in the NRM never depended solely on natural dispersal" and "recovery" may be attained through human-engineered, "agency-managed genetic exchange."  74 Fed. Reg. at 15,178.  In the more colorful words of FWS's wolf recovery coordinator, "[c]onnectivity can happen through a ride in the back of a truck."  AR 2009-034902 (Morell (2008), at 892).

These statements cannot justify delisting.  First, even if it were true that perpetual human interference could provide an adequate substitute for a naturally functioning metapopulation under the ESA, no relocation program has been established or funded.  See Fed'n of Fly Fishers v. Daley, 131 F. Supp. 2d 1158, 1165 (N.D. Cal. 2000) ("Secretary may not rely on future conservation actions" in listing decisions).  Second, and more fundamentally, the "back of a truck" theory of species recovery is inconsistent with the ESA, which requires recovery in a functioning ecosystem, not artificial maintenance of a captive or heavily manipulated population.  See 16 U.S.C. § 1531(b) (purpose of ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved").  "[T]he ESA's primary goal is to preserve the ability of natural populations to survive in the wild."  Trout Unlimited v. Lohn, 559 F.3d 946, 957 (9th Cir. 2009); see also 16 U.S.C. § 1539(a)(2)(B)(iv) (before issuing incidental take permit, FWS must find "the taking will not appreciably

reduce the likelihood of the survival and <u>recovery of the species in the wild</u>")

(emphasis added); 59 Fed. Reg. 34,273, 34,274 (July 1, 1994) (agency policy is to

"[d]evelop and implement recovery plans … in a manner that restores,

reconstructs, or rehabilitates the structure, distribution, connectivity and function

upon which … listed species depend").  FWS may not declare a species

"recovered" when it requires perpetual augmentation to ensure its survival.

## II.   A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM

This Court should issue immediate injunctive relief to prevent widespread

wolf mortality in the still-recovering northern Rockies wolf population.  Idaho and

Montana wolf hunts will authorize the killing of 330 wolves.  Montana has

established a mortality quota of 75 wolves.  <u>See</u> Ex. 4 at 4. Idaho authorized the

hunting of 220 wolves in addition to a tribal hunting limit of 35 wolves.  <u>See</u> Ex. 5

(noting that the 220-wolf hunting quota excludes "tribal harvest limit" of 35

wolves).  This hunt could result in the intentional killing of 30 percent of the Idaho

wolf population based on the last official estimate.  <u>See</u> AR 2009-041091 (2008

Annual Wolf Report, Table 4b) (December 2008 Idaho estimate of 846 wolves).

This hunting mortality will be additive to agency control, wolf killing by

individuals under the states' defense-of-property laws, illegal killing, and other

sources.  These non-hunting sources accounted for 161 documented mortalities in

Montana and 153 documented mortalities in Idaho in 2008.  <u>See</u> AR 2009-040966

(Montana); AR 2009-041119 (Idaho).  Idaho estimated that this 2008 documented

mortality translated to actual mortality of 372 wolves, for an overall population

mortality rate of 37 percent.  See AR 2009-041120.  Now, public hunts threaten an

even greater level of mortality.

 "'Environmental injury, by its nature, can seldom be adequately remedied by

money damages and is often permanent or at least of long duration, i.e.,

irreparable.'"  Idaho Sporting Congress, Inc. v. Alexander, 222 F.3d 562, 569 (9th

Cir. 2000) (quoting Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545

(1987)).  In ESA cases, "harm to a small number of animals is sufficient to

demonstrate irreparable harm to an endangered, or even a threatened, species."

Humane Soc'y of U.S. v. Kempthorne, 481 F. Supp. 2d 53, 70 (D.D.C. 2006),

vacated as moot, 527 F.3d 181 (D.C. Cir. 2008).[7]

 Here, the killing of 330 wolves through public hunting constitutes

irreparable injury—to individual wolves, the northern Rockies DPS as a whole,

and members of Plaintiff organizations—warranting injunctive relief.  First, the

killing of individual wolves that have been removed unlawfully from the

endangered species list is sufficient to demonstrate irreparable harm.  See id.

