MICHAEL R. EITEL, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
1961 Stout Street, 8th Floor, Room 812
Denver, Colorado 80294
Tel. (303) 844-1479/ Fax (303) 844-1350
Email:  Michael.Eitel@usdoj.gov

*Additional Attorneys for Federal Defendants*
*listed on Signature Page*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al., | ) | Case No. cv-09-77-M-DWM (Lead) |
| | ) | cv-09-82-M-DWM |
| Plaintiffs, | ) | (consolidated cases) |
| v. | ) | |
| | ) | **FEDERAL DEFENDANTS'** |
| KEN SALAZAR, et al., | ) | **COMBINED CROSS-MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| Defendants. | ) | **AND OPPOSITION TO** |
| _____ | ) | **PLAINTIFFS' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| GREATER YELLOWSTONE | ) | |
| COALITION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| KEN SALAZAR, et al., | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

1

# TABLE OF CONTENTS

PAGE

INTRODUCTION ....................................................................................................... 2

STANDARD OF REVIEW ......................................................................................... 3

ARGUMENT ............................................................................................................... 3

  I.    THE NRM RULE COMPLIES WITH APPLICABLE LAW ............................ 3

      A.  FWS Permissibly Interpreted The ESA In The
           NRM Rule ......................................................................................... 3

          1.   The Plain Language Of The ESA Does Not Foreclose
               FWS's  Interpretation ......................................................... 4

          2.   FWS's Interpretation Is Reasonable .................................. 7

          3.   FWS Fully Explained The Basis And Reasons For
               Its  Interpretation ............................................................. 12

      B.  FWS Properly Revised The 1978 Gray Wolf Listing .................... 14

      C.  FWS Did Not Violate ESA Section 10(j).................................... 15

  II.  FWS'S SCIENTIFIC ANALYSIS IS SUPPORTED BY
      THE RECORD.............................................................................................. 16

      A.  FWS's Methodology For Assessing Wolf Recovery
           Is Reasoned ..................................................................................... 16

      B.  FWS's Analysis Is Not Contrary To The Western Great
           Lakes Wolf Recovery Plan............................................................. 20

      C.  The NRM DPS Is Not Threatened By Inadequate
           Genetic Diversity............................................................................. 22

      D.  FWS Appropriately Identified Wyoming As A Significant
           Portion Of The DPS's Range .......................................................... 25

      E.  FWS Properly Analyzed All Portions Of The DPS's Range ......... 27

  III.  FWS'S CONSIDERATION OF STATE REGULATORY
       MECHANISMS COMPLIES WITH THE ESA. .................................... 28

      A.  FWS Is Not Limited To Considering Only Binding And
           Enforceable Measures That Ensure  Future Recovery ................... 29

      B.  Plaintiffs' Factual Complaints With State Management Fail........ 33

      C.  FWS Reasonably Considered The Genetics Memorandum
           And Human Management Of Wolves............................................. 36

CONCLUSION............................................................................................................ 38

# TABLE OF AUTHORITIES

CASES                                                                                                 PAGE

Abebe v. Gonzales, 493 F.3d 1092, 1102 (9th Cir. 2007) ............................................. 12

Alsea Valley Alliance v. Evans, 161 F. Supp. 2d 1154, 1162 (D. Or. 2001) ................................. 9

Ass'n of Irritated Residents v. EPA, 423 F.3d 989, 997
  (9th Cir. 2005)................................................................................................. 25

Brown v. Gardner, 513 U.S. 115, 118 (1994)................................................................ 4

Center for Biological Diversity v. FWS, 402 F. Supp. 2d 1198, 1210
  (D. Or. 2005)................................................................................................. 31

Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 843 (1984) ..................... 2, 6, 7, 12

Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 809 (1989) ................................... 4

Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 679
  (D.D.C. 1997) ............................................................................................... 32

Defenders of Wildlife v. Hall, 565 F. Supp. 2d 1160, 1172-75
  (D. Mont. 2008) ......................................................................................... 27, 35

Defenders of Wildlife v. Norton, 258 F.3d 1136, 1141
  (9th Cir. 2001)............................................................................................ passim

Ecology Ctr. v. Castaneda, 574 F.3d 652, 659 (9th Cir. 2009)............................... 18, 19

FTC v. Mandel Bros., 359 U.S. 385, 389 (1959)............................................................ 5

Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993) ..................................... 13

Greater Yellowstone Coalition v. Servheen, 2009 WL 3775085,
  (D. Mont. 2009) ........................................................................................... 37

Gustafson v. Alloyd Co., 513 U.S. 561, 569, (1995)....................................................... 4

Humane Soc'y v. Kempthorne, 579 F. Supp. 2d 7
  (D.D.C. 2008) ............................................................................................... 15

INS v. Cardoza-Fonseca, 480 U.S. 421, 447 n.30 (1987)............................................ 12

Kern County Farm Bureau v. Allen, 450 F.3d 1072, 1081
  (9th Cir. 2006)............................................................................................... 23

Lands Council v. McNair, 537 F.3d 981, 991 (9th Cir. 2008)............................... 2, 3, 33

Marmolejo-Campos v. Holder, 558 F.3d 903 (9th Cir. 2009) ..................................... 12

Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989)............................... 24

McFarland v. Kempthorne, 545 F.3d 1106, 1113 (9th Cir. 2008)................................. 24

Military Toxics Project v. EPA, 146 F.3d 948, 954 (D.C. Cir. 1998) ........................... 7

Morales-Izquierdo v. Gonzales, 486 F.3d 484, 493-94
  (9th Cir. 2007)............................................................................................................ 12

National Ass'n of Home Builders v. Norton, 340 F.3d 835, 848-49
  (9th Cir. 2003)............................................................................................................. 8

National Cable & Telecomms. Ass'n v. Brand X Internet Servs.,
  545 U.S. 967, 983 (2005)................................................................... 4, 9, 11, 12

National Wildlife Fed'n v. Norton, 386 F. Supp. 2d 553, 565 (D. Vt. 2005) .............. 15

Northwest Ecosystems Alliance v. FWS, 475 F.3d 1136, 1143 (9th Cir. 2007) ........... 8

Ranchers Cattleman Action Legal Fund v. U.S. Dep't of Agric.,
  415 F.3d 1078, 1093 (9th Cir. 2005) ........................................................................ 15

Rowland v. California Men's Colony, 506 U.S. 194, 200 (1993)................................. 31

Trout Unlimited v. Lohn, 559 F.3d 946, 955 (9th Cir. 2009)....................... 8, 9, 20, 21

Tucson Herpetological Soc'y v. Salazar, 566 F.3d 870 (9th Cir. 2009) ...................... 31

United States v. Cabaccang, 332 F.3d 622, 627 (9th Cir. 2003) .................................. 6

United States v. McKittrick, 142 F.3d 1170, 1174-75 (9th Cir. 1998)........................ 16

United States v. Novak, 476 F.3d 1041, 1048 (9th Cir. 2007) ...................................... 6

United States v. Wilson, 503 U.S. 329, 336 (1992)....................................................... 8

Winter v. Natural Res. Def. Council, 129 S.Ct. 365, 381-82 (2008)........................... 38

## STATUTES

5 U.S.C. § 706...................................................................................................... 3

16 U.S.C. § 1531(a)(5)........................................................................................ 37

16 U.S.C. § 1532(6) .............................................................................................. 5

16 U.S.C. § 1532(16) .......................................................................................... 10

16 U.S.C. § 1533(a)(1)........................................................................................... 8

16 U.S.C. § 1533(a)(1)(D) ..................................................................... 27, 28, 30, 32

16 U.S.C. § 1533(b)(1)(A)................................................................................... 37

16 U.S.C. § 1533(c) ............................................................................................ 15

16 U.S.C. § 1533(c)(1) ..................................................................................... 5, 7

16 U.S.C. § 1533(g) ............................................................................................ 30

16 U.S.C. § 1535 ......................................................................................... 30, 31

16 U.S.C. § 1536(a)(2) ......................................................................................... 5

16 U.S.C. § 1539(j) ............................................................................................. 15

16 U.S.C. § 1539(j)(2)(C) ............................................................................. 16, 18

FEDERAL REGULATIONS

50 C.F.R. § 17.11(h) .......................................................................................... 16

## INTRODUCTION

Plaintiffs challenge the Fish and Wildlife Service's ("FWS") Final Rule To Identify the Northern Rocky Mountain ("NRM") Population of Gray Wolf as a Distinct Population Segment ("DPS") and To Revise the List of Endangered and Threatened Wildlife, 74 Fed. Reg. 15123 (Apr. 2, 2009) ("NRM Rule").  FWS's rule and the record demonstrate that: FWS carefully examined the Endangered Species Act ("ESA") and its purposes and intent to reasonably interpret ambiguous statutory language; FWS's scientific analysis is comprehensive and firmly grounded in the best available scientific data; the States of Idaho and Montana have done everything asked in regards to the reasonable management of gray wolves; and the States have a proven and successful record of responsibly managing gray wolves in the NRM region.  The record on these points is clear.

Accordingly, although Plaintiffs disagree with FWS's analysis and decisions, their disagreement cannot overcome the law, which holds that FWS has the discretion to reasonably interpret ambiguous statutory text, and that FWS has the discretion to resolve complex scientific issues in a listing decision made under the ESA. *See Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984); *Lands Council v. McNair*, 537 F.3d 981, 991 (9th Cir. 2008) (*en banc*) (reaffirming "well-established law concerning the deference we owe to agencies and their methodological choices").  For these reasons, Plaintiffs' challenge to the NRM Rule must fail, and Federal Defendants respectfully request that the Court grant their motion for summary judgment and dismiss Plaintiffs' claims with prejudice.[1]

---

[1] Defendants generally refer to arguments as having been raised by "Plaintiffs," even though an argument is raised by only one of the Plaintiffs.  The brief filed by Defenders of Wildlife, *et al*., (Doc. 105) is cited as "Defenders Br. at ___," and the brief filed by the Greater Yellowstone Coalition (Doc. 106) is cited as "Coalition Br. at __."  Defendants' Statement of Facts, filed herewith, is cited as "Defs' SOF ¶ __."

