WILLIAMS LAW FIRM, P.C.
JAMES D. JOHNSON, ESQ.
235 E. Pine, P.O. Box 9440
Missoula, Montana 59807-9440
Telephone: (406) 721-4350
Fax: (406) 721-6037
E-Mail: james@wmslaw.com

LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO
Clive J. Strong
Chief, Natural Resources Division
Steven W. Strack
*Specially Admitted*
Deputy Attorney General
700 W. State Street, 2nd Floor
P.O. Box 83720
Boise, Id 83720-0010
Telephone: (208) 334-2400
Fax: (208) 854-8072
E-Mail: Steve.Strack@ag.idaho.gov

*Attorneys for State of Idaho*

David F. Hensley
*Specially Admitted*
Thomas C. Perry
*Specially Admitted*
P.O. Box 83720
Boise, ID 83720-0181
Telephone: (208) 334-2100
Fax: (208) 334-2175
E-Mail: dhensley@gov.idaho.gov
E-Mail: tperry@osc.idaho.gov

*Attorneys for Governor C.L. "Butch" Otter*

# UNITED STATES DISTRICT COURT

## DISTRICT OF MONTANA

### MISSOULA DIVISION

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE, et al., | ) | |
| | ) | Case Nos. |
| *Plaintiffs*, | ) | CV-09-77-M-DWM |
| | ) | CV 09-82-M-DWM |
| v. | ) | (consolidated) |
| | ) | |
| KEN SALAZAR et al, | ) | **MEMORANDUM IN** |
| | ) | **SUPPORT OF IDAHO'S** |
| *Defendants*. | ) | **CROSS-MOTION FOR** |
| _____ | ) | **SUMMARY** |
| GREATER YELLOWSTONE COALITION | ) | **JUDGMENT AND IN** |
| | ) | **OPPOSITION TO** |
| *Plaintiff*, | ) | **PLAINTIFFS'** |
| | ) | **MOTIONS FOR** |
| v. | ) | **SUMMARY** |
| | ) | **JUDGMENT** |
| KEN SALAZAR, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

## INTRODUCTION

Upon designation of the northern Rocky Mountains gray wolf distinct population segment ("NRM DPS"), the United States Fish and Wildlife Service ("Service") examined comprehensively all possible threats to the NRM DPS, and determined that the only remaining threat was the inadequacy of the regulatory mechanisms of Wyoming. The Service rationally concluded that given the scope

and nature of the threat, the overall health and vitality of the DPS, and the adequacy of existing regulatory mechanisms in Idaho and Montana, continuation of ESA protections in Wyoming alone would be sufficient to ensure the continued existence of the NRM DPS.

The central question this Court must answer is whether the ESA compels the Service to paint with an overbroad brush and list the entire DPS when the only remaining threat to the DPS can be addressed by applying 16 U.S.C. § 1533(c)(1) to "specify with respect to each species over what portion of its range it is endangered or threatened."  Nothing is gained by requiring the Service to perpetuate the listing of wolves in Idaho and Montana when such portions of the DPS are not threatened by the inadequacy of Wyoming's regulatory mechanisms. Any threat posed by Wyoming's regulatory mechanisms is fully addressed by the preemption of Wyoming's regulations by continued application of the Endangered Species Act ("ESA") in the Wyoming portion of the DPS.

Anticipating such situations, Congress provided the Service the discretion to tailor ESA listings so as to allow states with adequate state regulatory mechanisms to manage healthy populations of species threatened in other portions of their range.  Herein, State of Idaho and Governor C.L. "Butch" Otter (collectively "Idaho") will demonstrate that Idaho's regulatory mechanisms will maintain a wolf population well in excess of recovery levels, will address Plaintiffs arguments

regarding the adequacy of such recovery levels, and will demonstrate Congress'

clear intent, as confirmed by the Ninth Circuit, to allow listings to be limited to

those portions of a species' range where actual threats to species exist.

 While Idaho has not attempted to address every issue raised by Plaintiffs

Defenders of Wildlife et al., and Plaintiff Greater Yellowstone Coalition

(collectively "Plaintiffs"), silence should not be construed as concession.  To avoid

unnecessary duplication, Idaho has reviewed, and herein adopts by reference, the

arguments of the United States in response to issues raised by Plaintiffs but not

explicitly addressed herein.

## ARGUMENT

**I. THE SERVICE, UPON CAREFUL REVIEW OF IDAHO'S
REGULATORY MECHANISMS, RATIONALLY CONCLUDED
THAT SUCH MECHANISMS WILL MAINTAIN THE WOLF
POPULATION WITHIN IDAHO AT LEVELS FAR IN EXCESS OF
THE RECOVERY STANDARD WHILE PROTECTING
INTERCONNECTIVITY.**

**A. Idaho's Regulatory Mechanisms are Grounded in Statutory
Provisions Authorizing such Mechanisms.**

 In making a delisting decision, the Service must determine, among other

factors, the "inadequacy of existing regulatory mechanisms."  16 U.S.C. §

1533(a)(1).  This Court has previously held that that:

> [I]n the context of a petition to remove a species from the threatened
> or endangered list, the question is whether the existing regulatory
> mechanisms, without the protections of the ESA, are adequate to

maintain a population at a recovered level sufficient to prevent the
need for future relisting.

Greater Yellowstone Coalition v. Servheen, 2009 WL 3775085 (D. Mont. 2009).

