Lon J. Dale, Esq.
Milodragovich, Dale, Steinbrenner
   & Nygren, P.C.
P.O. Box 4947
Missoula, MT 59806-4947
(406) 728-1455/fax (406) 549-7077
LON@bigskylawyers.com

John I. Kittel, Esq.
Mazur & Kittel, PLLC
30665 Northwestern Hwy., Ste. 175
Farmington Hills, MI 48334
(248) 432-8000/fax (248) 432-8010
jkittel@mazur-kittel.com

Grant Parker, Esq.
Rocky Mountain Elk Foundation
5705 Grant Creek
Missoula, MT 59808
(406) 523-4524/fax (406) 523-0211
grant@rmef.org


Attorneys for *Amicus Curiae* Rocky Mountain Elk Foundation

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION


| | |
|---|---|
| DEFENDERS OF WILDLIFE, et al.) | |
| ) | Case No: CV-09-77-M-DWM |
| Plaintiffs, ) | Case No: CV-09-82-M-DWM |
| v. ) | (Consolidated) |
| ) | |
| KEN SALAZAR, et al. ) | ROCKY MOUNTAIN |
| ) | ELK FOUNDATION'S |
| Defendants. ) | AMICUS CURIAE BRIEF IN |
| ) | OPPOSITION TO PLAINTIFFS' |

GREATER YELLOWSTONE          )     MOTION FOR SUMMARY
COALITION,                   )     JUDGMENT
                 Plaintiff,  )
                             )
v.                           )
                             )
KEN SALAZAR, et al.          )
                             )
                 Defendants. )
_____)

## TABLE OF CONTENTS

INTRODUCTION.............................................................................1

ARGUMENT..............................................................................6

I.   THE GRAY WOLF IS NO LONGER ENTITLED TO PROTECTION UNDER THE ENDANGERED SPECIES ACT AND WOLVES SHOULD BE MANAGED BY THE APPROPRIATE STATE AGENCIES ...............................................................6

    A.   Reintroduction of the Gray Wolf into the Northern Rocky Mountains Has Been Successful ........................................6

        1.   The Gray Wolf Continues to Thrive in the Northern Rocky Mountains and Target Levels Set by the U.S. Fish & Wildlife Service Have Been Exceeded.........................6

        2.   Genetic Diversity Will be Sustained Under State Management ...................................................8

        3.   The Gray Wolf Has Recovered in the NRM DPS And Is Not At Risk For Extinction.........................9

    B.   Plaintiffs' Claims that Thousands of Wolves are Necessary are Unfounded ......................................................11

    C.   Idaho and Montana Have Demonstrated Effective State Management of Wolves ..........................................12

II.   PLAINTIFF"S MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED.......................................................15

    A.   This Court Should Defer to FWS Interpretation of the ESA.....15

B.    The FWS Did Not Improperly Sever Wyoming From the
      Northern Rocky Mountain DPS.........................................19

      1.    The FWS Lawfully Interpreted the ESA......................19

      2.    The NRM Rule is Consistent with Case Law..............22

      3.    The FWS Properly Relied on Sound Science and State
            Management........................................................25

CONCLUSION.........................................................................27

CERTIFICATE OF COMPLIANCE................................................30

# TABLE OF AUTHORITIES

## Supreme Court Cases

*Baldwin v. Montana Fish and Game Commission*, 436 U.S. 371,374, 98 S.Ct. 1852, 56 L.Ed. 2d 354 (1978)..............................................13

*Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843 (1984)..................................................................................15

*Gen. Elec. Co. v. Gilbert* (1976), 429 U.S. 125, 143, 97 S.Ct. 401, 50 L.Ed.2d 34..............................................................................17

*I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 447 n. 30 (1987)..............16-17

## Federal Cases

*Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154 (D.Or.2001)..............................................................................22, 24

*California State Grange v, NMFS*, 620 F. Supp. 2d 1111 (E.D Calif. 2008)..................................................................................25

*Lands Council v. McNair*, 537 F.3d 981, 983 (9th Cir. 2008) (*en banc*)....................................................................................15, 20

*Montana Outfitters Action Group v. Fish & Game Comm'n*, 417 F. Supp., 1005 at 1007 (Mont. 1976)..............................................................13

*Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir.2003)................................................................................21

*National Wildlife Federation v. Norton*, 386 F. Supp. 2d 553, 564 n.9 (D. Vt. 2005)..................................................................................23

*Ninilchik Traditional Council v. U.S*, 227 F.3d 1186, 1194 (9th Cir. 2000)..................................................................................17-18

*Ocean Advocates v. U.S. Army Corps of Engrs*., 402 F.3d 846, 859 (Wash. 2005)..................................................................................15

*Southwest Center for Biological Diversity v. Babbitt*, 980 F. Supp. 1080, 1085 (D.Ariz.,1997).................................................……....…20, 22-23

*Trout Unlimited v. Lohn*, 559 F.3d 946, 956 (9th Cir. 2009)....................12