(lethal take of 43 gray wolves in Wisconsin constitutes irreparable injury);

---

[7] "The reasoning of a vacated opinion may be looked to as persuasive authority if
its reasoning is unaffected by the decision to vacate."  Lolli v. County of Orange,
351 F.3d 410, 413 n.1 (9th Cir. 2003) (quotations, alteration and citation omitted).

Defenders, 354 F. Supp. 2d at 1174 ("death or injury of endangered wolves due to the [ESA section] 4(d) rules is irreparable injury"); see also Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1257-58 (10th Cir. 2003) (harm to three bald eagle nesting sites may constitute irreparable harm).  The Idaho and Montana wolf hunts will allow wolves to be killed within the heart of their core refugia in central Idaho and northwest Montana.  These wolves do not live in proximity to people or livestock, and would not be killed but for FWS's delisting decision.  As FWS acknowledged, more wolves will be killed under state management than under the ESA.  See 74 Fed. Reg. at 15,142.

Second, the wolf hunts will also irreparably harm the northern Rockies wolf population due to the loss of potential dispersers between subpopulations.  As discussed above, Idaho and Montana's wolf hunting seasons coincide with the time that wolves are most likely to travel between the northern Rockies' core recovery areas.  See section I.C.1.b., supra.  The states have not adopted regulations to limit wolf mortality in key dispersal areas.  See id.  As this Court noted, "[t]he reduction in the wolf population that will occur as a result of public wolf hunts and state depredation control laws … is more than likely to eliminate any chance for genetic exchange to occur between subpopulations." Defenders, 565 F. Supp. 2d at 1177-78.  This obstacle to genetic exchange is sufficient to demonstrate irreparable harm to the northern Rockies wolf population warranting preliminary injunctive relief.

See id. at 1178.

Third, the harm to members of plaintiff organizations stemming from wolf hunting provides an additional basis for finding that the balance of harms favors an injunction here.  Plaintiffs' members enjoy seeing and hearing wolves, and seeing signs of their presence, in the wild, including in areas targeted by Idaho and Montana for heavy hunting.  See Marvel Dec., ¶ 11; Stone Dec., ¶ 14; Garrity Dec., ¶¶ 4-5.  For example, Plaintiffs' members enjoy viewing wolves in the Sawtooth area of Idaho.  See Marvel Dec., ¶ 11; Stone Dec., ¶ 14.  Idaho has authorized killing of 55 of the Sawtooth's approximately 108 wolves, thus substantially reducing opportunities to view wolves.  See Ex. 3;  AR 2009-041117. This irreparable harm to Plaintiffs too is sufficient to warrant an immediate injunction.  See Fund for Animals v. Clark, 27 F. Supp.2d 8, 14 (D.D.C. 1998) (enjoining bison hunt on public lands; "[I]t is not unreasonable for these individuals to claim that seeing or even contemplating the type of treatment of the bison inherent in an organized hunt would cause them to suffer an aesthetic injury that is not compensable in money damages."); Fund for Animals v. Espy, 814 F. Supp. 142, 151 (D.D.C. 1993) (same).

## CONCLUSION

Because Plaintiffs are likely to prevail in their challenge to FWS's delisting decision—a decision that will cause irreparable harm to wolves and Plaintiffs'

members due to wolf hunting in Idaho and Montana—Plaintiffs respectfully

request that this Court issue a preliminary injunction reinstating essential ESA

protections for wolves.

Respectfully submitted this 20th day of August, 2009.

 /s/ Jenny K. Harbine
Douglas Honnold
Timothy J. Preso
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695
dhonnold@earthjustice.org
tpreso@earthjustice.org
jharbine@earthjustice.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I hereby certify that the foregoing brief contains 7,599 words, as determined by the word count function of Microsoft Word 2003 Professional Edition.  Plaintiffs have moved to file this brief in excess of the Court's 6,500 word limit.

Dated:  August 20, 2009                    /s/ Jenny K. Harbine
                                           Jenny K. Harbine