## STANDARD OF REVIEW

In evaluating the legal sufficiency of the NRM Rule, this Court is to apply the "arbitrary and capricious" standard of the Administrative Procedure Act, 5 U.S.C. § 706. Review is narrow and highly deferential, and a reviewing court may "set aside only agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Lands Council,* 537 F.3d at 987. Courts are not to act as scientists that "instruct[] the [agency] how to validate its hypotheses regarding wildlife viability" or how to "choose[] among scientific studies in determining" the adequacy of its final decisions and analysis. *Id*. at 988. It also is not incumbent upon the agency "to explain every possible scientific uncertainty." *Id*. Rather, a court may reverse an agency decision "only if the agency relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id*. at 987 (citation omitted).

## ARGUMENT

## I. THE NRM RULE COMPLIES WITH APPLICABLE LAW.

### A. FWS Permissibly Interpreted The ESA In The NRM Rule.

In the NRM Rule, FWS interpreted the ESA as permitting the listing of a "species," as defined in the ESA, and protecting as endangered those members in danger of extinction in a significant portion of the species' range. 74 Fed. Reg. at 15180-81; AR09_39216 (USDOI 2007); Defs' SOF ¶¶ 79-90.[2] FWS's statutory interpretation is a result of Congress' enactment of "inherently ambiguous" statutory text in the definition of "endangered species," *Defenders of Wildlife v.*

---

[2] Plaintiffs assert that FWS carved up a DPS and "listed" a portion of a DPS. This is factually incorrect, as FWS "listed" the *entire* NRM DPS. *See* 50 C.F.R. § 17.11(h) (identifying the "Wolf, gray [Northern Rocky Mountain DPS]" as the listed species).

*Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001), as well as the tension that exists between several distinct statutory provisions. The task of resolving these ambiguities, while at the same time giving effect to all statutory provisions, is exceedingly difficult and, at its core, requires the sound exercise of judgment and expertise by FWS.  FWS did precisely that here, and it is for this reason that the Court should accord substantial deference to FWS's reasonable interpretation of ambiguous statutory text.  *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005) ("the agency remains the authoritative interpreter (within the limits of reason) of such statutes").

### 1.    The Plain Language Of The ESA Does Not Foreclose FWS's Interpretation.[3]

Plaintiffs approach their challenge to FWS's statutory interpretation by arguing that the plain language of the ESA speaks to the precise issue of what can constitute an "endangered species" and what entity can be protected as such under the ESA.  In doing so, Plaintiffs focus on the definition of "species" and § 4(a)(1). *See* Defenders Br. at 4-8; Coalition Br. at 25-27.  Plaintiffs' statutory arguments are overly simplistic and do not withstand scrutiny.

Statutory provisions cannot be read in isolation.  *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context."); *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").  A court therefore must interpret the statute "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569, (1995), and "fit, if possible, all parts into an harmonious whole," *FTC v. Mandel Bros.*,

---

[3] Although Defendants focus on the definition of "endangered species," the same reasoning applies to "threatened species," as both terms contain the same "throughout all or a significant portion of its range" language.  16 U.S.C. § 1532(6), (20).

359 U.S. 385, 389 (1959) (citation omitted).  When the provisions of § 4 are reviewed together, the ESA does not unambiguously preclude FWS from identifying and protecting as endangered those members of a species that are in danger of extinction in a significant portion of the species' range.

First, § 4(c)(1) requires FWS to "specify with respect to each such species over what portion of its range it is endangered or threatened."  16 U.S.C. § 1533(c)(1). When combined with the definition of "species" as including any DPS (*id*. § 1532(16)), this provision provides that FWS shall specify over what portion of a DPS's range it is endangered. *Id*.  Further, the ESA's protections apply not to the "species," but rather to "endangered species."  16 U.S.C. §§ 1536(a)(2), 1538.  Thus, § 4(c)(1) indicates that a DPS may be found to be endangered only in a portion of its range and protected as such under the ESA, as FWS did in the NRM Rule.  *See* Defs' SOF ¶¶ 79-90.

Second, "endangered species" is defined as a species in danger of extinction "throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  The Ninth Circuit has held that "[s]tanding alone, the phrase 'in danger of extinction throughout … a significant portion of its range' is puzzling" and "inherently ambiguous."  *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001).  This provision lies at the heart of the current dispute, as the disputed issue is whether FWS appropriately identified wolves in Wyoming as an "endangered species."  In conjunction with § 4(c)(1), the inherently ambiguous definition of "endangered species" does not dictate that only an entire species may be designated as endangered under the Act.[4]

---

[4] Plaintiffs assert that Congress's definition of "species" to exclude certain categories of animals, for instance by limiting DPSs to "species of vertebrate fish or wildlife," 16 U.S.C. § 1532(16), means that FWS is precluded from determining that a species is endangered in a significant portion of its range, Defenders Br. at 5-6, 8.  Plaintiffs, however, conflate the definitions of "species" and "endangered species" and simply presume that Congress did not intend for the definition of "endangered species" to further refine FWS's inquiry. As demonstrated herein, this

Further belying Plaintiffs' "plain language" argument is the fact that their proffered interpretation does not give effect to the full definition of "endangered species." Plaintiffs contend that, once a species is found in danger of extinction "throughout … a significant portion of its range," the entire species must be designated as an endangered species. *See* Defenders Br. at 6-7. Under this reading, FWS would never need to independently assess whether a species is endangered "throughout all . . . of its range," as assessment of a species' status within a significant portion of its range would be dispositive (*i.e.*, a species not endangered within a significant portion of its range cannot, by definition, be endangered in "all" of its range). Therefore, Plaintiffs' interpretation effectively reads "or" out of the definition, a result rejected by the Ninth Circuit. *Defenders of Wildlife*, 258 F.3d at 1141-42; *see also United States v. Novak,* 476 F.3d 1041, 1048 (9th Cir. 2007) ("We avoid whenever possible statutory interpretations that result in superfluous language.").

Courts "must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *United States v. Cabaccang*, 332 F.3d 622, 627 (9th Cir. 2003) (*en banc*) (citation omitted). Plaintiffs' proffered interpretation runs afoul of this principle by disregarding § 4(c)(1), ignoring the ambiguity present in the definition of "endangered species," and reading "or" out of the definition of "endangered species." The plain language of the statute does not speak to the precise issue of what can constitute an endangered species and, as such, FWS possesses the discretion to fill the gap left by Congress in § 4. *Chevron*, 467 U.S. at 843.

//

---

presumption is not grounded in the ESA or the legislative history. *See* AR09_39216.

## 2. FWS's Interpretation Is Reasonable.

Since Congress has not directly spoken to the issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Here, FWS permissibly interpreted the ambiguous statutory text as authorizing FWS to identify as endangered those members in danger of extinction throughout a significant portion of the species' range. 74 Fed. Reg. at 15180-81; AR09_39216 (USDOI 2007).

First, FWS's interpretation gives effect to all statutory provisions. FWS's interpretation gives effect to "or" in the definition of "endangered species" by recognizing two distinct scenarios in which the statutory definition would be met. *See* AR09_39221-22 (an endangered species can be the entire species, where it is in danger of extinction throughout all of its range, or a portion of a species, where it is in danger of extinction throughout a significant portion of it range). Similarly, FWS's interpretation gives meaning to § 4(c)(1)'s requirement to identify those *portions* of a species' range where it is endangered. 16 U.S.C. § 1533(c)(1). Although Plaintiffs seek to dismiss § 4(c)(1), it must be given meaning and its inclusion into the statutory scheme cannot be ignored.

In the 1969 Endangered Species Conservation Act, Congress provided for the protection of species only when "threatened with worldwide extinction." P.L. 91-135 § 3(a) (Eitel Ex. A).[5] To implement a listing decision, Congress required the Secretary to promulgate lists that identify the species "by scientific, common, and commercial name or names." *Id.*; H.R. Rep. No. 91-382 at 6 (Eitel Ex. B at 7). Congress did not provide a geographical component to the listing obligation, because only entire species could be protected. *Id.*

---

[5] Defendants' exhibits are properly considered "apart from the record as authorities marshaled in support of a legal argument." *Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998).

In 1973, Congress significantly altered the 1969 Act by revising, among other things, the definition of "endangered species" to include species in danger of extinction "throughout all or a significant portion of its range." P.L. 93-205 §§ 3(4), 4(a) (Eitel Ex. C).   In recognition of this change, Congress altered the Secretary's listing obligation to require the identification of the species' name *and* to "specify … over what portion of its range it is endangered or threatened."  P.L. 93-205 § 4(c)(1).  When Congress alters the words of a statute, it does so with an intent to change the statute's meaning, *United States v. Wilson*, 503 U.S. 329, 336 (1992), and the insertion of a geographical component into § 4(c)(1), in conjunction with Congress's modification of the "endangered species" definition, shows that FWS's interpretation is permissible.

FWS's interpretation also does not render the DPS language in the definition of "species" superfluous.  Defenders Br. at 7-8.  The DPS and "significant portion of its range" concepts have different meaning and are not co-extensive. Identification of the "species" frames FWS's inquiry by defining the entity under consideration and by requiring FWS to consider the status of the entire entity. *See Trout Unlimited v. Lohn*, 559 F.3d 946, 955 (9th Cir. 2009) (ESA's definition of "species" relates to "the 'neutral' task of defining a species").  Once the species is identified, the inquiry turns to the distinct task of assessing whether the members of that species (such as a DPS) are in danger of extinction throughout all or a significant portion of the species' range.  16 U.S.C. § 1533(a)(1).