Idaho's regulatory mechanisms fulfill this standard.  Idaho's regulatory

mechanisms include statutes setting forth the framework for classification and

protection of wolves as a big game species; the 2002 Idaho Wolf Conservation and

Management Plan, as amended and approved by concurrent resolution of the Idaho

Legislature; the 2008 Idaho Wolf Population Management Plan, as adopted by the

Idaho Fish and Game Commission ("Commission"); the regulations adopted by the

Commission and published in the Idaho Administrative Code ("IDAPA"), and

Commission proclamations to establish wolf hunting seasons and mortality limits.

The Idaho Code requires the Commission to "preserve, protect and

perpetuate" all wildlife to ensure "continued supplies of such wildlife for hunting,

fishing and trapping."  Idaho Code § 36-103.  Because legislative administration of

wildlife policy is impractical, the legislature created the Commission "to

administer and carry out the policy of the state in accordance with the provisions of

the Idaho fish and game code."  Id.

The Commission is authorized to "[i]nvestigate and find facts regarding the

status of the state's wildlife populations in order to give effect to the policy of the

state."  Idaho Code § 36-104(b).  The Commission may adopt rules and

proclamations that "have full force and effect as law."  Idaho Code § 36-105.  The

Commission may classify all wildlife in the state of Idaho. Idaho Code § 36-201. Pursuant to this authority the Commission has classified gray wolves as big game animals, IDAPA 13.01.06.100.01, making them subject to the statutory obligation to ensure "continued supplies of such wildlife for hunting, fishing and trapping." Idaho Code § 36-103.

**B.    The 2002 Wolf Conservation and Management Plan.**

The regulatory framework for management of gray wolves is set forth in Idaho's two wolf management plans, the first of which was adopted by legislative resolution in 2002 as the Idaho Wolf Conservation and Management Plan (the "2002 Plan"). While Plaintiffs readily concede that the 2002 Plan is a regulatory mechanism, they assert that the Plan is inadequate because, in Plaintiffs' view, the Plan only commits Idaho to maintain 15 wolf packs.[1]

Plaintiffs misread the 2002 Plan. The 15-pack metric in the 2002 Plan is not a population objective, but rather is a fail-safe level at which additional conservation measures will be implemented in the event of a population decline.

---

[1] The 2002 Plan used the term "pack" to set the floors at which certain conservation actions will be taken, but the definition of "pack" used therein required evidence of successful breeding. 2002 Plan at 8 (AR2009-37333). Idaho interprets the term "pack" in the 2002 Plan to mean "breeding pairs" to maintain consistency with the terminology used by the Service. See, e.g., 2008 Idaho Wolf Pop. Mgt. Plan at 8 (AR2009-38306).

6

2002 Plan at 5 (AR2009-37330).[2]   The 2002 Plan left to the Commission the

determination of a wolf population goal that was consistent with the provision in

the 2002 Plan, stating that "[i]f it can be shown that wolves can expand their range

without causing unacceptable conflict, they will be allowed to do so."  2002 Plan at

4 (AR2009-37329).  "Conflict" is defined in the 2002 Plan to include livestock

depredations and adverse impacts on ungulate populations.  2002 Plan at 18

(AR2009-37343).

**C.     The 2008 Wolf Population Management Plan.**

The Commission implemented the directives of the 2002 Plan by adopting a

numerical population goal of 518-732 wolves as part of the Idaho Wolf Population

Management Plan ("2008 Plan").  AR2009-38294.  The Plan also includes the

qualitative goal of "maintain[ing] balanced wolf and prey populations and

ensur[ing] genetic transfer among states though maintaining connectivity and

functional metapopulation processes."  Id. at 19 (AR2009-38317).  Adoption of

game management plans is a critical step in the regulation of big game populations

within Idaho.  Such plans examine the current status of big game populations,

establish population objectives, and set forth concrete management steps that will

---

[2]   Control actions to address depredation may continue subject to restrictions
similar to those used during recovery if the number of breeding pairs falls below
15.  Such control actions, however, have a negligible effect on population growth,
as demonstrated by the tremendous increase in wolf populations that occurred
during the recovery period despite liberal depredation controls.

7

be implemented to achieve the objectives.  By rule, consideration and adoption of

management plans is a regular agenda item at Commission meetings.  IDAPA

13.01.01.051.03.

The 2008 Plan contains a number of tangible requirements to ensure wolves

do not return to pre-recovery levels.  The Plan establishes twelve data analysis

units or "zones" and short term harvest strategies for each zone.  2008 Plan at 33

(AR2009-38331).  The Plan requires IDFG to confirm mortality limits and

harvestable surpluses through monitoring, and requires additional monitoring at the

end of December to acquire accurate end-of-year population numbers.  Id. at 34

(AR2009-38332).

The 2008 Plan requires IDFG to protect border packs and to establish

harvest objectives that take into account border pack transboundary movements

and connectivity.  Id.  The Plan requires "regular monitoring of wolf health" by

means of necropsies of wolves found dead or killed in control actions.  Id. at 35

(AR 2009-38333).  The Plan requires IDFG to monitor wolf populations in

adjacent states and "adjust Idaho harvest of border pack animals so that overall

recovery area goals are not threatened."  Id.  Depredation control decisions are to

made using the same standards in place during the last four years of the recovery

period.  Id.