## **Statutes and Legislative Materials**

5 U.S.C. § 706...........................................................................19

16 U.S.C. § 1531, *et, seq.*.........................................................8, 26

16 U.S.C. § 1532...............................................................19, 25-26

16 U.S.C. § 1533...............................................................19, 25-26

16 U.S.C. § 3101.......................................................................18

61 Fed. Reg. 4722.....................................................................23

68 Fed. Reg. 15804, 18205, 15826...............................................16

68 Fed. Reg. 15808...................................................................22

68 Fed. Reg. 15821................................................................16-17

68 Fed. Reg. 15825...................................................................21

70 Fed. Reg. 1285, 1296............................................................17

74 Fed. Reg. 15123, 15151 .....................................................3, 7-8

74 Fed. Reg. 15124...................................................................12

74 Fed. Reg. 15128..................................................................8-9

74 Fed. Reg. 15129.....................................................................9

74 Fed. Reg. 15130 ....................................................................6

74 Fed. Reg. 15131 ...............................................................7

74 Fed. Reg. 15132......... ...........................................7,9-10

74 Fed. Reg. 15134...........................................................7

74 Fed. Reg. 15135...........................................................7

74 Fed. Reg. 15138..........................................................10

74 Fed. Reg. 15140..........................................................11

74 Fed. Reg. 15147..........................................................14

74 Fed. Reg. 15151..........................................................13

74 Fed. Reg. 15177.........................................................27

74 Fed. Reg. 15178..........................................................9

74 Fed. Reg. 15180-84...............................................17, 26

Senate Rpt. No. 151, 96th Cong., 1st Sess. at 7 (1979)......................20

## Other Sources

http://www.fishandgame.idaho.gov/ cms/hunt/wolf/quota.cfm.................10

http://fwp.mt.gov/hunting/planahunt/ wolfStatus.html.…....................10

## INTRODUCTION

The Rocky Mountain Elk Foundation, Inc. ("RMEF" or "Elk Foundation"), has its national headquarters located in Missoula, Montana. RMEF believes that opposing Plaintiffs' Motions for Summary Judgment is consistent with its mission to, "ensure the future of elk, other wildlife and their habitat." http://www.rmef.org. On August 26, 2009, RMEF filed an unopposed motion to appear as *Amicus Curiae* in these proceedings for the purpose of submitting *amicus curiae* briefs on motions before this Court. This Court granted RMEF's motion to file *amicus* briefs on August 28, 2009. RMEF is filing this *Amicus Curiae* Brief in Opposition to Plaintiffs' Motions[1] for Summary Judgment.

RMEF has approximately 150,000 members, with over 10,000 members in Montana and more than 5,000 members in Idaho. Many of our members spend extensive amounts of time in the field. Our membership is knowledgeable and very well-informed. The number one issue we hear from our members is concern about wolves and their impact on elk.

---

[1] Plaintiffs' Memorandum in Support of Motion for Summary Judgment submitted by Defenders of Wildlife et al. (Document 105) will be referred to as "Defenders Br. at __" and Plaintiff Greater Yellowstone Coalition's Memorandum of Points and Authorities in Support of Motion for Summary Judgment (Document 106) will be referred to as "Coalition Br. at __".

1

By means of permanent land protection and habitat improvement, RMEF has helped protect and enhance millions of acres throughout the west. In Montana, RMEF has permanently protected more than 164,000 acres of key wildlife habitat and helped enhance more than 436,000 additional acres over the past 25 years. In Idaho, RMEF has permanently protected more than 27,000 acres of prime elk country and helped enhance the habitat on over 315,000 acres since 1984. In addition, RMEF has spent hundreds of thousands of dollars supporting research projects concerning wolves and their interactions with elk.

Working cooperatively with the Montana Fish Wildlife & Parks, the Idaho Department of Fish and Game, and many other partners, RMEF has helped conserve significant habitat that has benefited elk and a number of other wildlife species. Thoughtful analysis and commentary on the history, re-introduction, management, biology and delisting of wolves has been provided to thousands of readers through RMEF's *Bugle* magazine since 1984.

The Elk Foundation's support of delisting and the management of wolves by state wildlife management agencies is consistent with its November 28, 2008 comments submitted together with other wildlife organizations in response to the U.S. Fish & Wildlife Service's ("FWS")

2

Proposed Rulemaking, as well as the tremendous success of wildlife conservation in North America generally known as the "North American Wildlife Conservation Model."   This model of wildlife conservation was described in RMEF's August 28, 2009 *Amicus Curiae* Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction.   Documents 81 and 82.[2]   The FWS recognized the effectiveness of this Model in its delisting rule as follows:

> State agencies are . . . qualified to manage a recovered wolf population.  State management of wolves will be in alignment with the classic State-led North American model for wildlife management which has been extremely successful at restoring, maintaining, and expanding the distribution of numerous populations of other wildlife species, including other large predators, throughout North America.

74 Fed. Reg. 15123, 15151 (April 2, 2009).

State wildlife agencies, supported largely by revenue from hunters and anglers, working together with landowners and non-profit organizations such as the Elk Foundation, have been instrumental in helping rebuild and maintain healthy wildlife populations.  The Montana Department of Fish, Wildlife and Parks and the Idaho Department of Fish and Game have been

---

[2] *See also* articles on the North American Wildlife Conservation in *Bugle* magazine from May/June 2004 through November/December 2005 at http://www.rmef.org/NewsandMedia/PubsTV/Bugle, and articles available from Orion, The Hunter's Institute at http://www.huntright.org/ heritage/conservation.aspx.