As such, criteria used to identify a DPS have "no bearing on whether the population is actually in danger of extinction for the purposes of" the definition of "endangered species." *Northwest Ecosystems Alliance v. FWS*, 475 F.3d 1136, 1143 (9th Cir. 2007).  Although the two concepts are similar, they are "not the same," *National Ass'n of Home Builders v. Norton*, 340 F.3d 835, 848-49 (9th Cir. 2003), and application of one concept does not render the other superfluous.

AR09_39230 n. 22.  This is reflected in the NRM Rule, where FWS appropriately defined the NRM DPS and, with the scope of its inquiry defined, analyzed whether the NRM DPS was threatened or endangered throughout "all" of its range or, if not, whether it was threatened or endangered throughout "a significant portion of its range." 74 Fed. Reg. at 15125-30, 15179-84.

FWS therefore gave effect to all statutory provisions, and Plaintiffs' reliance on cases discussing the "[t]he first step in a listing action," *i.e.*, the identification of a "species," is unavailing.  AR09_35666; *see* Defenders Br. at 6; Coalition Br. at 26 (relying on *Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154, 1162 (D. Or. 2001), and *Trout Unlimited*, 559 F.3d 946).  Those courts did not address or resolve the ambiguity in the definition of "endangered species," much less find that the plain language of the ESA directly speaks to this issue interpreted by FWS. *See Trout Unlimited*, 559 F.3d at 960 ("no party in this case claims that NMFS has listed anything but an entire ESU"); *Alsea*, 161 F. Supp. 2d at 1162 n.5 (noting the ESA does "allow[] agencies to differentiate its listing among the same species based, in part, on the degree of threat that species face in different geographical regions.").  Thus, the cases cannot undermine FWS's interpretation. *Brand X*, 545 U.S. at 982 ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.").

Moreover, Congress did not alter the prevailing regulatory framework with the 1978 amendments and the revision of the definition of "species" to include DPSs, as Plaintiffs claim.  In the 1973 ESA, "species" was defined to include certain "populations" below the species and subspecies levels.  *See* P.L. 93-205 § 3(11) (Eitel Ex. C).  Within this framework, Congress required FWS to consider whether a species, such as a population, was in danger of extinction "throughout …

9

a significant portion of its range," and Congress required FWS to specify, for instance, over what portions of a population's range it is threatened or endangered. *See* P.L. 93-205 § 4(a), (c).  The 1978 amendments did not alter this regulatory scheme, but rather altered the pre-existing "populations" language to the current DPS language.  *See* 16 U.S.C. § 1532(16).  Thus, the interplay between the definition of "species," "endangered species," and § 4(c)(1) remained unchanged between 1973 and 1978, refuting Plaintiffs' claims that the 1978 amendments significantly altered the regulatory scheme.[6]

Second, FWS's interpretation reflects Congress's intent expressed in § 4. The legislative history reveals Congress's understanding that FWS would have the flexibility and the discretion to protect members of a species before the species itself is faced with worldwide extinction.  S. Rep. No. 93-307 at 3 (Eitel Ex. D at 6) (the 1969 Act "'simply does not provide the kind of management tools needed to act early enough to save a vanishing species.'"); H.R. Rep. No. 93-412 at 1 (Eitel Ex. E at 2) (identifying "the need for greater flexibility in endangered species legislation, more closely designated to meet [the species'] needs").  In providing increased flexibility, Congress also paid careful attention to tailoring federal regulation and any preemption of efficient State programs.  S. Rep. No. 93-307 at 3 (Eitel Ex. D at 6) ("While the Federal government should protect such species where States have failed to meet minimum Federal standards, it should not pre-empt efficient programs.").

To achieve these objectives, Congress revised the definition of "endangered species" specifically to allow for the targeted protection of members of a species

---

[6] Plaintiffs err in asserting that the DPS language constitutes the sole source of FWS's listing flexibility.  Defenders Br. at 7-8. Congress provided numerous, complementary methods for FWS to tailor its listing decisions to the actual needs of the species, *see, e.g.,* 16 U.S.C. §§ 1532(6), (20), 1533(d), 1535, and neither Congress nor the courts have provided that the DPS concept constitutes the sole source of listing flexibility in the ESA. *See* AR09_39230 & n.22.

located only in, for instance, "the periphery of [the species'] range." H.R. Rep. 93-412 at 10 (Eitel Ex. E at 11) (the definition of "Endangered Species" constitutes "a significant shift in the definition in existing law" and permits the protection of "members of that species" that are "only found in this country insofar as they exist on the periphery of [the species'] range"). As Senator Tunney explained:

> Under S. 1983, however, the Secretary may list an animal as "endangered" through all or a portion of its range. An animal might be "endangered" in most States but overpopulated in some. In a State in which a species is overpopulated, the Secretary would have the discretion to list that animal as merely threatened or to remove it from the endangered species listing entirely while still providing protection in areas where it was threatened with extinction.

119 Cong. Rec. 25662, 25669 (July 24, 1973) (Eitel Ex. F at 9).

Senator Tunney's comments are echoed throughout the 1973 legislative history, *see* Eitel Ex. G, and, as recognized by Ninth Circuit precedent, should be accorded significant weight. In *Defenders of Wildlife,* 258 F.3d 1136, the court quoted Senator Tunney at length and explained: "It appears that Congress added" the significant portion of its range language "to allow the Secretary more flexibility in her approach to wildlife management," for instance by protecting species located within a portion of its range or by conferring "different degrees of protection" to a habitat in two states. *Id*. at 1144, 1146. The Court found this interpretation buttressed by FWS's historical application of the ESA. *Id*. at 1145.

Thus, the ESA, its legislative history, and Ninth Circuit precedent show that FWS's interpretation is permissible, and Plaintiffs' belief that their interpretation must control is contrary to law and should be rejected. *See Brand X*, 545 U.S. at 982 ("*Chevron* established a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." (citation omitted)).

11

### 3.    FWS Fully Explained The Basis And Reasons For Its Interpretation.

Plaintiffs argue that FWS's statutory interpretation is not entitled to *Chevron* deference because it purportedly conflicts with prior rulemakings.  Whether a current interpretation conflicts with past agency statements is not the relevant inquiry, as "[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework." *Brand X*, 545 U.S. at 981. Indeed, *Chevron* itself involved a situation where the agency revised its statutory definition, and full deference was accorded to the agency's interpretation.  *Id*. at 981-82.  As the Supreme Court explained:

> "An initial agency interpretation is not instantly carved in stone.  On the contrary, the agency … must consider varying interpretations and the wisdom of its policy on a continuing basis," for example, in response to changed factual circumstances, or a change in administrations.

*Id*. (quoting *Chevron*, 467 U.S. at 863-64) (citations omitted).

Thus, an agency "is free within the limits of reasoned interpretation to change course if it adequately justifies the change." *Brand X,* 545 U.S. at 1001. For this reason, the Ninth Circuit harmonized *INS v. Cardoza-Fonseca*, 480 U.S. 421, 447 n.30 (1987), the case relied upon by Plaintiffs, to hold that an agency's interpretation merits *Chevron* deference unless the agency "reversed course without adequate explanation." *Abebe v. Gonzales*, 493 F.3d 1092, 1102 (9th Cir. 2007).   The *en banc* Ninth Circuit further clarified that it is only in "rare instances, such as when an agency provides no explanation at all for a change in policy," where the courts will not accord deference to an agency's statutory interpretation. *Morales-Izquierdo v. Gonzales,* 486 F.3d 484, 493-94 (9th Cir. 2007) (*en banc*); *Marmolejo-Campos v. Holder*, 558 F.3d 903 (9th Cir. 2009) (*en banc*), pet. for cert. filed, No. 09-5124 (July 2, 2009).

Applying this precedent, there is no basis for withholding or diminishing the deference owed to FWS's interpretation.  FWS thoroughly explained both its

interpretation of the ESA *and* the reasons for its adoption.  *See* 74 Fed. Reg. 15180-81; AR09_39216. FWS's interpretation also does not reflect a partisan, political interpretation unadorned from the text, structure, legislative history, or purposes of the ESA, as two different Executive Administrations have adopted the interpretation, and the current Administration continues to adhere to the interpretation.  *See* 74 Fed. Reg. 56757 (Nov. 3, 2009) (proposing to identify a DPS of the Queen Charlotte goshawk as a threatened species in a portion of its range and an endangered species in a portion of its range).   Under these circumstances, Supreme Court and Ninth Circuit precedent dictate that FWS's interpretation is entitled to full *Chevron* deference, regardless of whether it may constitute a change in agency policy.

Further, Plaintiffs' factual arguments that FWS's interpretation is at odds with prior agency practice do not have merit.  The regulatory actions identified by Plaintiffs discussed the DPS provisions and not the ESA's definition of "endangered species" or FWS's full authorities under the ESA.  *See* 68 Fed. Reg. at 15821, 15826; 70 Fed. Reg. 1286, 1296 (Jan. 6, 2005).  Plaintiffs also disregard prior rulemakings that *are* consistent with FWS's interpretation, as recognized by the Ninth Circuit.  *Defenders of Wildlife*, 258 F.3d at 1145. Thus, the NRM Rule is not unique in applying differing degrees of protection to a single listed "species," as Plaintiffs assert here.

In short, FWS fully explained and articulated the reasons for its statutory interpretation adopted in the NRM Rule and, because FWS's interpretation constitutes a permissible interpretation of the ESA, its interpretation is entitled to deference and should be upheld.  *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("where the agency's interpretation of a statute is at least as plausible as competing ones, there is little, if any, reason not to defer to its construction.").