8

In the event that Idaho's wolf population experiences an unexpected decline, the 2008 Plan establishes a series of concrete measures that will be taken to arrest the decline.  In the unlikely event that the Idaho population falls below 20 breeding pairs, the Plan directs that harvest strategies will be adjusted, control actions will be restricted, and monitoring will be intensified to ensure that at least 15 packs contain radiocollared wolves.  Id. at 19 (AR2009-38317).[3]  If the number of breeding pairs falls below 15, then a comprehensive review of wolf management will be initiated to determine what changes are needed to arrest the decline, and monitoring efforts are intensified to ensure every pack contains one or more radiocollared wolves.  Id.  If the number of breeding pairs falls below 10 then depredations will be addressed with nonlethal controls, id., a standard even stricter then the depredation control measures in place during recovery.  Cf. 59 Fed. Reg. 60,252 (Nov. 22, 1994) (1994 experimental population rules).

Despite the series of concrete measures in the 2008 Plan to maintain wolves at recovery levels at least five times greater than required, Plaintiffs assert that the Plan does not qualify as a "regulatory mechanism" because it has not been codified

---

[3]  Plaintiff GYC asserts that the 20 breeding pair threshold would result in a population of just 180 wolves based on the unfounded assertion that "a breeding pair is equivalent to nine wolves."  GYC Brief at 16.  In its 2008 population report, Idaho reported 39 breeding pairs and a population of 846 wolves, a ratio of one breeding pair for every 22 wolves.  AR2009-41117.  There is no set ratio, however. Idaho verifies breeding pairs by field observation, not by estimates based on population.

as a regulation.  Defenders Brief at 16, GYC Brief at 14.  Plaintiffs, however, err in

conflating the term "regulatory mechanisms" with the term "regulations."  Not all

"regulatory mechanisms" are formally promulgated or codified as rules or

regulations.  The regulatory mechanisms of agencies are often set forth in

management plans that are adopted through a public process but not codified as

regulations.  For example, the ESA directs the Service to adopt recovery plans for

listed species.  While recovery plans are not codified into regulations, and are in

fact unenforceable in and of themselves,[4] they set forth concrete measures for the

recovery of species and are therefore an integral part of the regulatory mechanisms

that comprise the ESA.

      Likewise, state management plans setting forth concrete measures for the

protection of species are regulatory mechanisms that the Service may consider in

making a listing or delisting decision.  For example, in Defenders of Wildlife v.

Kempthorne, 535 F. Supp. 2d 121, 131-32 (D. D.C. 2008) the court upheld the

Service's determination that state land management plans setting forth "tangible

steps" to preserve black bear habitat were adequate regulatory mechanisms.  See

also Ctr. for Biological Diversity v. Badgley, 2001 WL 844399 *21 (D. Or. 2001)

(the Service "correctly considered present federal and state management plans as

---

    [4]  See Fund for Animals, Inc. v. Rice, 85 F.3d 535, 547 (11th Cir. 1996)
(holding that recovery plans do not have "the force of law" and are for "guidance
purposes only").

relevant factors and 'existing regulatory mechanisms'" when making listing decision).

**D.     Idaho Implements its Wolf Management Plans by Rules and Proclamations that Have the Force of Law.**

Although the 2008 Plan has not been codified as a regulation, it is implemented by means of rules and proclamations that carry substantial criminal penalties for non-compliance.  Idaho Code § 36-1402.  Hunters are limited to one wolf per calendar year, IDAPA 13.01.08.200, hunting must take place in specifically-defined seasons during daylight hours, id. at .400, the use of dogs, bait, traps, and electronic calls is prohibited, id. at .410.05, and hunters must report kills within 24 hours.  Id. at .422.  Shooting from motorized vehicles and aircraft is prohibited, as is any use of aircraft for spotting or locating game animals.  Idaho Code § 36-1101.

To ensure hunting is consistent with population objectives, IDFG staff establish zone-specific hunting limits by proclamations that have the "full force and effect of law."  Idaho Code § 36-105(2).  Hunting in each zone is stopped immediately once the mortality limit in that zone is reached.  AR2009-35122.  If an earlier closure is required in response to stochastic events or other circumstances, the IDFG director is authorized to limit or close hunting seasons on an emergency basis.  Idaho Code § 36-106(e)(6).

Idaho also regulates the circumstances under which wolves can be killed for livestock depredation.  Idaho Code § 36-1107 prohibits the shooting of depredating wolves by private persons unless the wolves are observed "annoying, disturbing, or persecuting, especially with hostile intent or injurious effect, or chasing, flushing, worrying, following after or on the trail of, or stalking or lying in wait for, livestock or domestic animals."  IDFG interprets this language to limit the shooting of wolves to circumstances where wolves are actually attacking livestock or engaging in behavior that immediately precedes attack.  AR2009-35128.  As such, the statute has similar substantive effect as the federal rules that applied before delisting, which authorized private persons to shoot wolves that were "chasing, molesting, or harassing . . . that would indicate to a reasonable person that . . . biting, wounding, grasping or killing of livestock or dogs is likely to occur at any moment."  70 Fed. Reg. 1286, 1306 (Jan. 6, 2005).  While Plaintiffs characterize Idaho Code § 36-1107 as allowing "unlimited killing" (Defenders' Brief at 24), the Service had before it evidence that the number of wolves killed under this provision will not only be quite low (11 during 2008 delisting) AR2009-35129, but that wolves killed in private control actions are accounted for in the allocation of hunting limits.  Id. at 35130 (Idaho comments).