3

involved in successful restoration and management of wildlife for more than a century, a period that has seen dramatic increases in species such as elk, mule deer, bighorn sheep, pronghorns, grizzly bears, black bears, mountain lions and wolves. RMEF believes that the wildlife management agencies of Montana and Idaho are best positioned to manage wolf populations, together with other wildlife populations, in their respective states.

On September 8, 2009, this Court refused to grant Plaintiffs' motions for preliminary injunction to halt wolf hunting in Idaho and Montana, holding that the proposed hunts were below what scientists believed the population could withstand and were not expected to have any impact on the genetic connectivity of the distinct population segments ("DPS.") Order at p. 12, Document 93. Since that time, both Idaho and Montana have conducted lawful wolf hunts that have further demonstrated the ability of Idaho and Montana to manage wolves along with other wildlife.

This Court also provided its opinion concerning the likelihood of Plaintiffs' arguments prevailing, noting that Plaintiffs' arguments that the FWS cannot, "delist part of the species below the level of the DPS without running afoul of the clear language of the ESA" and that the partial delisting, "resulted in a practical determination that does not seem to be

4

scientifically based."   Order at p. 7, Document 93.   With all due respect, *Amicus Curiae* RMEF contends the FWS has legal authority for such actions, and this Court should defer to the agency's judgment.

# ARGUMENT

I.  THE GRAY WOLF IS NO LONGER ENTITLED TO PROTECTION UNDER THE ENDANGERED SPECIES ACT AND WOLVES SHOULD BE MANAGED BY THE APPROPRIATE STATE AGENCIES

## A. Reintroduction of the Gray Wolf into the Northern Rocky Mountains Has Been Successful

### 1. The Gray Wolf Continues to Thrive In the Northern Rocky Mountains and Target Levels Set by the U.S. Fish & Wildlife Service Have Been Exceeded

The Northern Rocky Mountains ("NRM") Wolf Recovery Plan approved in 1980 and revised in 1987 established successful recovery criteria of a minimum of 10 breeding pairs of wolves (defined as two wolves of opposite sex and adequate age, capable of breeding offspring) for a minimum of three consecutive years in each of three distinct recovery areas (NW Montana, Central Idaho and the Yellowstone National Park area).  74 Fed. Reg. at 15130.  The FWS prepared an Environmental Impact Statement in 1994 that largely upheld the 1987 criteria, while modifying the definition of breeding pairs to include an adult male and adult female wolf that have produced at least two pups that survived until December 31 of the year of the pups' birth. Id. At that time, a "Recovered Wolf Population" in the NRM was, "10 breeding pairs of wolves in each of 3

6

areas for 3 successive years with some level of movement between areas." 74 Fed. Reg. at 15131.  Again, in 2001 and 2002, the FWS reviewed what constituted a recovered wolf population, and, "reaffirmed [its] more relevant and stringent 1994 definition."  Id.  In order to assure that the recovery goal is maintained, the FWS found that, "each state shall be managed for at least 15 breeding pairs and at least 150 wolves in mid-winter."  (Emphasis supplied).  74 Fed. Reg. at 15132.  After careful review, FWS reaffirmed that, "thirty or more breeding pairs comprising some 300+ wolves in a metapopulation … with genetic exchange between subpopulations should have a high probability of long-term persistence" 74 Fed. Reg. at 15134.

Wolf population numbers are robust.  The FWS determined that target levels to sustain a genetically viable Northern Rocky Mountain wolf population were first met at the end of 2000, and at the end of 2008 the NRM gray wolf population included approximately 1,639 wolves.  74 Fed. Reg. at 15135.  The numeric recovery goals have been exceeded for eight consecutive years, and the temporal goals were met in 2002.  74 Fed. Reg. at 15123, 15135.

Defenders of Wildlife acknowledge that the FWS and State agencies have effectively managed wolf populations, and reluctantly concede that they have been brought, "to the brink of recovery."  Defenders Br. at 30.

7

Since the successful reintroduction of wolves in the NRM has met with constant litigation, it is time for this Court to recognize that the population has been recovered, and that continued management by the States is the appropriate action under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et, seq.*

The science based managers (the FWS, Montana Fish, Wildlife & Parks, the Idaho Department of Fish and Game and Tribal Governments), have succeeded in vastly exceeding the science-based viability criteria established for recovery of the Northern Recovery Area wolf populations. Montana Fish Wildlife & Parks, and Idaho Department of Fish and Game are in the best position to maintain wolf populations in accord with the biological and cultural carrying capacity of their habitats. See 74 Fed. Reg. at 15151. ("[t]he FWS agrees that a recovered wolf population is best managed by the respective States and Tribes").