**B.    FWS Properly Revised The 1978 Gray Wolf Listing.**

Plaintiffs' contention that the NRM Rule improperly focused on the NRM population does not have merit, as FWS rationally explained why it focused on the NRM DPS. The NRM DPS "approximates the U.S. historic range of the purported NRM gray wolf subspecies" listed in 1974.  74 Fed. Reg. at 15143.    Further, recovery of the NRM wolves "has long been viewed as important to the taxon," *id*. at 15129, and FWS's long history of recovery planning has recognized the NRM DPS, consistent with the pre-1978 gray wolf subspecies listings, *id*. at 15143.  The 1978 revised listing was an effort to manage several prior listings conveniently, not an intent to abrogate distinctions between wolf populations.  Defs' SOF ¶ 13. Thus, FWS always has held that focusing on the NRM population is proper.

The NRM Rule also is not "biologically" at odds with the 1978 listing because there were over 1,000 wolves in Minnesota in 1978, as Plaintiffs assert. The 1978 listing had nothing to do with Minnesota's population numbers; rather, FWS found that the Minnesota population "represent[s] the last significant element of a species that once occupied a vastly larger range" and that "future circumstances" such as urbanization and loss of prey could threaten the wolves.  43 Fed. Reg. at 9611.  Moreover, the 1978 listing was based on 1978 data that cannot overcome FWS's decades-long scientific analysis for the NRM wolf.  *See* 74 Fed. Reg. at 15130-39; Defs' SOF ¶¶ 12-32.

Nor do Plaintiffs identify any legal basis for their assertion that FWS was required to assess the status of wolves *outside* of the NRM DPS.  FWS did not revise the listing status of wolves outside of the NRM DPS, and those wolves are and will remain protected under the ESA. "Nowhere in the ESA is the Secretary prevented from" designating and reclassifying a DPS within a broader listing merely because it would "creat[e] a 'non-DPS remnant' designation [outside of the DPS], especially when the remnant area was already listed as endangered."

14

*National Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 565 (D. Vt. 2005)).  Thus, Plaintiffs' efforts to impose additional requirements into the ESA fail.

Finally, Plaintiffs argue that "logic" dictates that FWS cannot simultaneously identify a DPS and then remove that DPS, or portions of the DPS, from the ESA's protections.  Defenders Br. at 27. The case law and the ESA belie Plaintiffs' "logic."  In *Humane Soc'y v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008), the court explained that the ESA "could be construed" as allowing actions like those taken by FWS here (*i.e.*, simultaneously identifying a DPS and revising its status under the ESA), but that the ESA is "silent or ambiguous with respect to the specific issue."  *Id*. at 19 (citation omitted).  The court remanded the rule "to permit the agency to address the ESA's ambiguity in light of its expertise, experience and insight into the ESA's objectives."  *Id*. at 15, 20-21.

FWS performed this inquiry, *see* AR09_28983-29001, and FWS adopted that interpretation in the NRM Rule, *see* 74 Fed. Reg. at 15144-45.  Plaintiffs fail to mention this case law, the statutory text directly bearing on this inquiry (16 U.S.C. § 1533(c)), or FWS's interpretation.  As such, Plaintiffs' "logic" presents no valid argument against FWS's actions.  *Ranchers Cattleman Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005) (burden in challenging agency action rests with plaintiffs).[7]

## C.    FWS Did Not Violate ESA Section 10(j).

Plaintiffs cursorily suggest that FWS violated § 10(j), 16 U.S.C. § 1539(j), because the Greater Yellowstone Area population is not protected under the ESA in Idaho and Montana.  *See* Defenders Br. at 28.  FWS, however, did not alter the experimental population designation for this population, *see* 50 C.F.R. § 17.11(h),

---

[7]  Plaintiffs elsewhere fail to present any reasoned argument for a broad claim, for instance by asserting in a footnote that FWS's statutory interpretation of "range" contradicts Ninth Circuit precedent. *See* Defenders Br. at 29 n.7.  As its placement in a footnote suggests, this issue bears no relevance here, as FWS expressly considered historical habitat and its importance to the DPS.  74 Fed. Reg. at 15145.

and the population continues to satisfy the definition of an experimental population under the ESA. *United States v. McKittrick*, 142 F.3d 1170, 1174-75 (9th Cir. 1998) (upholding FWS's definition and interpretation of "wholly separate geographically" in § 10(j), which is satisfied where populations remain separate even with documented immigration and emigration). Because wolves in Wyoming are protected under the ESA *and* continue to be part of the Greater Yellowstone Area experimental population, the protections of § 10(j) apply. 16 U.S.C. § 1539(j)(2)(C). FWS's actions comply with § 10(j) and should be upheld.

## II.   FWS'S SCIENTIFIC ANALYSIS IS SUPPORTED BY THE RECORD.

### A.   FWS's Methodology For Assessing Wolf Recovery Is Reasoned.

Plaintiffs criticize FWS's recovery goal by mischaracterizing that goal and asserting their own views on how FWS should conduct a viability analysis for the NRM wolves. For instance, Plaintiffs repeatedly characterize FWS's recovery goal as a 20-year-old standard requiring maintenance of "300 wolves." Defenders Br. at 10-14. FWS's actual recovery goal was developed *over a 20-year period*, not 20 years ago, as Plaintiffs should know. 74 Fed. Reg. at 15130-31; Defs' SOF ¶¶ 12-32. Further, FWS's actual recovery goal requires a wolf metapopulation (a population composed of partially isolated subpopulations) that never goes below ten "breeding pairs" (a pack with at least one adult male and one adult female and at least two pups on December 31) and at least 100 wolves each in Montana, Idaho, and Wyoming for at least three successive years in mid-winter. 74 Fed. Reg. at 15123. Far more than requiring "300 wolves," each specific element of this recovery goal has biological importance, and the recovery goal addresses all important life-history components of wolf population viability and persistence.

Maintenance of a metapopulation provides a population more resilient to area-specific disruptions. 74 Fed. Reg. at 15134; AR09_36980 (Fritts and Carybn (1995)); SAR09_121 (Mills 2007, p. 212-14). FWS's metapopulation requirement

recognizes that either or both human-assisted or natural connectivity and genetic exchange can occur between recovery units, thereby maintaining genetic diversity above levels that would threaten the NRM population.  74 Fed. Reg. at 15131. The breeding pair requirement provides biologically meaningful criteria, as the foundation of any viable population is successful breeding and recruitment into the population.  *Id*. at 15132; AR09_36155 (Bangs (2002)).  Assessing a population's status in winter (December 31) is conservative, as winter constitutes the low point of the wolf's annual population cycle.  74 Fed. Reg. at 15132; AR09_37042 (Fuller et al. 2003).

FWS also did not rest on its minimum recovery goal, but rather added a 50% buffer by requiring each State to maintain at least 15 breeding pairs and 150 wolves in mid-winter.  74 Fed. Reg. at 15132.  Further, a breeding pair is only one small part of a wolf population, AR09_37045 (Fuller et al. 2003), and decades of *actual data* show that the maintenance of at least 15 breeding pairs in each State will correspond to an NRM wolf population of over 600 wolves.  74 Fed. Reg. at 15132 (data since 1986 show that a breeding pair corresponds to at least 14 wolves); AR09_40937-38 (USFWS et al. 2009).  Further, FWS required the States to adhere to their stated management objectives, and State management objectives provide that the DPS will be managed for over 1,000 wolves in winter, 74 Fed. Reg. at 15140-41, 15148, 15177, 15184-85.

Accordingly, Plaintiffs' repeated focus on supposed 20-year-old, "300 wolf" standard is completely divorced from the facts of this case.  Nor does Plaintiffs' reliance on selected population viability analysis studies, or the so-called "50/500 rule," undermine FWS's methodology.  *See* Defenders Br. at 10-12.[8]  These studies expressly recognize that their modeling is "inexact" and imprecise and applies to

---

[8] *See* AR09_30680 (defining and assessing population viability analysis and minimum viable population size concepts and application to NRM wolves).

isolated populations (unlike the NRM wolves connected to over 12,000 wolves in Canada), and that there is "no 'magic number' that will ensure persistence." AR09_25833 (Reed et al. 2003); AR09_35879 (Brook et al. 2006); AR09_25798 (Traill et al. 2007). Thus, the studies are expressly intended to provide "broad guidelines" where budgetary or other constraints *preclude* "case-specific analysis." AR09_25826 (Reed et al. 2003). The "50/500" rule is no different. SAR09_139 (Mills 2007, p. 150).

Contrary to Plaintiffs' claims, these are not new concepts, and the concepts were expressly addressed by FWS. In the rule, FWS relied on actual and extensive data gathered over a 20-year period from the NRM population and wolf populations from around the world to assess the NRM's status, and with this data FWS concluded that the NRM wolves were genetically and demographically viable. 74 Fed. Reg. at 15130-39, 15176-78. FWS also fully explained its chosen methodology and why reliance on generalized minimum viable population estimates (as advocated by Plaintiffs) is not scientifically warranted. *Id*. at 15177 ("We find that actual data concerning genetic diversity in wolves and wolf population persistence is a better predictor of future outcomes than theoretical models."). FWS's choice of methodology is supported by the record, and Plaintiffs belief that theoretical studies should trump a species-specific analysis is both fatally flawed and legally irrelevant. *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 659 (9th Cir. 2009) ("Though a party may cite studies that support a conclusion different from the one the Forest Service reached, it is not our role to weigh competing scientific analyses." (citation omitted)).