The Plaintiffs also assert that Idaho Code § 25-2601 authorizes county commissioners to declare wolves to be agricultural pests "and to take all steps that

they may deem necessary to control such pests" (Defenders' Brief at 23). Idaho

Code § 36-1107(c), however, explicitly requires that any person desiring to control

wolves not in the act of molesting or attacking livestock must obtain a permit from

the director of IDFG. Thus, any county seeking to control wolves pursuant to

Idaho Code § 25-2601 would have to comply with the terms of the more specific

and recently-enacted Idaho Code § 36-1107(c) and obtain a permit from IDFG and

comply with any conditions therein.

In short, Idaho's wolf management plans, as implemented by statutes, rules,

and proclamations, not only establish population objectives at least five times

higher than recovery levels, they set forth standards explaining how the population

goals will be achieved and how mortality limits will be enforced. Regulation of

hunting, in conjunction with regulation of depredation controls, provides an

adequate mechanism for achieving population objectives because hunting limits

are set by proclamation after accounting for other sources of mortality, including

mortalities from natural causes, accidents, private predation controls, agency

predation controls, and estimated illegal mortality, based on data gathered from

radio-collared wolves since reintroduction. AR2009-35110.

Given the strict regulation of wolf mortality by the Commission via rule and

proclamation, the Service did not err in concluding that Idaho has in place

regulatory mechanisms to maintain a population that exceeds numerical recovery

13

goals and provides the number of wolves necessary to maintain existing

connectivity with populations in Montana, Wyoming and Canada.

**E.    The Service Properly Determined that Idaho's Regulatory Mechanisms Will Maintain a Population Providing Sufficient Dispersers for Genetic Exchange.**

Mech & Boitani (2003) described wolf packs as "dispersal pumps" since

every wolf born into a pack will eventually leave it, except in the rare instance of a

wolf assuming a breeding position in its natal pack.  AR 2009-38005.  Studies have

documented annual dispersal rates in gray wolf populations of approximately 25%.

AR2009-36310 (Boyd & Pletscher 1999).  Given such facts, the Service rationally

determined that the populations that Idaho and Montana will maintain after

delisting will provide sufficient dispersers to maintain connectivity.  This

determination was confirmed by radio telemetery data showing that at levels

comparable to or lower than those to be maintained after recovery, "at least one

wolf naturally disperses into the [Greater Yellowstone Area] each year."  74 Fed.

Reg. 15,123, 15,176 (April 2, 2009).

The Service's determination that this number of wolves was sufficient was

based on "the well-studied 'One Migrant Per Generation' (OMPG) rule of thumb."

AR2009-26603 (Mills 2008).  According to Dr. L. Scott Mills, the OMPG rule is

"the level of gene flow sufficient to prevent the loss of alleles and minimize loss of

heterozygosity . . . regardless of population size."  AR2009-3602 (Mills 2007);

14

AR2008-25558 (Fritts & Carbyn 1995) (genetic variation can be assured with "one or a few migrants per generation").  Given the documentation in the record that the OMPG rule represented the best available science,[5] the Service's determination is entitled to substantial deference.  Lands Council v. McNair, 537 F.3d 981, 993 (9th Cir. 2008) (it is not the "proper role" of the courts to make "fine-grained judgments" as to the worth of scientific analysis).

**F.     The Service Rationally Concluded that Idaho's Regulatory Mechanisms will Limit Mortality of Dispersing Wolves.**

The Service's determination that Idaho's hunting management would not substantially affect dispersal is supported by the record.  Because dispersal occurs year-round, AR2009-36311 (Boyd and Pletscher 1999), establishment of hunting seasons ensures that there will always be some dispersers that are not subject to the risk of hunting mortality.  In addition, Idaho establishes zone-specific hunting limits to minimize the impacts of hunting on dispersers.  The two wolf management zones managed for dispersal are the Southern Mountains zone and the Upper Snake zone, and particularly the game management units along the Idaho-Montana border, which are used for dispersal between core populations in central

---

[5] Dr. Mills' Declaration stated unequivocally that the OMPG rule requiring "one breeding wolf every four years" was the best available science, but also noted that such a figure could be doubled to "be conservative and allow for error." AR2008-26603.  Dr. Mills' description of a more conservative approach, however, does not modify his earlier conclusion that the OMPG rule is the best available science.

Idaho and the Greater Yellowstone Area.  AR2009-38325.  Hunting limits in the Southern Mountains and Upper Snake zones are very restrictive compared to other zones.  For example, in 2008, there would have been a hunting limit of two wolves in each of the zones.  AR2009-35122.

Because those portions of the Southern Mountains and Upper Snake zones identified as dispersal corridors are relatively small compared to the total area of the zones, the small hunting limits for those zones further assures that impacts on dispersal are limited.  For example, the Southern Mountains zone is a very large zone consisting of 15 game management units that stretch from the South Fork of the Boise River to the Idaho-Montana border.  AR2009-38326.  Only five of the 15 game management units in the Southern Mountains zone have been identified as dispersal corridors and those five units constitute less than one-fourth of the area of the Southern Mountains zone.  AR2009-38325-26.  Assuming hunting is spread equally among game management units, less than 1/4 of the limited hunting mortality allocated to the Southern Mountains zone is likely to occur in the units identified as dispersal units.