### 2. Genetic Diversity Will be Sustained Under State Management

Wolves can disperse over 680 miles, with actual travel distances exceeding 6,000 miles. 74 Fed. Reg. at 15128. Even though only 30% of the NRM wolf population has been radio-collared, between 1992 and 2005 11 confirmed dispersals were beyond the core population and over 190

8

miles. Id. The FWS has determined that 52,000 to 60,000 wolves occur in Canada. 74 Fed. Reg. at 15129. Wolves simply have phenomenal natural dispersal abilities, and suitable wolf habitat lies in relatively close proximity across southwestern Canada, northwestern Montana, central Idaho and northwestern Wyoming. In the extremely unlikely event that genetic diversity of the wolf populations is at risk, the FWS has indicated that wolves once more would be transplanted into the NRM DPS. 74 Fed. Reg. at 15178.

Despite the success of reintroducing wolves into Montana and Idaho, Plaintiffs make the claim that human-assisted transplants are, "directly contrary to the purpose of the ESA, which requires recovery of naturally functioning ecosystems." Coalition Br. at 22. While denouncing the obvious wildlife management techniques that brought wolves back to Yellowstone and elk back to many areas throughout the west, Plaintiffs ignore the ability to ensure genetic viability by means of transporting wolves – just as was done under the successful reintroduction efforts. See 74 Fed. Reg. at 15132.

> 3. <u>The Gray Wolf has Recovered in the NRM DPS and is Not at Risk for Extinction</u>

From 1995 to 2008, the Northern Rocky Mountain wolf population has grown at an appropriate average annual rate of 22 percent.[3] Id. After this Court refused to grant Plaintiffs' Motion for a Preliminary Injunction, Montana and Idaho proceeded with wolf hunting seasons with a combined quota of 297 wolves, or approximately 18 percent of the NRM population. Montana has closed its 2009 wolf hunting season with 74 wolves harvested out of a quota of 77. As of November 25, 2009, Idaho had 114 wolves harvested out of a quota of 220. See http://www.fishandgame.idaho.gov/cms/hunt/wolf/quota.cfm and http://fwp.mt.gov/hunting/planahunt/wolfStatus.html. Before hunting was allowed, the NRM wolf population suffered an annual mortality rate of 26 percent. 74 Fed. Reg. at 15138. Based on the 2008 population figure, an estimated wolf mortality figure of 426 wolves in the NRM could have been expected. As this Court found, the NRM DPS can sustain single season harvest rates in excess of 30%. Order at p. 12, Document 93.

The point here is that the gray wolf, as a species, is not threatened with extinction if a small number of them are killed by hunters in Montana and Idaho. In fact, large numbers of problem wolves have recently been

---

[3] However, the FWS noted that the population growth for 2008 was slower, "indicating it could be approaching the carrying capacity of suitable habitat." 74 Fed. Reg. at 15138.

killed by professional wildlife managers at public expense.  Having hunters participate in the managed harvesting of wolves under state regulation will help provide a sustainable wolf management program.

### B.    Plaintiffs' Claims that Thousands of Wolves are Necessary are Unfounded

Defenders of Wildlife claims that "well over 1,000", "a few thousand" "1,403", and "500 breeding individuals", or "2,500 to 5,000" wolves are needed to have a viable population.  Defenders Br. at 10-11.  Plaintiffs are doing a disservice to the ESA by making politically charged arguments for desired or allegedly "viable" population numbers.

As the FWS correctly stated, species recovery is a return of a species to the point it is no longer threatened or endangered.  74 Fed. Reg. at 15140.  Moreover, the FWS has determined that most suitable habitat is occupied by wolves and significant expansion of wolves into new areas of the NRM DPS is unlikely.  Id.  The FWS found that:

> [M]aintaining the NRM gray wolf population at or above 1,500 wolves in currently occupied areas would slowly reduce wild prey abundance in suitable wolf habitat.  This would result in a gradual decline in the number of wolves.

Id.

Plaintiffs have twisted what should be an argument over the level of wolves needed to demonstrate that the species is no longer threatened or

11

endangered into an argument over the numbers of wolves Plaintiffs would like to see.  The latter argument, what the level of wolves that should be managed once a species is recovered, is properly left to the state wildlife management agencies not this Court.

Defenders argue that the FWS failed to use the best available science in the delisting rule.  Defenders Br. at 2.  Plaintiffs rely on dissenting opinions as to the adequacy of wolf population and genetic exchange.  The existence of dissenting opinions in the record does not undermine the FWS's rule. *Trout Unlimited v. Lohn*, 559 F.3d 946, 956 (9th Cir. 2009) (lack of scientific consensus is not a basis for overturning a rule). The FWS has properly exercised its discretion and made its delisting determination.  In this instance best available science supports the FWS's action and the implementation of valid management plans in Idaho and Montana.

## C.    Idaho and Montana Have Demonstrated Effective State Management of Wolves

Plaintiffs argue that the FWS determination that Idaho and Montana laws are sufficient to protect the NRM wolves was, "arbitrary and unlawful." Defenders Br. at 16.  On the contrary, the FWS properly recognized that both Idaho and Montana's laws and management plans were, "adequate to assure that their share of the NRM wolf population would be maintained

12

above recovery levels." 74 Fed. Reg. at 15124. Working in cooperation with the FWS, both Idaho and Montana have successfully worked to help manage wolves, as well as manage other wildlife populations. 74 Fed. Reg. at 15151.