Plaintiffs' reliance on the International Union for Conservation of Nature ("IUCN") listing criteria to challenge FWS's rule is likewise flawed, as those criteria were not developed to apply to local or regional populations like the NRM DPS. AR09_22473. The IUCN criteria also represent a framework for conducting

an analysis, not an actual analysis. *Id.*[9]  To the extent the IUCN criteria are instructive, it designated the gray wolf as a species of "least concern," clearly supporting FWS's findings.  AR09_5690.  Further, FWS did not rely on the IUCN listing criteria in the polar bear listing, *see* Defenders Br. at 11-12, but rather relied on evaluations by the Polar Bear Specialist Group, s*ee* 73 Fed. Reg. 28212, 28275, 28277, 28282 (May 15, 2008) (discussing the Group, its assessments, and the Union's action based on those assessments).

Plaintiffs also grossly mischaracterize the record by asserting that FWS's recovery goal was based on and improperly influenced by a single sentence in FWS's 1994 review, which stated the existence of thousands of wolves in the United States may not be feasible.  *See* Defenders Br. at 13.  Over the past 20 years, FWS repeatedly sought outside peer review by a diverse array of experts on its recovery goals, a process used to ensure that development of the recovery goal was based on scientific, not practical, considerations.  74 Fed. Reg. at 15131; AR09_36974 (Fritts and Carbyn 1995); AR09_36161-62 (Bangs 2002). The fact that a majority of the experts found FWS's criteria adequate soundly refutes Plaintiffs' claims that FWS's recovery goal is based on something other than the science.  *See* AR09_36971 (Fritts and Carbyn 1995); AR09_41876 (USFWS 1994); AR09_36155 (Bangs 2002).

Finally, Plaintiffs latch on to a few minority opinions (without disclosing the supporting opinions) to argue that their selected peer reviews are the only ones that count and that the rest of the experts in the field, and FWS, are wrong.  *See* Defenders Br. at 12-13 & n.3.  Not only is Plaintiffs' reference to their selected

---

[9]  *See also* AR09_3651 ("[A]lthough the IUCN system may be efficient at picking up different species facing diverse threats, it is not designed to be an accurate tool for measuring extinction risk, for projecting population status, or for designing population management plans.").

peer reviews misleading,[10] but their contention that only some of the peer reviews should matter is absurd.  The existence of dissenting opinion in the record shows that the matter was fully vetted and that there is not absolute scientific consensus, neither of which undermines FWS's rule.  *Trout Unlimited v. Lohn*, 559 F.3d 946, 956 (9th Cir. 2009) (lack of scientific consensus is not a basis for overturning a rule; rather, "[i]n such situations, we stay our hand").  Plaintiffs' challenge to FWS's methodology for assessing wolf recovery fails.

###    B.    FWS's Analysis Is Not Contrary To The Western Great Lakes Wolf Recovery Plan.

In an effort to create an inconsistency in FWS's analysis, Plaintiffs characterize the Western Great Lakes recovery plan as requiring the maintenance of 1,240 to 1,400 wolves in Minnesota and argue that such criteria conflict with FWS's NRM recovery goal.  Defenders Br. at 14-16.  The Western Great Lakes and NRM recovery goals are consistent, and FWS never required the maintenance of 1,240 to 1,400 wolves in the Western Great Lakes region as a pre-condition to wolf recovery.

In the Western Great Lakes recovery plan, FWS's recovery goal required "(1) the survival of the wolf in Minnesota is assured, and (2) at least one viable population (as defined below) … outside Minnesota and Isle Royale in the contiguous 48 states of the USA is re-established."  Eitel Ex. H at 26 (Western Great Lakes Recovery Plan).  FWS explained that the second prong is satisfied with, in short, either: (1) an isolated, self-sustaining population of 200 wolves for

---

[10] For example, Plaintiffs selectively quote Dr. Allendorf as stating that "'300 wolves is too small to avoid genetic problems in the foreseeable future.'" Defenders Br. 13.  In full, Dr. Allendorf stated:  "The recovery goal of at least 300 wolves is too small to avoid genetic problems in the foreseeable future *if this population is isolated from other populations of wolves*."  AR09_22589 (emphasis added). All three NRM subpopulations are connected, and the DPS is connected to over 12,000 wolves in Canada. 74 Fed. Reg. at 15137-38.  Thus, FWS's findings are consistent with Dr. Allendorf's statement, and the other peer reviews likewise do not present a scathing review as portrayed by Plaintiffs. AR08_22498-500; AR08_22473.

five successive years; *or* (2) a self-sustaining population of 100 wolves within 100 miles of the Minnesota population. *Id.*

The Western Great Lakes recovery goal is clearly consistent with FWS's NRM recovery goal. Like the Western Great Lakes recovery goal, the NRM recovery goal requires the maintenance of multiple wolf populations. 74 Fed. Reg. at 15132-35. The Western Great Lakes recovery plan also provides that "a healthy, self sustaining wolf population should include at least 100 interbreeding wolves. This level is considered essential to maintain an acceptable level of genetic diversity." Eitel Ex. H at 28. This is also consistent with the NRM recovery goal. 74 Fed. Reg. at 15130-36. Finally, the NRM recovery goal is *more conservative* in that FWS does not permit the existence of an isolated wolf population in the NRM region, as it did in the Western Great Lakes recovery plan. *Compare* Eitel Ex. H at 26 (permitting a second, isolated population of 200 wolves); *with* 74 Fed. Reg. at 15130-33 (requiring maintenance of an NRM metapopulation). Thus, there is no basis for concluding that the NRM and Western Great Lakes recovery goals are somehow contradictory.

Nor did the Western Great Lakes recovery plan find that the Minnesota population must number in the 1000s to be considered viable. Rather, FWS explained in the Western Great Lakes recovery plan that the *target management goal* was between 1,251 and 1,400 wolves. Eitel Ex. H at 29 ("Federal and state natural resource management agencies have established population goals for specific areas to facilitate planning at the management level"). This target management goal did not constitute FWS's recovery goal. Eitel Ex. H at 29 ("These [target management] goals, in total, exceed what is required for recovery and delisting of the eastern timber wolf"). FWS appropriately tailored its analysis

to the NRM DPS, and Plaintiffs' mischaracterizations of the Western Great Lakes recovery plan fail.[11]

### C. The NRM DPS Is Not Threatened By Inadequate Genetic Diversity.

Plaintiffs argue that there is a "genetic isolation problem" in the NRM DPS, and that FWS failed to adequately evaluate this problem. This argument is baseless, as it ignores the NRM Rule and FWS's extensive and reasoned discussion of the genetic fitness of the NRM DPS and whether the three NRM subpopulations are connected and genetically viable.

It cannot be disputed rationally that the NRM DPS's genetic diversity is high in every relevant respect. 74 Fed. Reg. at 15175; AR09_41401 (vonHoldt et al. 2008) ("Measures of genetic diversity … of all three recovery areas indicate that each subpopulation has high standing levels of genetic variability throughout the study period"). The NRM wolf populations inhabit secure, protected habitats in each of the three recovery areas; wolves biologically disperse, often long distances, to find new habitat and to breed; and wolves reproduce quickly and efficiently. 74 Fed. Reg. at 15134-35. For this reason, telemetry data from *less than* 30% of the NRM DPS, obtained between 1993 and 2005, confirms that wolves have regularly dispersed between all three NRM subpopulations and with Canadian wolves. *See* 74 Fed. Reg. at 15165, 15175-76; AR09_37648-49 (Jimenez et al. 2008d). Such dispersal events occurred even when the entire NRM DPS contained only 41 wolves. *See* AR09_37658 (Jimenez et al. 2008d) (wolf dispersing into the Greater Yellowstone Area in 1992); AR09_40938 (USFWS et al. 2009) (41 wolves in the NRM region in 1992).

---

[11] Plaintiffs spend significant time arguing why the NRM region's habitat requirements, ungulate density, and other factors are similar to the Western Great Lakes region. Defenders Br. at 14-15. It is unnecessary to address these arguments, as the habitat and prey availability are obviously distinct in both regions. 74 Fed. Reg. at 15139.

In addition, genetic data from a limited sampling of NRM wolves, obtained between 1995 and 2004, prove that effective genetic exchange has occurred between all three recovery areas and with the Canadian wolf population. *See* AR09_1672; AR09_41401 (vonHoldt et al. 2008); AR09_37657 (Jimenez et al. 2008d).  The data showed that "at least one wolf naturally disperses into the Greater Yellowstone Area each year and at least 4 radio-collared non-Greater Yellowstone Area wolves have bred and produced offspring in the Greater Yellowstone Area in the past 12 years (1996–2008)."  74 Fed. Reg. at 15176. FWS determined that the known rate of dispersal and genetic exchange is sufficient to maintain the currently high levels of genetic diversity.  74 Fed. Reg. at 15176; AR09_36299 (Boitani 2003).

Thus, FWS extensively considered this issue and rationally concluded that "inadequate genetic diversity is not a wolf conservation issue in the NRM at this time."  74 Fed. Reg. at 15141.  That Plaintiffs disagree with this analysis, or believe that the data is insufficiently robust, is not a basis for concluding that FWS's analysis is arbitrary and capricious or based on anything short of the best available scientific data.  *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1081 (9th Cir. 2006) ("Without any evidence in the record that FWS ignored relevant information, we hold that FWS satisfied its duty to base its listing determinations on the best available data.").

FWS also appropriately explained that, "[u]ndoubtedly, other uncollared wolves have also naturally dispersed into and bred in the GYA."  74 Fed. Reg. at 15176.  It is well established that wolves will leave their natal packs to seek out new territory, find unrelated mates, and breed.  74 Fed. Reg. at 15177 ("Yearling and other young wolves must disperse to find unrelated mates … This social event is a basic function of wolf populations and occurs regardless of the numbers, density, or presence of other wolves.").  FWS cannot rationally ignore a basic

tenant of wolf biology to presume that no additional dispersal events or instances of genetic exchange are occurring than those documented through limited sampling and monitoring efforts. Plaintiffs' contrary argument merely seeks to preclude FWS from utilizing its expertise, a result that has no basis in law. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (agency has the "discretion to rely on the reasonable opinions of its own qualified experts").