Additionally, IDFG requires hunters to report the locations of any successful wolf hunt, allowing IDFG to determine, as the season progresses, the amount of mortality in units designated for dispersal management.  If such mortality were to exceed expectations, the IDFG director has the discretion to close hunting in such

units.  Idaho Code § 36-106(e)(6).  Mortality in units designated for dispersal is

further limited by working with grazing allottees in border areas to utilize non-

lethal depredation controls including "radio-collaring and releasing on site, noise-

making devices adjacent to livestock, aversive conditioning and fladry."  AR2009-

35114-15.[6]

## II.   THE SERVICE PROPERLY CONSIDERED THE THREE-PARTY MOU FOR COOPERATION ON GENETIC EXCHANGE.

Plaintiffs assert that the Service erred in considering the memorandum of

understanding ("MOU") between Idaho, Montana and the Service setting forth a

framework for coordinating the exercise of each party's existing regulatory

mechanisms to address genetic exchange issues.  AR2009-37222 (MOU).  First,

Plaintiffs overstate the Service's reliance on the MOU.  The Service found that

NRM DPS will "not be threatened by lower genetic diversity in the foreseeable

future" due to the "populations' current high genetic diversity, proven

connectivity, [and] the strong tendency of wolves to outbreed (choose mates not

_____

[6] Plaintiffs assert that Idaho's short-term management directives to reduce wolf populations in the Salmon and Southern Mountains zones to 2005-2007 levels to address livestock depredations is inconsistent with protection of dispersing wolves.  See AR2009-38331 (management directives).  Such concerns are unfounded.  The Salmon zone has not been identified as a dispersal zone, and reductions in the Southern Mountains zone to address depredation occur primarily in the southern end of the zone in units not identified for dispersal management.  See 2008 Idaho Wolf Conservation and Management Progress Report at AR2009-41191-94 (discussing removal of three packs in southern units of Southern Mountains zone).

related to themselves) . . . ."  74 Fed. Reg. at 15,178.  Because the Service

concluded it "is extremely unlikely" that "genetic or demographic issues [will]

ever materialize that could threaten the NRM wolf population," it rationally

concluded that the measures in the MOU were not currently necessary to ensure

genetic diversity but instead were an additional layer of protection that "makes it

even more unlikely that agency-managed genetic exchange would be necessary in

the foreseeable future."  74 Fed. Reg. at 15,177.  In short, the MOU is not a

regulatory mechanism needed to maintain wolves above recovery levels.  Rather, it

sets forth additional fail-safe measures, particularly translocation, that are unlikely

to ever be necessary.

　　　Plaintiffs' assertions that the Service was precluded from considering the

MOU because the Service has no authority to compel performance of the MOU

have no basis in law, for several reasons.  First, the assertion that the Service must

retain authority to enforce the MOU is inconsistent with the plain terms of the

ESA, which, upon delisting, limits the Service to monitoring the status of

recovered species, and to implementing emergency relisting if there is "a

significant risk to the well being of any such recovered species."  16 U.S.C. §

11533(g).  A requirement that the Service retain the ability to compel states to

perform post-delisting management actions violates the plain terms of the ESA by

requiring the Service to retain significant management authority over delisted species.

Second, the Ninth Circuit has held that the Service may consider voluntary agreements that set forth tangible actions to protect species.  See Defenders of Wildlife v. Norton, 258 F.3d 1136, 1139-40 (9th Cir. 2001) (discussing conservation agreement for flat-tailed horned lizards in which state and local agencies "agreed to take voluntary steps" to reduce threats to the lizards) and Tucson Herpetological Soc. v. Salazar, 566 F.3d 870, 881 (9th Cir. 2009) (discussing the same Conservation Agreement and determining that the Service "did not err in taking the Conservation Agreement into account" when the benefits the Service identified as resulting from the Agreement "are supported by the record"); see also Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv., 2007 WL 716108 (D. Co. 2007) (rejecting argument that in listing decision "voluntary efforts must be rejected when they are not enforceable through a regulatory mechanism").

Among the tangible actions set forth in the MOU are provisions for the future translocation of wolves in the event genetic monitoring suggests a threat to the NRM DPS that is not resolved through natural dispersal.  AR2009-37233. Such translocations are consistent with the conclusion that the NRM DPS is a recovered, self-sustaining population.  The 1994 EIS contemplated explicitly the

post-recovery "periodic infusion" of wolves and stated that there was "no reason why migration management should be view[ed] negatively." AR2009-41838, 42228 (1994 EIS). More generally, management of wildlife to mitigate for human-caused barriers to migration is not inconsistent with ESA requirements. Nothing in the ESA prohibits states from monitoring the genetic diversity of recovered populations and taking steps to maintain the genetic health of the population. Cf. Greater Yellowstone Coalition v. Servheen, 2009 WL 3775085, *13-14 (D. Mont. 2009) (rejecting argument that contemplation in delisting rule of future translocation to improve genetic diversity prevented delisting).

## III.   THE SERVICE USED "BEST AVAILABLE SCIENCE" IN ESTABLISHING AND CONFIRMING RECOVERY LEVELS.

Over the last 20 years the Service has repeatedly applied the best available science to determine and refine the population numbers and structure necessary to ensure continued viability of the NRM DPS upon delisting. The process began with the 1987 Recovery Plan, prepared by a team of federal and state experts, which established the initial recovery goal of ten breeding pairs in each of three recovery areas. The recovery objective was further refined in the 1994 Environmental Impact Statement ("EIS") to include the requirement of dispersal among and between the three recovery areas. 1994 EIS App. 9 (AR2009-42223). The management directives in the EIS were adopted after examining published

literature on population viability analysis ("PVA") and minimum viable

populations ("MVP") and by surveying the opinions of numerous wolf experts.  Id.