It is important to provide the state wildlife management agencies the ability to manage all of the wildlife species in its jurisdiction in order to balance the conservation and stewardship of the different species and the habitats on which they depend.[4] If this Court grants Plaintiffs' Motions for Summary Judgment, the wolf population will continue to grow and state wildlife agencies will continue to be limited in their ability to manage all wildlife species. The short-sighted approach urged by the Plaintiffs herein, if successful, could ultimately harm the wolf population they claim they are trying to save. State management of the wolf population will best provide effective controls to preserve the appropriate ecological balance. Idaho and Montana wildlife management agencies should have all available tools to manage the public's wildlife resource. Anything less will pave the way for gray wolves to find their way back to the endangered species list.

---

[4] See *Baldwin v. Montana Fish and Game Commission*, (upholding Montana's right to charge more for non-resident hunting licenses, while recognizing the importance of managing wildlife in order to survive as a species), 436 U.S. 371,374, 98 S.Ct. 1852, 56 L.Ed. 2d 354 (1978), citing *Montana Outfitters Action Group v. Fish & Game Comm'n*, 417 F. Supp., 1005 at 1007 (Mont. 1976).

13

Furthermore, since the gray wolf has been successfully reintroduced into the Rockies, the equities favor the hunters who have shouldered the majority of funding for wolf recovery. In the past, hunters also supported programs that increased the numbers of deer, elk and other ungulates. Without those herds to serve as prey there could never have been a successful wolf reintroduction.  It is hunting license money that now helps pay for the state wildlife biologists to manage wolves, and for the habitat and winter range purchases that support them and their prey.  The FWS has found that hunting has not threatened wolf populations, and in fact provides a, "valuable, efficient, and cost-effective tool to help manage wildlife populations." 74 Fed. Reg. at 15147.  It is inequitable for Plaintiffs and likeminded groups to support the overpopulation of the gray wolf at the expense of the elk and other ungulates when it is hunters and landowners that are ultimately responsible for providing the financial wherewithal to maintain the big game herds which provide the food supply necessary for the wolves to survive.   Since the wolves are clearly on the path to continued survival, the equities favor a balanced system in which state wildlife agencies may continue to utilize hunters in their time honored practice in the Rockies as one of their wolf management tools.

II.   PLAINTIFF"S MOTIONS FOR SUMMARY JUDGMENT SHOULD BE
      DENIED

A.   **This Court Should Defer to FWS Interpretation of the ESA**

This Court should defer to the FWS in its interpretation of an
ambiguous statute and its interpretation of scientific evidence.  The FWS
has articulated a reasonable rationale for the decision to delist.  Deference
to an agency's scientific expertise is mandated when the agency presents a
rational connection between the facts and its conclusion.   *Ocean
Advocates v. U.S. Army Corps of Engrs.*, 402 F.3d 846, 859 (Wash. 2005).

The evidence presented shows that the Northern Rocky Mountain
wolf is ready for delisting, but that the FWS has determined that the
Wyoming management plan is inadequate.  In *Chevron U.S.A. v. Natural
Resources Defense Council*, the Supreme Court required courts to defer to
"reasonable" constructions of a statute put forth by an agency.  467 U.S.
837, 843 (1984).  Because FWS' interpretation in the rule is reasonable
and consistent with the text, purpose, and legislative history of the ESA, it
is entitled to *Chevron* deference and should be upheld.  When an agency
decision involves a high level of technical and scientific expertise, a Court
should defer to the agency's conclusions, so long as they are reasonable.
*Lands Council v. McNair,* 537 F.3d 981, 983 (9th Cir. 2008) (*en banc*).

15

Plaintiffs argue that such deference does not apply when an "agency interpretation of a relevant provision" conflicts with the "agency's earlier interpretation." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 447 n. 30 (1987). Plaintiffs rely on the April, 2003 FWS statement that "[d]elisting can occur only when a species (or subspecies or DPS) is recovered . . . .". 68 Fed. Reg. 15804, 15825, 15826 (Apr. 1, 2003), see Defenders Br. at 9. Plaintiffs argue that this statement is at odds with the proposed delisting and represents a conflict with the agency's earlier interpretation. However, the quoted material does not prohibit partial delisting. Instead the statement was made in reference to a 2003 decision to expand the boundaries of the gray wolf DPSs. 68 Fed. Reg. at 15826. This comment is not a definitive statement that DPS boundaries cannot be subdivided as suggested by Plaintiffs, and therefore does not represent a conflicting statement.