Plaintiffs next argue that FWS "selectively" relied on Mills 2008 (AR09_38062). This is not the case. Mills 2008 unambiguously states that the "best available science would prescribe" that "one breeding immigrant individual per generation should allow for local evolutionary adaptation while minimizing negative effects of genetic drift and inbreeding depression." AR09_38070. Mills 2007 likewise finds that "one breeding individual (migrant) entering a population each generation achieves the balance between genetic tradeoffs, regardless of the population size." SAR09_111 (Mills 2007 at 193). Therefore, FWS had a rational basis to conclude the NRM subpopulations' currently high genetic variability will be sustained with the existence of one immigrant entering a population and breeding every wolf generation, and this finding is not rendered arbitrary by another standard expressed in the record, as Plaintiffs assert. *McFarland v. Kempthorne*, 545 F.3d 1106, 1113 (9th Cir. 2008) ("If an agency's determination is supportable on any rational basis, we must uphold it." (quotations omitted)).

Finally, Plaintiffs argue that the NRM subpopulations' genetic fitness may be threatened should the populations fall to 15 breeding pairs and 150 wolves in each State. *See* Coalition Br. at 21-22. FWS thoroughly considered this hypothetical situation, and its analysis easily withstands scrutiny. Wolves will disperse and seek unrelated mates, regardless of the numbers, density, or presence of other wolves, dispersing wolves are more likely to be selected as mates where a population is experiencing genetic inbreeding, and the introduction of one or two

genetic lines can substantially benefit even those populations that are experiencing low genetic diversity.  74 Fed. Reg. at 15177; AR09_38005-12 (Mech and Boitani 2003); AR09_36281-86 (Bensch et al. 2006); AR09_41375 (vonHoldt et al. 2007). Further, past known instances of wolf dispersal occurred when the NRM DPS ranged from 41 to 663 individuals and suffered high levels of annual mortality, and the Greater Yellowstone Area population will be managed for around 300 wolves. 74 Fed. Reg. at 15177.

FWS rationally concluded that, "at such levels, combined with expected levels of gene flow, [] genetic diversity will not threaten this wolf population.  The other recovery areas face even lower threat levels related to future genetic diversity."  *Id.*  As FWS further explained:

> [i]n all but the most extreme cases, small wolf populations are unlikely to be threatened solely by the loss of genetic diversity (Boitani 2003, p. 330).  In fact, none of the highly inbred recovering populations from around the world have ever gone extinct or failed to recover because of low genetic diversity (Fuller et al. 2003, p. 189–190).  It is our current professional judgment that even in the highly unlikely event that no new genes enter YNP or the GYA in the next 100 years, that wolf population's currently high genetic diversity would be slightly reduced, but not to the point the GYA wolf population would be threatened.

*Id.*  Accordingly, FWS unquestionably considered the effects on connectivity and dispersal at lower population levels, and FWS had a rational basis for its findings. The law demands no more.  *See Ass'n of Irritated Residents v. EPA,* 423 F.3d 989, 997 (9th Cir. 2005) ("There is no basis for this court to second guess" the agency's decision, "particularly given the discretion vested in the [agency].").

**D.   FWS Appropriately Identified Wyoming As A Significant Portion Of The DPS's Range.**

Plaintiffs argue that FWS unlawfully identified Wyoming as a significant portion of the DPS's range because the Greater Yellowstone Area population is not restricted to Wyoming and because FWS allegedly based its determination on

improper, political considerations.  *See* Coalition Br. at 27-28.  Neither of these claims has merit.

First, Ninth Circuit precedent refutes Plaintiffs' claim that a significant portion of a species' range must enclose a population or otherwise be defined in a pre-determined manner.  In *Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001), the Ninth Circuit held that the "Secretary necessarily has a wide degree of discretion in delineating 'a significant portion of its range,' since the term is not defined in the statute."  *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).  The court determined that a significant portion of a species' range "need not coincide with national or state political boundaries, *although they can*."  *Id*. (emphasis added).  Thus, FWS's use of state political boundaries does not violate the ESA.[12]

Further, FWS's decision to identify Wyoming as a significant portion of the DPS's range is firmly grounded in biological considerations.  The habitat in Wyoming is and has long been considered by FWS to be "critical to the establishment and maintenance of NRM wolf population."  74 Fed. Reg. at 15181. Wyoming contains: approximately 25% of the DPS's current population and 17% of the DPS's total suitable habitat; refugium (Yellowstone National Park) protected from threats, thereby providing habitat for the DPS to recover from periodic disturbances; unique ecological settings that result in unique behavior and local adoptions; and other factors that show that habitat in Wyoming meaningfully contributes to the representation, redundancy, and resiliency of the NRM DPS. *Id.* at 15181-82.  Further, FWS considered "whether the threats are geographically

---

[12]  Plaintiffs' contention that wolves outside of Wyoming "lose protection" is not persuasive.  *See* Coalition Br. at 28-29.  All aspects of the Greater Yellowstone Area population are protected, either by Federal protections in Wyoming or State protections in Idaho and Montana, and FWS rationally concluded that protections to the Greater Yellowstone Area population in Idaho and Montana will maintain the NRM wolf's biologically recovered status into the future.  *See* 74 Reg. Reg. at 15176-77.

concentrated in some way," and FWS rationally determined that Wyoming's regulatory framework concentrates the threats in Wyoming.  74 Fed. Reg. at 15180-83; *Cf. Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160, 1172-75 (D. Mont. 2008).  As the very language of the ESA dictates, regulatory mechanisms and their effects on species constitute biological, not political, considerations. 16 U.S.C. § 1533(a)(1)(D), (b)(1)(A); *see also* Defs' SOF ¶¶ 171-80.

    For these reasons, FWS's identification of Wyoming as a significant portion of the DPS's range is reasoned, complies with the law, and should be upheld.

### E.    FWS Properly Analyzed All Portions Of The DPS's Range.

This is not a case where any aspect of the NRM wolf's current or historic range was ignored or disregarded.  The NRM DPS approximates the range of the NRM subspecies first listed in 1974, *see* 74 Fed. Reg. at 15125, and FWS reviewed the quality, quantity, and distribution of all habitat relative to the biological requirements of the wolves, *id.* at 15157; AR09_38165 (Oakleaf et al. 2006); AR09_36541 (Carroll et al. 2003); AR09_36554 (Carroll et al. 2006).  FWS found that nearly all suitable NRM habitat is occupied, 74 Fed. Reg. at 15158, core habitat in each recovery area will remain intact and continue to provide secure habitat and a constant source of dispersing wolves, *id.* at 15158, and NRM habitat "will remain more than sufficient to allow adequate levels of natural connectivity into the foreseeable future," *id.* at 15161.

Further, FWS assessed unsuitable and unoccupied habitat, finding that the small and fragmented areas of unsuitable habitat outside the core recovery areas represent geographic locations where wolf breeding pairs persist only in low numbers.  74 Fed. Reg. at 15161.  While the habitat is important to facilitating dispersal of wolves, FWS also found that the threats to the wolf's habitat are unlikely to disrupt connectivity in the foreseeable future.  *Id.* at 16162.  "Although such areas may historically have contained suitable habitat, wolf pack persistence

in these areas are not important or necessary for maintaining a viable, self sustaining, and evolving representative wolf population in the NRM into the foreseeable future." *Id*. at 15161-62.

Thus, FWS analyzed all NRM habitat, including historical NRM habitat, in assessing the future conservation status of NRM wolves, and Plaintiffs' assertions that this analysis is missing rings hollow. *See* Defenders Br. at 28-29 & n.7; Coalition Br. at 29-30.   FWS also rationally determined that unoccupied and unsuitable habitat outside of the core recovery areas do have the potential to constitute a significant portion of the DPS's range, and for this reason explicitly analyzed this possibility. 74 Fed. Reg. at 15183-84; Defs' SOF ¶¶ 181-85.  Thus, FWS did not find that such habitat "cannot form a 'significant portion' of the" DPS's range, Defenders Br. at 29; rather, FWS analyzed the habitat and made a rational, fact-based decision to which Plaintiffs' disagree.

Finally, to the extent Plaintiffs are arguing that FWS must restore wolves to unoccupied, unsuitable, or historical habitat, these claims also fail.  S*ee Defenders of Wildlife*, 258 F.3d at 1143 ("[I]t simply does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing. A species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat.").  For these reasons, FWS's analysis of the DPS's habitat is reasonable, is supported by the record, and should be upheld.

## III.  FWS'S CONSIDERATION OF STATE REGULATORY MECHANISMS COMPLIES WITH THE ESA.

FWS determined that Montana's and Idaho's laws, regulations, and wolf management plans were adequate to assure that their share of the NRM wolf population would be maintained above recovery levels.  74 Fed. Reg. at 15124. Montana and Idaho have successfully managed gray wolves for years, and they

possess ample expertise and discretion to responsibly manage wolves.  *Id*. at 15151; Defs' SOF ¶¶ 99-110.  FWS found that the States have committed to managing wolves well above the minimum recovery goal and above the more conservative 15 breeding pair and 150 wolf criteria.  74 Fed. Reg. at 15167, 15169; Defs' SOF ¶¶ 99-130.  State management provides for connectivity and exchange between all three subpopulations and Canada.  *Id*. at 15135; Defs' SOF ¶¶ 155-170.  Human-caused mortality, the principal potential threat to gray wolves, is adequately regulated. *Id*. at 15167-70; Defs' SOF ¶¶ 111-154.