 While the time for judicial review of the 1994 EIS has long since passed,

Plaintiffs seek to collaterally attack the EIS by asserting that the Service arbitrarily

refused to apply the 50/500 rule, a rule of thumb that suggests 50 breeding

individuals are needed for a population to be viable in the short term and 500

breeding individuals are necessary for a population to be viable for 100 years or

more.  The Plaintiffs suggest that the Service did not apply the rule because it

concluded that finding an area to support an effective population of 500 wolves

was "very unlikely."  Defender's Brief at 13, quoting 1994 EIS App. 9 at 38

(AR2009-42224).  While the Service noted the unlikelihood of supporting 500

breeding wolves in the NRM, such fact was not cited as a rationale for non-

application of the 50/500 rule.  Rather, the Service, noting that such estimates of

minimum viable population assume that the population is totally isolated and that

no management will occur, properly rejected the 50/500 rule because "neither

assumption is likely to be valid for wolves in the Northern Rockies of the U.S."

AR2009-42227.

 This bears repeating: the Service determined that the 50/500 rule of thumb

and other generic calculations of MVP were not applicable to gray wolves in the

NRM because the assumptions upon which such calculations are based do not

apply to the NRM.  Indeed, to apply a rule of thumb where its assumptions do not prove true would violate the best available science standard.

Nonetheless, Plaintiffs assert that "best available science" developed after publication of the EIS compels the determination that "well over 1,000 wolves are necessary to maintain a viable, non-endangered wolf population."  Defender's Brief at 10.[7]  The Service, however, has repeatedly reviewed the NRM recovery standard to determine if the standard remains the best available science, primarily by seeking the opinions of experts in wolf population viability.  The Service "has a fair degree of latitude in deciding what rational approach should be used to comply with the statutory mandate that its decision be based on the 'best' available scientific evidence then available."  Western Watersheds Project v. Kempthorne, 2008 WL 4649130 (D. Idaho. 2008).  "An agency may turn to outside experts to constitute the necessary scientific forum to develop and analyze the best available science."  Id.

In the Service's 2001 review, 35 of 53 respondents confirmed that the recovery standard in the 1994 EIS represented a reasonable science-based description of a viable wolf population.  AR2008-24758 (Bangs 2002)

---

[7]  In support of their argument, the Plaintiffs direct the Court to the listing standards of the International Union for the Conservation of Nature (IUCN), which suggest listing when species fall below 1,000 mature individuals.  It is notable that Dr. L. David Mech, chair of the IUCN Wolf Specialist Group, AR2009-32193, is on record as supporting the Service's delisting standard for the NRM DPS.  AR2008-22454.

(summarizing 2001 peer review results).  Yet, the Plaintiffs would have the Court

seize upon those several reviewers who commented that the contemplated

population was too small.  Such an exercise proves nothing, however.  One could

argue with equal justification that the Service ignored the comments of those

reviewers who concluded that the contemplated population was, if anything,

unnecessarily large.  See AR2008-22390 (Dr. Layne Adams) ("based on the

distribution of breeding pairs we see today throughout the region, 20-25 pairs

would probably be adequate for a viable population."); AR2008-22403 (Dr. Rod

Boertje) (suggesting ten packs would be "more than enough for the area in

question"); AR2008-22427 (Dr. Steven Fritts) (suggesting 20-25 breeding pairs,

with 200+ wolves, distributed over the three areas, would be a viable population, if

wolves were able to move among subpopulations).

        The Service's resolution of this issue in light of differing opinions regarding

the minimum viable wolf population is exactly the type of scientific dispute that

the Ninth Circuit has held is best left to the expertise of the Service.  See Ecology

Ctr. v. Castaneda, 574 F.3d 652, 659 (9th Cir. 2009) ("[t]hough a party may cite

studies that support a conclusion different from the one the Forest Service reached,

it is not our role to weigh competing scientific analyses"); NW. Ecosystem

Alliance v. U.S. Fish & Wildlife Serv., 475 F.3d 1136, 1150 (9th Cir.2007) ("we

must defer to the agency's interpretation of complex scientific data").

Moreover, Plaintiffs' assertions that numerous peer-reviewed PVA studies compel the conclusion that "well over 1,000 wolves are necessary to maintain a viable, non-endangered wolf population" ignore the substantial literature in the record concluding that theoretical applications of PVA have "proved unsatisfactory" when applied to wolves. AR2009-36300 (Boitani 2003). "[T]here is no evidence that any wolf population has been threatened by loss of genetic diversity" despite the fact that many wolf populations worldwide number less than 1000 individuals. Id. at AR2009-36299. See also AR2009-37053 (Fuller et al. 2003) (PVA models "applied to wolves have proved unsatisfactory or even misleading"); AR2009-41491 (White 2000) ("most estimates of population viability are nearly useless"); AR2008-25565 (Fritts & Carbyn 1995) (case histories of small, isolated wolf populations "suggest that wolf populations may be considerably more resilient than suggested by the theoretical MVP calculations to date").