Defenders also argue that the FWS is inconsistent because it stated that it, "cannot use a boundary between States to subdivide a single biological population in an effort to artificially create a discrete population." Defenders Br. at 9 *citing* 68 Fed. Reg. at 15821. This quote was in the context of supporting listing the mid-west wolf population (including the previously listed State of Minnesota population) as threatened rather than

16

endangered, and also recognized a situation where boundaries between states were appropriate. 68 Fed. Reg. at 15821. Defenders also cited a 2005 wolf rule in which the FWS stated the ESA does not allow wolves to be delisted on a state-by-state basis. Defenders Br. at 9. However, the FWS also stated that it was not proposing to delist wolves at that time, and that it was not addressing the comment proposing state-by-state delisting at that time. 70 Fed. Reg. 1285, 1296 (Jan. 6, 2005). The FWS has properly moved to delist wolves within the NRM DPS, except for Wyoming where it made a determination of danger of extinction in a significant portion of its range. 74 Fed. Reg. at 15180-84. Prior FWS statements concerning state delisting are not clearly in conflict with the current FWS position, and the limited deference of *I.N.S. v. Cordoza-Fonseca* and *Gen. Elec. Co. v. Gilbert* is not appropriate. *Gen. Elec. Co. v. Gilbert* (1976), 429 U.S. 125, 143, 97 S.Ct. 401, 50 L.Ed.2d 34.

Deference to experts is especially important in the wildlife management context as seen in *Ninilchik Traditional Council v. U.S* when the court deferred to the Federal Subsistence Board in a matter regarding subsistence hunting of moose. 227 F.3d 1186, 1194 (9th Cir. 2000). In Ninilchik the tribal council challenged restrictions on antler size of moose taken by subsistence hunters on certain public lands. The restrictions were

17

determined by the Federal Subsistence Board which was established as part of the Alaska National Interest Lands Conservation Act (ANILCA) to protect the viability of subsistence living.  16 U.S.C § 3101.  The limitation in moose size stemmed from interpretation of Section 3114 of ANILCA. The Federal Subsistence Board read the provision to require a priority be given to subsistence uses over other uses.  The Ninilchik tribal council felt that the priority should be absolute in that all non-subsistence uses would be eliminated before subsistence use was restricted in any way.  *Ninilchik*, 227 F.3d at 1191.  Applying the deferential standard of *Chevron* the court in *Ninilchik* allowed the Subsistence Board to interpret the ANILCA provision and held that "to balance the competing aims of subsistence use, conservation, and recreation, while at the same time providing subsistence hunters with a meaningful use preference, is reasonable." Id. at 1193.  The court stated that "[s]uch deference is especially appropriate here as the challenged decision implicates substantial agency expertise." Id. at 1194.

Similar to the situation in *Ninilchik*, the FWS interpretation and application of the DPS listing rules to allow a partial delisting of wolves requires substantial agency expertise.  Furthermore the FWS decision is reasonable and should be given *Chevron* deference.

18

**B.    The FWS Did Not Improperly Sever Wyoming From the Northern Rocky Mountain DPS**

Plaintiffs argue that the FWS decision to delist wolves in Montana and Idaho, and continue their listing in Wyoming is not proper.  Coalition Br. at 25-29; Defenders Br. at 4-8.  While RMEF is hopeful that Wyoming and the FWS can agree upon a management regime under which Wyoming can manage wolves, Montana and Idaho should be allowed to manage wolves in their respective jurisdictions.  The FWS did not act in an arbitrary and capricious manner in violation of the Administrative Procedure Act.  5 U.S.C. § 706.

1.    <u>The FWS Lawfully Interpreted the ESA</u>

Plaintiffs argue that the delisting of a portion of the DPS is invalid as the ESA does not allow for listing or delisting below the level of species, subspecies or DPS.  Defenders Br. at 5.  Plaintiffs rely on the definition of "species" which includes any subspecies and a designated DPS.  16 U.S.C. § 1532(16).  However, Section 4(c)(1) requires the FWS to list species and to specify over what portion of a species' range it is endangered or threatened.  16 U.S.C. § 1533(c)(1).  Moreover, "endangered species" is defined as a species in danger of extinction throughout all or a significant portion of its range.  16 U.S.C. § 1532(6).

19

Plaintiffs erroneously jump to the conclusion that the FWS cannot delist a species in a portion of a DPS without running afoul of the clear language of the ESA. The ESA is ambiguous as to whether protections must be applied to the entire listed species or whether they may be applied only within a significant portion of the species range. Nowhere in the ESA does it specifically state that the FWS is prohibited from delisting part of a DPS, nor does the ESA prohibit utilization of political boundaries in delineating DPS boundaries. The FWS's interpretation of an ambiguous statute is reasonable and should be given deference. *Lands Council v. McNair*, 537 F.3d 981, 991 (9th Cir. 2008) (*en banc*).

The need for flexibility in endangered species listing and delisting is reflected in the ESA's legislative history. The Senate noted the need for the FWS to have management flexibility, stating that, "[o]ne of the weaknesses of the 1969 Act which was corrected in the 1973 amendments was the inability of the FWS to adopt different management practices for healthy, threatened, or endangered populations." Senate Rpt. No. 151, 96th Cong., 1st Sess. at 7 (1979). It is important for the FWS to have the flexibility to protect a portion of a species according to that portion's conservation status. *Southwest Center for Biological Diversity v. Babbitt*, 980 F. Supp. 1080, 1085 (D.Ariz.,1997).