Considering the States' regulatory frameworks and management commitments, as well as the science and other factors, FWS rationally concluded that the NRM populations will remain viable and adequately regulated into the foreseeable future.  74 Fed. Reg. at 15174 ("As long as populations are maintained well above minimum recovery levels, wolf biology ... and the availability of large, secure blocks of suitable habitat will maintain strong source populations capable of withstanding all other foreseeable threats.").  Plaintiffs challenge FWS's analysis primarily by criticizing the scope of FWS's inquiry, for instance, by asserting that FWS is restricted to considering and relying on what Plaintiffs term "binding" and "enforceable" laws and regulations.  *See* Defenders Br. at 16-20; Coalition Br. at 12-20.  This challenge has no legal basis and must be rejected, as explained below.

### A.    FWS Is Not Limited To Considering Only Binding And Enforceable Measures That Ensure Future Recovery.

Neither the ESA nor Ninth Circuit law restricts FWS's inquiry to only binding and enforceable laws, regulations, or commitments and, as demonstrated below, cannot form the basis for invalidating FWS's NRM Rule.

First, the text and intent of the ESA confirm that FWS's inquiry is not restricted to the consideration of only binding and enforceable commitments.  FWS is required to consider "existing regulatory mechanisms," a factor that is not

limited to "laws" and "regulations."  16 U.S.C. § 1533(a)(1)(D).  Congress also specified that FWS shall consider "those efforts, if any, being made by any State … to protect such species," which specifically includes "conservation practices" and other broadly enumerated factors.  *Id*. § 1533(b)(1)(A).  As reflected in the statute, Congress intentionally structured FWS's inquiry broadly: "The section [§ 4(a)(1)] is drawn broadly to allow the Secretary to declare endangered or threatened any species for any legitimate reason."  H.R. Rep. No. 93-412 at 11 (emphasis added) (Eitel Ex. E at 12).  Thus, there is no basis in the ESA for restricting FWS's inquiry to only binding and enforceable laws or regulations.[13]

Any doubt is resolved by § 6, 16 U.S.C. § 1535.  There, Congress defined an "adequate and active program for the conservation of endangered species and threatened species," as one where, *inter alia*: (1) "authority resides in the State agency to conserve resident species;" (2) "the State agency has established acceptable conservation programs;" (3) "the State agency is authorized to conduct investigations to determine the status and requirements for survival of resident species;" (4) "the State agency is authorized to establish programs … for the conservation of resident endangered or threatened species;" and (5) "provision is made for public participation."  16 U.S.C. § 1535(c)(1)(A)-(E).

This section reflects Congress's intent that "conservation programs" and other broadly enumerated factors are a proper consideration under the ESA. Further, even in § 6, Congress structured FWS's inquiry broadly and did not specify that an adequate State conservation program must consist of certain

---

[13] Indeed, even a law or regulation adopted by a State is not "binding" and "enforceable," as a State would remain free to alter or revise the laws or regulations after delisting.  Rather than impose this requirement into § 4(a), Congress enacted § 4(g) to provide statutory mechanisms that assure a species' recovered status is maintained post-delisting.  16 U.S.C. § 1533(g); S. Rep. No. 100-240 at *10 (Eitel Ex. I at 8) ("The new subsection will facilitate progress toward recovery and de-listing … by assuring that a species will be relisted promptly if it again declines to the point where it is likely to become threatened or endangered.").

elements, such as binding and enforceable commitments. *Id.* Indeed, interpreting § 4 to impose a higher standard than § 6 imposes (for instance, by requiring binding and enforceable commitments in § 4) would lead to absurd results, as a State conservation program based on broadly enumerated "conservation programs" would be sufficient under § 6 to bring the species to a point where the ESA's protections are no longer necessary, but insufficient under § 4 to thereafter manage a recovered wildlife population. Such an interpretation must be rejected, *Rowland v. California Men's Colony*, 506 U.S. 194, 200 (1993) (noting "common mandate of statutory construction to avoid absurd results"), and § 6 confirms that FWS's inquiry in a delisting decision is not restricted to only binding and enforceable measures.

Second, Ninth Circuit precedent also holds that FWS's inquiry is not restricted to only "binding" and "enforceable" commitments. In *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870 (9th Cir. 2009), the Ninth Circuit held that FWS "did not err" in considering a conservation agreement and a management strategy, where the agency appropriately considered both its conservation benefits and its limitations. *Id.* at 881. The Ninth Circuit focused not on whether the regulatory mechanisms are binding and enforceable, but rather whether the agency considered all relevant factors and issued a rational decision. *Id.*; *accord Defenders of Wildlife*, 258 F.3d at 1136 (finding FWS's consideration of a conservation agreement incomplete and lacking, not that consideration of the agreement in the first instance was improper).[14] Accordingly, the Ninth Circuit has

---

[14] *Center for Biological Diversity v. FWS*, 402 F. Supp. 2d 1198, 1210 (D. Or. 2005), *aff'd in relevant part*, 274 Fed. Appx. 542 (9th Cir. Apr. 18, 2008) (upholding FWS's detailed review of, among other things, "state management practices" and "newer regulatory systems designed to improve conservation"), *aff'd in relevant part*, 274 Fed.Appx. 542 (9th Cir. Apr. 18, 2008); *Center for Biological Diversity v. Badgley*, cv-99-287, 2001 WL 844399, *21 (D. Or. June 28, 2001) (holding that FWS "correctly considered present federal and state management plans as relevant factors and 'existing regulatory mechanisms"), *aff'd*, 335 F.3d 1097 (9th Cir. 2003).

not adopted Plaintiffs' views that only binding and enforceable measures may be considered and relied upon in a listing or delisting decision.

Third, there is no legal requirement that existing regulatory mechanisms must insure species recovery. Rather, FWS is required to consider whether the "inadequacies" in existing regulatory mechanisms, either alone or in conjunction with the other statutory factors, warrants listing or delisting. 16 U.S.C. § 1533(a)(1)(D). In this way, the statute is explicit that "perfect" regulatory mechanisms are not required. *Center for Biological Diversity*, 402 F. Supp. 2d at 1209 ("There can be a large gap between the best regulatory mechanisms and a situation in which the regulatory mechanisms contribute to the threat or endangerment of a species."). Thus, the relevant question whether the inadequacies present preclude delisting and not, as Plaintiffs claim, whether regulatory mechanisms exist that are binding and enforceable and ensure future recovery. *See Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679 (D.D.C. 1997) ("[t]he statute contains no requirement that the evidence be conclusive" and "[a]pplication of such a stringent standard violates the plain terms of the statute").

In sum, the ESA and Ninth Circuit precedent recognize that FWS has broad discretion to consider state management commitments in a listing decision, and that FWS is not restricted to considering and relying on only binding and enforceable management prescriptions that ensure future recovery. By seeking to impose substantive requirements into the ESA, Plaintiffs' challenge must fail. S*ee Defenders Br. at 16-17; Coalition Br. at 14, 20. This is so regardless of whether district courts have in the past imposed such requirements, as the *en banc* Ninth Circuit firmly reiterated that courts are not free to impose their "own notion of which procedures are 'best' or most likely to further some vague, undefined public good" and may not "impose 'procedural requirements [not] explicitly enumerated

in the pertinent statutes.'" *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (*en banc)* (citations omitted)).

### B. Plaintiffs' Factual Complaints With State Management Fail.

Plaintiffs also level several criticisms at FWS's analysis of the State regulatory mechanisms. First, Plaintiffs argue that State management will impact wolf dispersal and connectivity, for instance by allowing hunting during "periods of peak wolf dispersal." Defenders Br. at 19; Coalition Br. at 15-18. FWS, however, did not find that dispersal will be unaffected under State management. Rather, FWS found that: adequate dispersal opportunities will exist under State management; the States' management frameworks minimize mortality during key dispersal times; the State regulatory frameworks provide other assurances that dispersal and genetic exchange will occur; and that expected levels of dispersal are adequate to maintain the NRM DPS's currently high genetic diversity. 74 Fed. Reg. at 15175-76; Defs' SOF ¶¶ 155-170. Thus, Plaintiffs' characterization of FWS's rule as finding that no impacts to dispersal will occur does not show that FWS's *actual* analysis or findings are arbitrary and capricious.

Similarly, Plaintiffs' claim that Montana has not ensured the maintenance of over 150 wolves in mid-winter is not accurate. Defenders Br. at 21. Montana provided that it would not manage wolves down to 15 breeding pairs or otherwise deliberately cap the number of wolves in the State. 74 Fed. Reg. at 15167; AR09_37859 (McDonald 2008). Rather, the 15 breeding pairs figure constitutes an adaptive-management trigger which, if met, would prompt more protective management of gray wolves. AR09_37858, 37863 (McDonald 2008). Further, actual data prove that well over 150 wolves will be present in Montana when over 15 breeding pairs are maintained. 74 Fed. Reg. at 15132; Defs' SOF ¶¶ 29, 104-08. Thus, FWS rationally determined that Montana has provided the "necessary regulatory mechanisms to assure maintenance of the State numerical and

distributional share of a recovered NRM wolf population well into the foreseeable future." *Id*. at 15168.

Likewise, Idaho's regulatory commitments provide for the maintenance of over 15 breeding pairs and 150 wolves. Although Plaintiffs rely on the 2002 Wolf Plan and its reference to "packs," Defenders Br. at 21-22, the Idaho legislature used "packs" and "breeding pairs" interchangeably, AR09_38301 (Otter 2008); *see, e.g.,* AR09_37333 ("Packs are formed when 2 wolves of opposite sex develop a pair bond, breed, and produce pups"). Further, Idaho's management plan clearly commits to managing wolves at levels far exceeding 15 breeding pairs and 150 wolves in the States. AR09_38317 (Otter 2008). FWS appropriately considered these factors, and Plaintiffs' mischaracterizations of State management commitments fail.