Given this literature and the comments of its peer reviewers, the Service concluded that applying theoretical calculations of PVA to the NRM DPS would not provide useful guidance since such calculations are at odds with empirical data based on field observations of smaller, yet viable, wolf populations:

> The results of previous population viability analysis for other wolf populations varied widely, and as we had concluded in our 1994 analysis, reviewers in 2002 concluded theoretical results were strongly dependent on the variables and assumptions used in such

models and conclusions often predicted different outcomes than actual
empirical data had conclusively demonstrated.

74 Fed. Reg. at 15,131.  The Service's resolution of this issue is entitled to

substantial deference for "the merits of the conflicting studies is not a proper

subject for this court to resolve."  Tucson Herpetological Soc., 566 F.3d at 881.

IV.    **THE "SIGNIFICANT PORTION OF RANGE" PROVISION WAS
       INCLUDED IN THE ESA TO ADDRESS THE VERY SITUATION
       PRESENTED IN THE NRM DPS, WITH THE SPECIES
       RECOVERED IN SOME STATES AND THREATENED IN OTHERS.**

        The ESA provides the following definitions for endangered and threatened

species:

>       The term "endangered species" means any species which is in danger
>       of extinction throughout all or a significant portion of its range . . . .
>       . . . .
>       The term "threatened species" means any species which is likely to
>       become an endangered species within the foreseeable future
>       throughout all or a significant portion of its range.

16 U.S.C. § 1532(6) and (20).

        As the Ninth Circuit Court of Appeals has held, the term "all or a significant

portion of its range" (or "SPR"), if it is to have any meaning, can not be interpreted

to require that the entire species must be listed when the species is in danger of

extinction only in a significant portion of its range.  Such an interpretation is

"internally inconsistent," since the concept of partial disappearance can not be

logically conflated with the concept of extinction, "since 'extinction' suggests total

25

rather than partial disappearance." <u>Defenders of Wildlife v. Norton</u>, 258 F.3d 1136, 1141 (9th Cir. 2001).

In other words, Congress' incorporation of the concept of extinction in a significant portion of a species' range would be superfluous if the ESA only allowed species (or biological entities deemed to be species) to be listed in their entirety. <u>Id.</u> To solve this conundrum, the Ninth Circuit concluded that "the Act allows the Secretary to '***list*** an animal as "endangered" through all ***or a portion of its range***.'" <u>Id.</u> at 1144 (quoting 120 Cong. Rec. 25,669 (1973) (emphasis added).[8]

The Ninth Circuit confirmed its interpretation of the ESA by citing legislative history emphasizing that listings should exclude states with healthy populations and adequate regulatory mechanisms. For example, Senator John Tunney noted that "an animal might be 'endangered' in most States but overpopulated in some," so that in states with an abundance of a species, the Service could "list that animal as merely threatened or . . . remove it from the endangered species listing entirely" while in "that portion of its range where it was not threatened with extinction, the States would have full authority to use their management skills to insure the proper conservation of the species." <u>Id.</u> at 1144, quoting 120 Cong. Rec. 25,669 (1973). Senator Tunney explicitly rejected the assertion that a species must be listed in its entirety if only threatened in a portion

---

[8]   The opinion mistakenly cites 62 Fed. Reg. 25,669 (July 25, 1973) as the source of the quoted material.

of its range, since "such a broad listing prevents local authorities from taking steps to insure healthy population levels." Id.

Significantly, the Ninth Circuit also cited with approval historical listings that distinguished between listed and nonlisted portions of species' ranges using state boundaries. Id. at 1145.

After reviewing the legislative history and historical application of the SPR provision, the Ninth Circuit affirmed that the Service has the flexibility to limit the listing of a species to that portion of the species range in which it is actually endangered or threatened and that listings limited to a significant portion of a species' range can "coincide with national or state boundaries." Id.

There is no indication that Congress, in amending the definition of species in 1978 to include distinct population segments of vertebrate species, intended to supplant the provisions it adopted five years earlier allowing the Service to limit listings to a significant portion of a species' range. Indeed, as at least one court has noted, there is "no language in the statute, the legislative history (or any relevant case) that illuminates Congress' intent regarding whether distinctions among members of a DPS may be considered during the listing process," thereby leaving "the type of gap which agencies commonly fill by way of regulation or policy that is due Chevron deference." California State Grange v. Nat'l Marine Fisheries Serv., 620 F. Supp. 2d 1111, 1152-53 (E.D. Cal. 2008) (footnote omitted).

If anything, the plain language of the ESA requires that a DPS, once designated, is to be treated in all respects as if it is a "species."  All provisions applicable to "species" are equally applicable to DPSs, including the requirement that the Service "specify with respect to each species over what portion of its range it is endangered or threatened."  16 U.S.C. § 1533(c)(1).  While some courts have concluded that the Service may not split a DPS into smaller taxonomic or biological entities for the purpose of assigning each such entity a different conservation status,[9] no court has held that the ESA prohibits the Service from designating that significant portion of a DPS's geographic range where the DPS is actually threatened.  Such a designation makes no biological distinctions between the listed and unlisted portions of the DPS, and thus is consistent with the original designation of the DPS as a biological entity.  See California State Grange, 620 F. Supp. 2d at 1153 n.16 (noting, in discussion of allowed distinctions among DPS members, that "Defenders of Wildlife [258 F.3d 1136] confirms that a species may be listed according to its geographical range"); Ctr. for Biological Diversity v. Norton, 411 F. Supp. 2d 1271, 1280 (D. N.M. 2005), vacated pursuant to settlement, 2007 WL 6477262 (D. N.M. 2007) (9th Circuit's interpretation of SPR

---

[9] See, e.g., Alsea Valley Alliance v. Evans, 161 F. Supp. 2d 1154, 1162-63 (D. Or. 2001) (holding that agency could not distinguish between hatchery and naturally-spawning portions of coho DPS since the term "distinct population segment" was included in the ESA to "exclude taxonomic [biological] categories below subspecies [smaller taxa] from the definition") (bracketed material in original).

provision "does not preclude listing a species, including a subspecies or a distinct population segment, in only a portion of its current range" since "[l]isting in only a portion of the range may be all that is necessary to ensure the survival of the species").