20

The FWS has consistently recognized its discretion to work at the subspecies, species or the DPS level as they believe to be most appropriate to carry out their listing and recovery programs.  68 Fed. Reg. at 15825 (April 1, 2003).  "The ability to designate and list [distinct population segments] allows the [agency] to provide different levels of protection to different populations of the same species."  *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir.2003).  The benefits of this flexibility are further explained in the FWS policy:

> Listing, delisting, or reclassifying distinct vertebrate population segments may allow the Services to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range.  This may allow protection and recovery of declining organisms in a more timely and less costly manner, and on a smaller scale than the more costly and extensive efforts that might be needed to recover an entire species or subspecies.   The Services' ability to address local issues (without the need to list, recover, and consult rangewide) will result in a more effective program.  61 Fed. Reg. 61 4725 (Feb. 7, 1996).

The ability to address local issues is particularly relevant here, as alleged inadequacies in Wyoming's management plan led the FWS to a partial delisting of the Northern Rocky Mountain gray wolf population.  The FWS has stated that, "a listing, reclassification, or delisting action may, in some circumstances, be more appropriately applied over something less than the entire area in which a species or subspecies is found or was known to

21

occur in order to protect and recover organisms in a more timely and cost-effective manner." 68 Fed. Reg. 15808 (April 1, 2003).

These explanations clarify that, as intended by the legislature, flexibility is essential to effectively accomplish long term management goals and ultimately species recovery. The FWS policy has consistently adhered to the goal of species recovery.

### 2.   The NRM Rule is Consistent with Case Law

Defenders of Wildlife rely on *Alsea Valley Alliance v. Evans* for the principal that listing distinctions below that of subspecies or a DPS of a species are not allowed under the ESA.   161 F. Supp. 2d 1154, 1161 (D.Or.2001).   Defenders Br. at 6.   The source of the *Alsea* principal is *Southwest Center for Biological Diversity v. Babbitt.*   980 F. Supp. 1080, 1085 (D.Ariz. 1997).

Contrary to Plaintiffs' argument, *Southwest Center* does not conclude that distinctions below subspecies or DPS are not allowed under the ESA. In *Southwest Center,* an environmental group filed action challenging the FWS's denial of a petition for listing of three subspecies of northern goshawk as a DPS.   Southwest had argued that the denial was arbitrary and capricious because it was based upon a DPS listing policy which was contrary to the ESA.   The FWS policy at issue limited the number of

22

subspecies allowed to any DPS listing to one.  61 Fed. Reg. at 4722.  The FWS supported its decision by arguing that there was nothing in the ESA which prohibited this policy, thus it was allowed. *Southwest Center*, 980 F. Supp at 1081.    The court held the FWS's policy allowing only one subspecies per DPS listing was arbitrary and capricious and constituted abuse of discretion.  The court further clarified that the policy limited DPSs in a manner which was not contemplated by Congress in enacting the ESA and which was not supported by the information in the administrative record. Id. at 1085.

The policy of one subspecies per DPS at issue in *Southwest Center* was rejected because it conflicted with the intent of Congress and the administrative record which reflects the importance for the FWS to have the flexibility to protect a portion of a species according to that portion's conservation status. Id.  The *Southwest Center* holding in favor of FWS flexibility actually supports the partial delisting in the instant proceeding.

Plaintiffs further rely on *National Wildlife Federation v. Norton* for the notion that the FWS cannot exclude portions of a DPS from listing a species.  386 F.Supp. 2d 553, 564 n.9 (D. Vt. 2005).  *National Wildlife Federation* cites *Alsea* for this concept.  386 F.Supp. 2d at 564.  Thus it is useful to consider *Alsea.*  In *Alsea* the court held that to list only naturally

23

spawning coho salmon as "threatened" was arbitrary and capricious, and thus invalid.  161 F. Supp. 2d at 1161.  The FWS had separated hatchery raised and natural salmon into two DPS's and proposed listing only the natural fish.  The court held that this listing decision would create "the unusual circumstance of two genetically identical coho salmon swimming side-by-side in the same stream, but only one receives ESA protection while the other does not."  Id. at 1163.  The court deemed this distinction arbitrary. Id.

The wolf delisting decision at issue here is easily distinguished from the situation in *Alsea*.  Rather than a situation where genetically identical wolves are running side by side in the same valley, with only one receiving ESA protection, the FWS is proposing to protect wolves throughout their range by delisting only in those areas where sufficient regulatory schemes are in place.  Considering Congress' intention to provide the FWS flexibility to tailor protections to the actual threats to species recovery, delisting segments should be allowed.

The ESA requires that the condition of listed species (or DPSs) be improved so that they will no longer need the protection of the ESA. Although not originally contemplated in the ESA, a modified policy considering the distinction between wild and hatchery salmon was critical.

24

National Marine Fisheries Service ("NMFS") subsequently adopted an alternative, more reasonable, interpretation. *California State Grange v, NMFS*, 620 F. Supp. 2d 1111, 1157 (E.D Calif. 2008). This modification in agency policy reflects the need for individualized management adapted for different species. An alternate and reasonable interpretation of the ESA must likewise be applied to the Northern Rocky Mountain wolf DPS.