Plaintiffs next argue that the States may authorize lethal control actions below recovery levels. *See* Defenders Br. at 22-23. Each State, however, must ensure that recovery goals are met and retained in order to maintain management control over gray wolves. 74 Fed. Reg. at 15184-85; AR09_37343 (2002 Idaho Plan); Mont. Code § 87-1-201(9)(a). The State plans are consistent with this objective, providing increasingly more conservative management actions and expressly limiting use of lethal control measures should wolf populations fall to or near FWS's recovery criteria. AR09_37855-58 (McDonald 2008); AR09_38317-23 (Otter 2008).[15] Nor is lethal control inconsistent with wolf recovery as, even at lower levels, wolf populations rapidly increase notwithstanding relatively high

---

[15]  The 2002 Idaho Plan states: "In the unlikely event the number of packs in Idaho falls below 10, depredations will be addressed with nonlethal control *unless unusual circumstances absolutely necessitate the use of lethal control* to end the depredation problem." AR09_37330 (Idaho 2002 Wolf Plan); *see also* Mont. Admin. R. 12.9.1301(1) (expressing same level of conservative management should wolf populations decrease, despite intended State management). This is not the same as broadly authorizing lethal control below ten breeding pairs, as Plaintiffs convey. Defenders Br. at 22-23.

levels of lethal control actions. 74 Fed. Reg. at 15165 (noting about 22% annual population growth "in the face of ongoing levels of human-caused mortality"). Therefore, FWS rationally determined that, should a wolf population's size decrease, the States' adoption of adaptive management frameworks and the availability of control actions even at lower levels is compatible with wolf recovery. *Id.* at 15162, 15165.

Plaintiffs' assertion that wolves are "predatory" animals and can be treated as "pests" subject to unlimited take under State law is particularly unfounded. Defenders Br. at 23.  The regulations and statutory provisions Plaintiffs cite govern "predators," and wolves are not classified as "predators" in either Montana or Idaho.  Mont. Code §§ 87-5-131, 87-5-102(5); Idaho Admin. Code §§ 13.01.06, 13.01.08.  Nor do provisions of State law governing predators abrogate the specific State laws or regulations governing lethal take of gray wolves. *Id.*; 74 Fed. Reg. at 15148.

Finally, Plaintiffs' contention that the States' defense-of-property laws equate to the "unregulated" killing of wolves is baseless. *See* Defenders Br. at 23-24. Idaho's and Montana's defense-of-property laws carefully define the instances where such lethal measures are permissible, Idaho Code § 36-1107; Mont. Code § 87-3-130, and these laws closely resemble the federal rules governing take in defense of property while the wolves were protected under the ESA (a point which Plaintiffs do not dispute).  *See* 70 Fed. Reg. 1286, 1307 (Jan. 6, 2005) (prior federal defense of property laws); *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160, 1175-76 (D. Mont. 2008). Because the States' laws and regulations closely resemble prior federal rules, FWS has actual data on the effects of these defense-of-property laws, and FWS rationally concluded that the State laws will not significantly increase mortality in the foreseeable future. 74 Fed. Reg. at 15165; AR09_36262-63 (Bangs et al. In Press).

Plaintiffs cannot show that FWS's analysis is arbitrary and capricious, and this is confirmed by their reliance on a memorandum from a Department of the Interior Solicitor discussing defense-of-property laws relating to the grizzly bear. Defenders Br. at 24 (citing AR09_58296). There, the Solicitor found that the grizzly bears have "certain mortality limits that should not be exceeded" and that the defense-of-property law places "no upper limit on human-caused mortality." AR09_34931-32. This finding was based on examination of the grizzly bear and its recovery needs, including the fact that grizzly bears cannot tolerate the same levels of human-caused mortality as gray wolves. *See* AR09_39417-18, 39433-34 (USFWS 1993). It is not persuasive to argue that those regulatory mechanisms needed to address threats to grizzly bears are the same as are required for gray wolves, and Plaintiffs' attempts to show that FWS's rule is arbitrary and capricious fall flat.

## C.   FWS Reasonably Considered The Genetics Memorandum And Human Management Of Wolves.

There is no evidence in the record that the wolf populations will decrease to recovery goal levels or will ever be threatened with genetic problems. *See* 74 Fed. Reg. at 15166. The States nonetheless addressed a future contingency in the genetics memorandum of understanding, developed and signed by the States and the federal government, by agreeing to identify and correct, if necessary, any future genetic problems that may arise. AR09_37222 (Groen et al. 2008). This conservative action was not required under the ESA, but rather constitutes reasonable and responsible foresight by federal and State wildlife agencies. *Id.*; 74 Fed. Reg. at 15135 ("the States and Service and other federal agencies and have committed to monitor wolf genetics over time and should data suggest it is appropriate, conduct human-assisted migration management, which we believe is *extremely unlikely to be necessary.*" (emphasis added)). Plaintiffs present no legal

or factual basis supporting their claims that FWS is precluded from encouraging or considering agreements that address problems that are unlikely to arise in the future and, as such, their criticisms of FWS's consideration of the genetics memorandum of understanding fail.

Plaintiffs also err in asserting that FWS may not delist a species if State or federal management, for instance the use of proven management techniques that facilitate genetic exchange between wolf populations, may be required. *See* Coalition Br. at 22-25. Congress declared that States shall "develop and maintain conservation programs," 16 U.S.C. § 1531(a)(5), and Congress defined "conservation" broadly to encompass "all methods and procedures," including "propagation, live trapping, and transplantation," *id*. § 1532(3).[16] Thus, the ESA expresses no intent that human-assisted management of wildlife populations is improper, and neither have the courts. *See Greater Yellowstone Coalition v. Servheen*, --- F. Supp. 2d. ---, 2009 WL 3775085, *13-14 (D. Mont. 2009) (rejecting the same Plaintiffs' argument reliant on the district court's decision in *Trout Unlimited*).

Further, FWS rationally explained that human-assisted genetic exchange "is a proven technique that has created effective migrants in the NRM DPS." 74 Fed. Reg. at 15178. Past relocations in the NRM have occurred successfully, *id*., and the record supports FWS's findings that human-assisted genetic exchange is a viable, valuable management tool available to the NRM wolves, if ever needed. *See* AR09_36980 (Fritts and Carbyn 1995) ("A wolf population that was truly in danger of extinction could be artificially augmented with wolves from another area, unless introducing genetic material from another area is not desirable"); AR09_2603 (discussing pros and cons of various methods to facilitate genetic

---

[16]  Other ESA provisions reflect that human-assisted management envisioned by Congress is compatible with species' recovery. *See* 16 U.S.C. § 1533(b)(1)(A), (a)(1)(D).

exchange); AR09_5022 (considering unintended consequences relocations and noting that other methods (transfer of DNA versus relocations) may be more beneficial); AR09_5565 (explaining several ways to assist in genetic exchange other than merely relocating wolves).  Indeed, the existence of the currently robust NRM population is a product of successful relocation of Canadian wolves into the NRM region, efforts Plaintiffs themselves concede were successful.  *See* Coalition Br. at 1-2 (noting success of reintroduction (or relocation) of gray wolves in the NRM region).  Thus, Plaintiffs' criticisms of a valuable management tool for wolf conservation ring hollow.

## **CONCLUSION**

As explained above, and as is well documented in FWS's Rule, FWS fully complied with the ESA in issuing the NRM Rule.  On this basis, Plaintiffs' claims should be dismissed with prejudice, and summary judgment should be entered in Defendants' favor.  However, should the Court find that Plaintiffs are entitled to summary judgment on some or all of their claims, Federal Defendants respectfully request an opportunity for further briefing on the nature of an appropriate remedy.[17]

DATED this 23rd day of November, 2009

> WILLIAM W. MERCER
> United States Attorney for the District of Montana
> MARK SMITH, Assistant United States Attorney

---

[17] To the extent the Court denies this request, Federal Defendants hereby incorporate their evidence proffered in opposition to Plaintiffs' motion for preliminary injunctive relief, Doc. 72 (Aug. 28, 2009), and Federal Defendants assert that any request for permanent injunctive relief must be denied on the same grounds as this Court's preliminary injunction order, *i.e.*, the absence of a showing of irreparable harm to the NRM wolf population.  *See Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 381-82 (2008) (noting that the same factors apply to "the propriety of any injunctive relief, preliminary or permanent" and that its "analysis of the propriety of preliminary relief is applicable to any permanent injunction as well").

2929 3rd Ave. North, Suite 400
Billings, MT 59101
Tel: (406) 657-6101 / Fax (406) 657-6989

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

JEAN E. WILLIAMS, Section Chief

*/s/ Michael R. Eitel*
MICHAEL R. EITEL, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
1961 Stout Street, 8th Floor, Room 812
Denver, Colorado 80294
Tel. (303) 844-1479/ Fax (303) 844-1350
Email:  Michael.Eitel@usdoj.gov

OF COUNSEL:
MARGOT ZALLEN
Department of the Interior
Office of the Solicitor
Rocky Mountain Region
Lakewood, Colorado

*Attorneys for Federal Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(A) and Order, Doc. 112, the attached brief is proportionately spaced, has a typeface of 14 points, and contains 11,995 words, excluding the caption and certificates of service and compliance, as indicated by processor's word count function.

DATED this 23rd day of November, 2009.

*/s/ Michael R. Eitel*
Trial Attorney

## **CERTIFICATE OF SERVICE**

I certify that on the 23rd day of November, 2009, the Department of Justice served copies of the attached document by CM/ECF or first class mail, postage prepaid, to counsel of record.

*/s/ Michael R. Eitel*
Trial Attorney