Here, the issue of necessity is paramount, since the only threat the Service identified to the NRM DPS was the inadequacy of Wyoming's regulatory mechanisms. While Wyoming is a significant portion of the range of the NRM DPS, there is nothing in the record to suggest that the threat to wolves in Wyoming threatens the continued existence of wolves in Idaho and Montana. All biological recovery criteria have been fulfilled, populations are well above recovery levels and are connected via dispersers to each other and to the large population of gray wolves in Canada. 74 Fed. Reg. at 15,136.[10]

In short, the threat posed by the inadequacy of Wyoming's regulatory mechanisms is limited to wolves in Wyoming. A listing limited to Wyoming ensures the survival of the NRM DPS, since it addresses the only threat to the NRM DPS identified by the Service, and fulfills Congress' intent to avoid over-

---

[10]   Because the connection between the subpopulations in the NRM DPS occurs via individual dispersers, the GYA subpopulation remains "wholly separate geographically" from the central Idaho and NW Montana subpopulations, thus qualifying it as an experimental population for purposes of 16 U.S.C. § 1639(j). See United States v. McKittrick, 142 F.3d 1170, 1175 (9th Cir. 1998) (holding that "wholly separate" requirement of ESA § 10(j) is not violated when individual wolves disperse into experimental population area from another wolf population).

broad listings that prevent state authorities from managing species where state management is adequate to ensure healthy and viable populations.

Plaintiffs assert that the Court should pay no deference to the Service's interpretation of the SPR provision allowing it to limit listings to those portions of a species' range where the species is actually threatened, since the Service previously asserted in litigation that such listings were not authorized by the DPS provision.[11]  Agencies, however, may amend their interpretation of statutory language if they have a rational basis for doing so.  Here, the agency had never adopted a formal policy regarding the listing of a significant portion of a species' range until the Solicitor for the Department of the Interior completed a thorough examination of the ESA and its legislative history and concluded that the Service retained discretion to geographically delimit limit listings to a significant portion of a species' range.  AR2008-14471.  In cases where an informal interpretation is replaced by a "first declaration of national policy by the Department of Interior's Solicitor's Office," the new interpretation is accorded deference.  Exxon Corp. v. Lujan, 970 F.2d 757, 762 (10th Cir. 1992).  This is especially true where the

---

[11]  AR2008-14484.  In his 2007 opinion reviewing the SPR provision, the Solicitor for the Department of the Interior noted while the Service had never adopted a formal policy position on the application of the SPR provision, it had argued in litigation that the SPR provision did not authorize the Service to limit listings to that significant portion of a species range where actually endangered. The Solicitor ultimately concluded that the argument was inconsistent with the legislative history of the ESA.  Id.

Solicitor's opinion sets forth a "reasoned analysis" for the change in course based on an "examination of the legislative history."  Id. at 762 n.4.

Tellingly, since the 2007 Solicitor's opinion affirming the Service's authority to list species in significant portions of their ranges, the Service has been consistent in its application of such authority in a variety of contexts, including partial listings of DPSs.  See, e.g., 74 Fed. Reg. 56,757 (Nov. 3, 2009) (proposing to list SPR of Queen Charlotte goshawk DPS as endangered with remainder of DPS listed as threatened); 73 Fed. Reg. 77264 (Dec. 18, 2008) (finding that listing of SPR of the New Zealand/Australia DPS of rockhopper penguins is warranted); 73 Fed. Reg. 39,790 (July 10, 2008) (listing subspecies of jumping mouse in SPR defined by state boundaries).

In sum, the Service's carefully-considered rationale for its change in position regarding the application of the SPR concept to DPSs, coupled with its consistent application of such rationale, provides a sufficient basis for judicial deference to the Service's interpretation of the ESA.

## CONCLUSION

Summary judgment should be entered affirming the Final Rule and denying all relief sought by Plaintiffs.

\

\

RESPECTFULLY SUBMITTED this 2d day of December 2009.

                     /s/ James D. Johnson, Esq.
                     James D. Johnson, Esq.
                     WILLIAMS LAW FIRM, P.C.

                     LAWRENCE G. WASDEN
                     ATTORNEY GENERAL
                     STATE OF IDAHO
                     Steven W. Strack
                     Deputy Attorney General
                     Natural Resources Division
                     *Attorneys for State of Idaho*

                     David F. Hensley
                     Thomas C. Perry
                     *Attorneys for Governor C.L. "Butch" Otter*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing memorandum is in compliance with the 6500 word limit of L.R. 7.1(d)(2)(A), in that it consists of 6,310 words, excluding the caption and this certificate, as calculated by the word count function of the word processor used to prepare the memorandum; and with L.R. 10(1)(a) in that it is double spaced in a 14-pt font typeface.

                     /s/ James D. Johnson, Esq.
                     James D. Johnson, Esq.