### 3.   The FWS Properly Relied on Sound Science and State Management

The ESA requires agencies to make listing decisions on the basis of the best science and commercial data available and after considering efforts of states to protect a species under consideration for threatened or endangered status. 16 U.S.C. § 1533(b)(1)(A). The listing agencies are also required to consider the "inadequacy of existing regulatory frameworks." 16 U.S.C. § 1533 (a)(1)(D). These statutory mandates require consideration of regulatory frameworks as well as science.

The purpose of the ESA is to bring listed species to a point where the species is recovered and returned to state management. See 16 U.S.C. § 1532(3) (defining "conservation"). Section 4 of the ESA provides that delisted species are to be monitored "in cooperation with the States."

25

16 U.S.C. § 1533(g)(l). The adequacy of state regulatory mechanisms is an element to be considered in any delisting decision. 16 U.S.C. § 1533(a)(1)(D). State management is necessary to ensure consideration of the unique circumstances relating to the conservation of wolves. Consideration of state efforts is consistent with one purpose of the ESA to "encourage the States and other interested parties … to develop and maintain conservation programs." 16 U.S.C. § 1531(a)(5). State wildlife managers can better ensure the maintenance of proper predator/prey balances while including protections against avoidable depredations on livestock and domestic pets.

It is appropriate to delist a portion of the DPS, and the ESA does not prohibit such action. The FWS properly considered whether existing regulatory mechanisms are adequate to protect the wolf as required by 16 U.S.C. § 1533(a)(1)(D). The FWS determined that Montana and Idaho have in place adequate regulatory mechanisms for the protection and enhancement of wolf populations and habitat. Specifically, the FWS found that maintenance of the Northern Rocky Mountain DPS at over 15 breeding pairs and 150 wolves in each State will maintain a well distributed core population in each recovery area, which will in turn provide a secure source of dispersing wolves to seek out new territory and unrelated mates. 74

26

Fed. Reg. at 15180. The scientific evidence supports these conclusions, as wolves have dispersed between recovery areas and into the Greater Yellowstone Area. 74 Fed. Reg. at 15177. The FWS has articulated a rational connection between the facts found and the choice made. *Ocean Advocates v. U.S. Army Corps of Engrs.*, 402 F.3d 846, 859 (Wash. 2005).

## CONCLUSION

For the last-quarter century, the RMEF has made profound and enduring contributions to habitat protection and enhancement efforts, as well as wildlife research, in Idaho, Montana and throughout North America. These efforts, together with those of Montana Fish Wildlife & Parks and the Idaho Department of Fish and Game, and many other partners, have helped conserve habitat and sustain the health of elk herds and other wildlife species, including grizzly bears, black bears, mountain lions and wolves. Because all of the appropriate targets for the Northern Rocky Mountain wolf repopulation have been met, the RMEF strongly supports the efforts of the FWS, and the States of Montana and Idaho to delist the Northern Rocky Mountain gray wolf distinct population segment.

Only effective state management of the current wolf population can provide the proper ecological and biological balance necessary so that all

Rocky Mountain wildlife, including wolves and elk can coexist. Therefore, the RMEF respectfully requests that this Court deny the Plaintiffs' motion for summary judgment, grant Federal Defendants' cross-motions for summary judgment, and allow the experienced hands of the appropriate state agencies to continue to effectively manage wolf populations.

DATED this 2nd day of December, 2009

/s/ Lon J. Dale.
Lon J. Dale, Esq.
Milodragovich, Dale, Steinbrenner
    & Nygren, P.C.
P.O. Box 4947
Missoula, MT  59806-4947
(406) 728-1455/fax (406) 549-7077
LON@bigskylawyers.com

John I. Kittel, Esq.
Mazur & Kittel, PLLC
30665 Northwestern Hwy.; Ste. 175
Farmington Hills, MI 48334
(248) 432-8000/fax (248) 432-8010
jkittel@mazur-kittel.com

Grant Parker, Esq.
Rocky Mountain Elk Foundation
5705 Grant Creek
Missoula, MT 59808
(406) 523-4524/fax (406) 523-0211
grant@rmef.org

28

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of December, 2009, a copy of the

foregoing document was served by the following means:

**CM/ECF**

/s/ Lon J. Dale
Lon J. Dale, Esq.
Milodragovich, Dale, Steinbrenner
    & Nygren, P.C.
P.O. Box 4947
Missoula, MT  59806-4947
(406) 728-1455/fax (406) 549-7077
LON@bigskylawyers.com

John I. Kittel, Esq.
Mazur & Kittel, PLLC
30665 Northwestern Hwy., Ste. 175
Farmington Hills, MI 48334
(248) 432-8000/fax (248) 432-8010
jkittel@mazur-kittel.com

Grant Parker, Esq.
Rocky Mountain Elk Foundation
5705 Grant Creek
Missoula, MT 59808
(406) 523-4524/fax (406) 523-0211
grant@rmef.org

Attorneys for *Amicus Curiae* Rocky Mountain Elk Foundation

29

## CERTFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I certify that the foregoing brief contains 5531 words as determined by the word count function of Microsoft Word.


Dated: December 2, 2009          /s/ Lon J. Dale_____