

**FILED**

**AUG 0 5 2010**

PATRICK E. DUFFY, CLERK

By_____
DEPUTY CLERK, MISSOULA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE,<br>NATURAL RESOURCES DEFENSE<br>COUNCIL, SIERRA CLUB, HUMANE<br>SOCIETY OF THE UNITED STATES,<br>CENTER FOR BIOLOGICAL<br>DIVERSITY, JACKSON HOLE<br>CONSERVATION ALLIANCE,<br>FRIENDS OF THE CLEARWATER,<br>ALLIANCE FOR THE WILD ROCKIES,<br>OREGON WILD, CASCADIA<br>WILDLANDS, WESTERN<br>WATERSHEDS PROJECT, WILDLANDS<br>NETWORK, and HELLS CANYON<br>PRESERVATION COUNCIL,<br><br>              Plaintiffs,<br><br>    v.<br><br>KEN SALAZAR, Secretary of the Interior,<br>ROWAN GOULD, Acting U.S. Fish and | CV 09-77-M-DWM<br>CV 09-82-M-DWM<br>(consolidated)<br><br>OPINION |

Wildlife Service Director, and UNITED )
STATES FISH AND WILDLIFE )
SERVICE, )
)
                  Defendants, )
)
      v. )
)
STATE OF IDAHO, SAFARI CLUB )
INTERNATIONAL, SPORTSMEN FOR )
FISH AND WILDLIFE, MONTANA )
FARM BUREAU FEDERATION, IDAHO )
FARM BUREAU FEDERATION, )
MOUNTAIN STATES LEGAL )
FOUNDATION, STATE OF MONTANA, )
MONTANA DEPARTMENT OF FISH, )
WILDLIFE AND PARKS, IDAHO )
GOVERNOR C.L. "BUTCH" OTTER, )
NATIONAL RIFLE ASSOCIATION )
OF AMERICA, )
)
                 Intervenor- )
                 Defendants. )
)
_____ )
GREATER YELLOWSTONE )
COALITION, )
)
                 Plaintiff, )
)
      v. )
)
KEN SALAZAR, Secretary of the Interior, )
ROWAN GOULD , Acting U.S. Fish and )
Wildlife Service Director, and UNITED )
STATES FISH AND WILDLIFE )
SERVICE, )

Defendants.　　）
_____　）

## I.  Introduction

When Congress enacted the Endangered Species Act (the "ESA") what it

envisioned was an orderly process beginning with a determination of when a

species is at risk of extinction and ending when that risk is reduced  to an

acceptable level.  The Act was not intended to sow the dragon's teeth of strife or

to plant the seeds of future conflicts that have given rise to this case.  The fight

about wolves, steeped in stentorian agitprop, ignores the two different mandates of

the act: the risk assessments, whether listing or delisting, are designed to prevent

extinction of a species and secondly they are intended to promote recovery of that

species.  Even though the focus is different, both contribute to the principal goal of

the Act, conserving a listed species and its habitat.  It does so by using scientific

evidence and efforts to stabilize the species but also by ameliorating threats the

species faces to the point that the species is no longer unacceptably at risk of

extinction.  Dale D. Goble, *Recovery, in* ENDANGERED SPECIES ACT: LAW,

POLICY, AND PERSPECTIVES 71, 71 (Donald C. Baur & Wm. Robert Irvin eds.,

2010).  "[I]t is clear that Congress intended that conservation and survival be two

different (though complimentary) goals of the ESA."  Gifford Pinchot Task Force

-3-

v. U.S. Fish & Wildlife Serv. 378 F.3d 1059, 1070 (9th Cir. 2004).

The Talmudic disagreement in this case is to some degree a product of the fact that the Congress does not explicitly define "recovery" in the Act. Consequently there are different views about how that status is to be measured or achieved. Congress did, however, define "conservation" as an affirmative obligation to "use . . . all methods and procedures which are necessary to bring any [listed] species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3). While the statute is bare, the implementing regulations define "recovered" to mean "no longer in need of the Act's protection." It is the Act's definitions of "endangered" and "threatened" that provide the applicable standards for determining whether a species is recovered. Goble, *Recovery* at 72. Despite this reality, it is not necessarily the case that threatened or endangered status can be determined solely on the basis of scientific evidence alone. Beyond the question of risk is the issue of the acceptability of risk. Id. at 73. The decision that a risk is acceptable regarding a specific species is, in turn, an ethical and policy judgment. That means, in many respects, the complications are political. Even so, such judgments must be made within the context of the law, and the mandate of Congress cannot be altered or diminished to satisfy political or other purposes that are contrary to the plain meaning of the

ESA.

When a species is delisted it creates additional legal concerns: will "removal of the ESA's 'existing regulatory mechanisms' again place the species at risk by removing its legal protection?" Id. at 74. The delisting decision, which must consider the same five factors as the listing decision, focuses on two separate issues. First, there is the question of whether the species has recovered biologically. The resolution of this question depends upon the population size and distribution and whether its numbers have increased sufficiently to provide assurance that the species is not unacceptably at risk from stochastic events. Then it is necessary to determine if the biological recovery is threatened by the lack of sufficient legal protections. It is the conflated turmoil of the legal issues with the pragmatic management issues that form the basis of Plaintiffs' challenge, and Defendants' response in this case.

As discussed in greater detail below, after reviewing the Final Rule, the administrative record, the arguments submitted by the parties, the statutes and relevant case law, the Court finds:

- The Endangered Species Act does not allow the U.S. Fish & Wildlife Service to list only part of a "species" as endangered, or to protect a listed distinct population segment only in part as the Final Rule here does; and

- the legislative history of the Endangered Species Act does not support the Service's new interpretation of the phrase "significant portion of its range." To the contrary it supports the historical view that the Service has always held, the Endangered Species Act does not allow a distinct population segment to be subdivided.

Accordingly, the rule delisting the gray wolf must be set aside because, though it may be a pragmatic solution to a difficult biological issue, it is not a legal one. Because the Rule does not comply with the ESA, it is unnecessary to resolve all of the issues raised by the parties.

## II. Case Background

The Defenders of Wildlife, et al. ("Defenders of Wildlife") and the Greater Yellowstone Coalition ("Greater Yellowstone") challenge the U.S. Fish & Wildlife Service's (the "Service's") decision to designate and partially remove protections for the northern Rocky Mountain gray wolf distinct population segment ("DPS") under the ESA, 16 U.S.C. § 1536. They seek judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 and the ESA, 16 U.S.C. § 1531 et seq.

Plaintiff Defenders of Wildlife's claims are that the Service's gray wolf delisting Rule violates the ESA for nine separate reasons: (1) the decision violates the statute by partially protecting a listed species; (2) the decision is based on outdated and unscientific recovery targets; (3) there is a lack of genetic

connectivity to support the decision; (4) there are inadequate regulatory

mechanisms to protect wolves without protections of the ESA; (5) the Service

failed to consider loss of historic range when determining whether the wolves are

recovered; (6) the Service disregarded the status of gray wolves throughout the

lower-48 states in conducting its analysis; (7) the decision violates the ESA by

delisting a previously unlisted population of wolves; (8) the Service defined the

DPS boundaries contrary to the ESA and the Service's own policy; and (9) the

decision impermissibly designates wolves in Wyoming as a "non-essential,

experimental" population.

Plaintiff Greater Yellowstone challenges the Service's delisting decision

claiming it violates the ESA on five grounds: (1) the Service arbitrarily assessed

the current and future genetic connectivity of the DPS; (2) the decision relies upon

inadequate regulatory mechanisms to assure genetic connectivity; (3) the decision

violates the ESA by partially protecting a listed population; (4) the Service failed

to consider loss of historic range when determining whether to delist; and (5) the

decision impermissibly designates wolves in Wyoming as a "non-essential,

experimental" population.

The briefing on the issues is extensive leading to eight related motions for

summary judgment. Disposition of the statutory argument makes resolution of the

remaining issues unnecessary. Plaintiffs Defenders of Wildlife and Greater

Yellowstone each filed a motion for summary judgment to set aside the Service's

April 2, 2009 Final Rule ("Final Rule"), an action by the Service that removed the

ESA's protections for gray wolves throughout the northern Rocky Mountain DPS

except for Wyoming. Federal Defendants and five Defendant-Intervenors each

filed cross-motions for summary judgment seeking a declaration that the Service's

Final Rule complies with all relevant laws and statutes. The case is resolved at

this point on the first argument Defenders of Wildlife makes. The plain language

of the ESA does not allow the agency to divide a DPS into a smaller taxonomy.

For this reason, the Rule delisting the northern Rocky Mountain gray wolf DPS

must once again be vacated and set aside.

### III. Factual Background

The gray wolf is the largest wild member of the dog family. 74 Fed. Reg.

15,123, 15,123 (April 2, 2009). Wolves generally live in packs of 2 to 12 animals

and have strong social bonds. Id. Wolf packs consist of a breeding pair (the alpha

male and alpha female), their offspring from previous years, and an occasional

unrelated wolf. Id. Generally, only the alpha male and alpha female breed. Id.

Litters are born in April and average around 5 pups. Id. Normally, 4 pups survive

until winter. Id. Wolves can live up to 13 years, but in the northern Rocky

Mountains 4 years is the average lifespan. Id. Packs typically occupy territories from 200 to 500 square miles, which they defend against other wolves and wolf packs. Id.

Wolves were once abundant throughout most of North America. Id. Hunting and an active, government-sponsored eradication program resulted in the extirpation of wolves from most of their range in the lower-48 states. Id. Wolves were exterminated in Montana, Idaho, Wyoming, and adjacent southwestern Canada by the 1930s. Id.

In 1974, the northern Rocky Mountain gray wolf was listed as endangered under the ESA. Id. at 15,124 (citing 39 Fed. Reg. 1171 (Jan. 4, 1974)). In 1987, the Service developed a wolf recovery plan (the "1987 Recovery Plan"). That Plan established a recovery goal of at least 10 breeding pairs and 100 wolves for three consecutive years in each of three core recovery areas: northwestern Montana, central Idaho, and the greater Yellowstone area. Id. at 15,130. In 1994, the Service proposed to designate portions of Idaho, Montana, and Wyoming as two nonessential experimental population areas for the gray wolf under § 10(j) of the ESA. Id. at 15,124 (citing 59 Fed. Reg. 60,252, 60,266 (Nov. 22, 1994)). Through these designations, the Service initiated gray wolf reintroduction projects in central Idaho and in the greater Yellowstone area.

In 1994, the Service also prepared an Environmental Impact Statement on the reintroduction of gray wolves in the northern Rocky Mountains (the "1994 EIS"). Id. at 15,130. The 1994 EIS evaluated whether the population goals for delisting wolves contained in the 1987 recovery plan would result in a viable wolf population. Id. The 1994 EIS concluded the goal of 10 breeding pairs and 100 wolves in three separate recovery areas for three consecutive years was "reasonably sound and would maintain a viable wolf population in the foreseeable future." Id. at 15,131. Nonetheless, the 1994 EIS noted the 1987 recovery plan goals were "somewhat conservative . . . and should be considered minimal." Id. It predicted "[t]hirty or more breeding pairs comprising some 300+ wolves in a metapopulation (a population that exists as partially isolated sets of subpopulations) with genetic exchange between subpopulations should have a high probability of long-term persistence." Id. at 15,130-31. In 1995 and 1996, the Service released wolves captured in southwestern Canada into central Idaho and into the greater Yellowstone area. Id. at 15,137.

The northern Rocky Mountain wolf population met the Service's numeric recovery goal of 300 wolves and 30 breeding pairs for the first time in 2000. In late 2001 and early 2002, the Service conducted another evaluation of what constitutes a recovered wolf population and reaffirmed the recovery criteria set

forth in the 1994 EIS.  Id.  By the end of 2007, the northern Rocky Mountain wolf

population had achieved its numerical recovery goal for eight consecutive years.

On February 8, 2007, the Service proposed to identify the northern Rocky

Mountain gray wolf DPS and to delist the species.  The Service issued a final rule

("2008 Rule") doing so on February 27, 2008.  The DPS encompassed all of

Montana, Idaho, and Wyoming, as well as parts of eastern Washington, eastern

Oregon, and northern Utah.  73 Fed. Reg. 10,514, 10,518 (Feb. 27, 2008).

Twelve parties, all of whom are a part of this present action, challenged the

2008 Rule in this Court, and moved to preliminarily enjoin the delisting.  A July

18, 2008 Order granted plaintiffs' motion for preliminary injunction and enjoined

implementation of the 2008 Rule.  The Court found plaintiffs were "likely to

succeed on the majority" of their claims.  Defenders of Wildlife, et al. v. Hall, et

al., 565 F. Supp. 2d 1160, 1163 (D. Mont. 2008).  Specifically, the Court

identified two problems with the Service's decision.  First, the Service likely acted

arbitrarily in delisting the northern Rocky Mountain DPS without evidence of

genetic exchange between subpopulations.  Id.  Second, the Service likely acted

arbitrarily and capriciously in relying upon Wyoming's 2007 wolf management

plan "despite the State's failure to commit to managing for 15 breeding pairs and

the plan's malleable trophy game area."  Id.  Following the Court's preliminary

-11-

injunction order, the Service asked the Court to vacate the 2008 Rule.  On October 14, 2008, this Court did so and then remanded the Rule to the Service for further consideration.

Two weeks later, on October 28, 2008, the Service reopened the comment period on its 2007 proposal to identify and delist the northern Rocky Mountain gray wolf DPS.  This comment period sought information, data, and comments regarding the 2007 proposal in light of the issues raised by the Court in its preliminary injunction Order of the 2008 Rule.  The comments were many and varied.

On April 2, 2009, the Service issued a Final Rule to identify the northern Rocky Mountain gray wolf DPS, and revise the list of endangered and threatened wildlife.  74 Fed. Reg. 15,123.  The Final Rule found the DPS continues to have numbers well above the minimum population recovery goal and new data showed genetic exchange not to be an issue between the three recovery areas of the DPS.  Id.  Additionally, the Rule observed that Montana and Idaho have laws, plans and regulations that ensure the wolf population will remain recovered into the foreseeable future.  Id.  However, the Rule also noted Wyoming's regulatory framework failed to meet the ESA's requirements.  Id. at 15,125.  Accordingly, the Final Rule declared "(1) the [northern Rocky Mountain] DPS is not threatened or

-12-

endangered throughout 'all' of its range (i.e. not threatened or endangered

throughout all of the DPS); and (2) the Wyoming portion of the range represents a

significant portion of range where the species remains in danger of extinction

because of inadequate regulatory mechanisms." 74 Fed. Reg. 15,123. The Final

Rule "removes the Act's protections throughout the [northern Rocky Mountain]

DPS except for Wyoming." Id.

Once again, on June 2, 2009, Defenders of Wildlife brought an action

challenging the Final Rule. On June 10, 2009, Greater Yellowstone filed a

separate but similar challenge to the Final Rule. The cases were consolidated on

June 12, 2009. Since then various parties, including the State of Idaho and State

of Montana, have intervened in support of the Final Rule.

With the removal of ESA protections, Idaho and Montana authorized public

wolf hunts that were to begin in September 2009. On August 20, 2009, Plaintiffs

moved for a preliminary injunction to reinstate ESA protections for the gray wolf

DPS. The motion was denied because Plaintiffs failed to show irreparable harm in

the absence of the injunction given the limited number of wolves authorized for

take. Prelim. Inj. Or. 12-13 (Sept. 8, 2009). In that order it was  noted that

Plaintiffs had demonstrated a likelihood of success on the merits because "the

Service cannot delist part of the species below the level of the DPS without

-13-

running afoul of the clear language of the ESA." Id. at 7.

## IV.  Legal Framework

### A.    Endangered Species Act

The ESA is designed to conserve the ecosystems upon which endangered

and threatened species depend and to provide a program for the conservation and

protection of such species.  16 U.S.C. § 1531(b).  Protections of the ESA apply to

species listed as endangered or threatened after public notice and comment.  Id. §

1533.  An endangered species is "any species which is in danger of extinction

throughout all or a significant portion of its range."  Id. § 1532(6).  A threatened

species is "any species which is likely to become an endangered species within the

foreseeable future throughout all or a significant portion of its range."  Id. §

1532(20).  The ESA defines "species" to include "any distinct population segment

of any species of vertebrate fish or wildlife which interbreeds when mature."  Id. §

1532(16).

The ESA requires the Secretary to examine five factors when determining

whether a species is threatened or endangered; the same factors apply to determine

if a previously listed species should be delisted.  Id. § 1533(a)(1); 50 C.F.R. §

424.11(d).  The factors include:

(A) the present or threatened destruction, modification, or curtailment

-14-

of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; [and]

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c). Any one of the factors is sufficient to support a listing determination if the factor causes the species to be in danger of extinction or likely to become an endangered species in the foreseeable future throughout all or a significant portion of its range. Listing decisions must be made "solely on the basis of the best scientific and commercial data available," and without reference to possible economic or other impacts of such a determination. 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(b); 50 C.F.R. § 424.13. Delisting cannot be based on the constituent interests of economic, recreational or other purposes. The decision  must be based on the best available science. It cannot be based on emotion or sentiment. "A species may be delisted only if [the best scientific and commercial data available] substantiate that it is neither endangered nor threatened," because it is extinct, recovered, or the original data for classification was in error. 50 C.F.R. § 424.11. A species reaches "recovery" when there is "improvement in the status of listed species to the point at which

-15-

listing is no longer appropriate under the criteria set out in [16 U.S.C. §
1533(a)(1)]." 50 C.F.R. § 402.02.

Once listed, the ESA requires the species to be monitored, and when
appropriate, to be reclassified or delisted. 16 U.S.C. § 1533(c). All federal
departments and agencies must seek to conserve a species once it is listed as
endangered or threatened. 16 U.S.C. § 1531(c).

## B.     Administrative Procedure Act

Judicial review of an agency's compliance with the ESA is governed by the
judicial review provisions of the Administrative Procedure Act ("APA"). Oregon
Natural Res. Council v. Allen, 476 F.3d 1031, 1035 (9th Cir. 2007). Agency
decisions can only be set aside under the APA if they are "arbitrary, capricious, an
abuse of discretion, or otherwise not in accordance with law." Citizens to Pres.
Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) (quoting 5 U.S.C. § 706(2)(A),
overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)). Review
under the arbitrary and capricious standard is "narrow," but "searching and
careful." Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989).
Agency action can be set aside "if the agency has relied on factors which Congress
has not intended it to consider, entirely failed to consider an important aspect of
the problem, offered an explanation for its decision that runs counter to the

-16-

evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n

of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983). The court must ask

"whether the [agency's] decision was based on a consideration of the relevant

factors and whether there has been a clear error of judgment . . . [The court] also

must determine whether the [agency] articulated a rational connection between the

facts found and the choice made. [The] review must not rubber-stamp . . .

administrative decisions that [the court deems] inconsistent with a statutory

mandate or that frustrate the congressional policy underlying a statute." Ocean

Advocates v. U.S. Army Corps of Eng'rs, 361 F.3d 1108, 1119 (9th Cir. 2004)

(internal citations and quotations omitted). Nevertheless, a court may not

substitute its judgment for that of the agency or merely determine it would have

decided an issue differently. Oregon Natural Res. Council, 476 F.3d at 1035.

## C. Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary

judgment is a particularly appropriate tool for resolving claims challenging agency

action.  See Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985).  The

issues presented here address the legality of Defendants' actions based on the

administrative record and do not require resolution of factual disputes so summary

judgment is appropriate.

### V. Analysis

The fulcrum of Plaintiffs' principal argument is that the Service violated the

plain terms of the ESA by listing something less than a DPS as endangered.  The

essence of the claim is that in the delisting Final Rule the agency relied on factors

Congress did not authorize it to consider: an agency created sub-DPS taxonomy.

The listing (or delisting) of a species is a three step process.  See Trout

Unlimited v. Lohn, 559 F.3d 946, 949 (9th Cir. 2009).  First, the Service must

identify a "species" within the meaning of the ESA.  The ESA defines "species" to

include not only the taxonomic species, but also "any subspecies of fish or wildlife

or plants, and any distinct population segment of any species of vertebrate fish or

wildlife which interbreed when mature."  16 U.S.C. § 1532(16) (emphasis added).

Notably the statute stops at a designated DPS — nothing smaller.  "The ability to

designate and list [distinct population segments] allows the [agency] to provide

different levels of protection to different populations of the same species."  Trout

Unlimited, 559 F.3d at 946 (alteration in original) (quoting Nat'l Ass'n of Home

Builders v. Norton, 340 F.3d 835, 842 (9th Cir. 2003)). Second, the Service must decide whether to "list" or "delist" the species. The identified species then may be listed as either "endangered" or "threatened." 16 U.S.C. § 1533(a)(1). Third, the Service must then list the species in the Federal Register as endangered or threatened. The list needs to reference the listed species "by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat with such range." Id. § 1533(c)(1). The Service must then "accord the species or the [DPS] various legal protections," such as preventing the taking of any such species. Trout Unlimited, 559 F.3d at 949-50; 16 U.S.C. § 1538(a)(1).

In this case the Service identified the northern Rocky Mountain gray wolf DPS as the species. 74 Fed. Reg. 15,125. No one takes issue with the DPS designation. Next, the Service determined the DPS is in danger of extinction in Wyoming, and that Wyoming is a "significant portion of its range." Id. at 15,183. Then, the Service placed the northern Rocky Mountain gray wolf DPS on the list of endangered or threatened species. It listed the common name of the "species" as "wolf, gray [Northern Rocky Mountain DPS]," the scientific name as *Canis lupus*, and the range where endangered or threatened as Wyoming. Id. at 15,187.

The Plaintiffs take issue with this action. They argue the Service violated

the ESA by determining the DPS is "in danger of extinction throughout . . . a significant portion of its range"–and thus an endangered species–but then only applied the Act's protections to one geographical area of the DPS.  Plaintiffs insist that when the species identified in step one of the listing process is designated, here the NRM DPS, the Service must designate the same species–no more, no less–as the endangered or threatened species in step two.  Then that same species en masse must be listed and protected in step three.  They reason that to do otherwise, as was done here, contravenes the express Act of Congress.  They support their argument by relying on the text, the structure, and the judicial interpretations of the ESA, as well as the fundamental goals of the Act.  The argument is bolstered by the Service's historical view that the statute prohibits a legal taxonomy smaller that a DPS.

Some Defendants argue against this view because they claim the ESA is ambiguous as to whether the Service can "list" something below the level of DPS.  Federal Defendants, on the other hand, argue the ESA is ambiguous about whether the Service can "list" a species and then remove protections for that listed species.[1]

---

[1]Federal Defendants note the entire northern Rocky Mountain DPS is listed by the Final Rule. It is uncertain if this means the Service listed the DPS as an endangered species and then protected only a portion of the species, or if the Service listed the DPS, but not as an endangered species.

They insist that how Congress defined "endangered species" and "threatened species" implies the Service can do what was done here. The claim is said to be supported by the requirement that the Secretary publish the name of the species, and the range through which it is endangered. Defendants too support their argument through the text, the structure and the judicial interpretations of the ESA, as well as the statute's legislative history.

Whether the ESA must list and protect only "species" as defined by the ESA is the question. It is one of statutory interpretation, and Chevron v. Natural Res. Def. Council, 467 U.S. 837 (1984), guides the analysis. If "Congress has directly spoken to the precise question at issue . . . that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. If, however, "the statutory provision at issue is susceptible to multiple interpretations, 'the question for the court is whether the agency's answer is based on a permissible construction of the statute.' " Trout Unlimited, 559 F.3d at 954 (citing Chevron, 467 U.S. at 843). For the reasons that follow, it appears the Service is misconstruing the plain terms of the ESA and disregarding the intent of Congress by taking the course it has in the Final Rule. The agency has no authority to add a new categorical taxonomy to the statute. Only Congress can do that as is shown by the history of the Act itself.

## A. The Plain Meaning of the Relevant Portions of the ESA

When interpreting a statute, the "starting point" is the "language [of the statute] itself." Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1982). Statutory terms are normally given the same meaning throughout the statute, Watson v. United States, 552 U.S. 74, 81 (2007) (quoting Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224, 232 (2007)), and this presumption is at its most "vigorous" when the term is repeated within a sentence. Brown v. Gardner, 513 U.S. 115, 118 (1994).

Implicitly relying on such principles, Plaintiffs argue that the word species must be "given the same meaning" throughout the statute. They maintain that when done in this case it resolves the issue. Congress defined "species" to be nothing smaller than a DPS. See 16 U.S.C. § 1532(16). Thus, an "endangered species" is "any species"–meaning species, subspecies or DPS–that is "in danger throughout all or a significant portion of [the species'] range." Id. at § 1532(6). If the species (DPS or larger) is so in danger, then that "species," or DPS, must be protected as required by the terms of the statute. "[I]f [an agency] decides to list a species or [DPS] as 'endangered' or 'threatened,' it must accord the species or the [DPS] various legal protections." Trout Unlimited, 559 F.3d at 949.

Plaintiffs reason that the Service read "endangered species" here to mean

-22-

"[members of the DPS]" that are "in danger throughout . . . a significant portion of

the [DPS's] range." 16 U.S.C. § 1532(6). Based on this view, the Service is (a)

inappropriately not giving the term species the same meaning throughout the

statute, Watson, 552 U.S. at 81, and (b) improperly rewriting the statute by adding

the words "members of" in front of "species" when making its determination. See

Bates v. United States, 522 U.S. 23, 29 (1997) (noting that a court should not

ordinarily add words or elements to a statute that do not appear on its face).

Defendants disagree and counter that Plaintiffs' uniform application of the

term "species" is simplistic at best and does not account for the full text and

structure of the statute. They argue the statute must be read in its entirety, "since

the meaning of statutory language, plain or not, depends on context." King v. St.

Vincent's Hosp., 502 U.S. 215, 221 (1991). Defendants point to two phrases in

the ESA that they say mean the statute allows for the partial listing or partial

protecting of a species as defined by the statute. The approach is novel but

creative in light of the agency's historical view that it could not do what it now

claims it can.

First, Federal Defendants emphasize that " 'endangered species' means any

species which is in danger of extinction throughout all or a significant portion of

its range." 16 U.S.C. § 1532(6) (emphasis added). Defendants argue the phrase

"significant portion of its range" compels the conclusion that the ESA is

ambiguous on what must be protected as endangered. The argument turns the

statute grammatically on its head. They cite Defenders of Wildlife v. Norton,

which describes the ESA as "inherently ambiguous" in regards to the phrase

"significant portion of its range." 258 F.3d 1136, 1141 (9th Cir. 2001). That case

described the phrase "significant portion of its range" as ambiguous because "

'extinction' suggests total rather than partial disappearance," and thus it makes no

sense to describe extinction at the scale of a portion of a species' range. Id. From

this proposition the Defendants read Defenders of Wildlife to mean the term

"endangered species" is also ambiguous, so there is no plain statutory language

requiring an entire species (including subspecies or DPS) to be protected as an

endangered species. Such a reading of Defenders of Wildlife is too broad. The

case makes clear that the ambiguity of concern lies in what a significant portion of

a species' range means. See id. ("Standing alone, the phrase 'in danger of

extinction throughout . . . a significant portion of its range' is puzzling."); id. at

1145 ("The Secretary necessarily has a wide degree of discretion in delineating 'a

significant portion of its range,' since the term is not defined in the statute."). It is

not concerned with the meaning of "endangered species." A reasoned reading of

Defenders of Wildlife is that the term "endangered species" is ambiguous only to

the extent that a "significant portion of its range" is not clear.  Here there is no

dispute about whether Wyoming constitutes a significant portion of the gray wolf

DPS's range.  A question about the ambiguity of "significant portion of its range"

should not be conflated with the issue of whether "species" means what Congress

defined it to mean.

To embellish their position Defendants also argue that the phrase

"significant portion of its range" can be read to qualify what the term species

means in the definition of endangered species.  Under this view, an endangered

species is "any [member of the] species which is in danger of extinction

throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  By this

reasoning only those wolves in a significant portion of the range, here Wyoming,

would be the endangered species.  This cannot be reconciled with the biological

facts leading to the DPS listing in the first place.

Defendants' reading of the term "endangered species" does not work for

two reasons.  First, the phrase "significant portion of its range" does not qualify

*where* a species is endangered, but rather it qualifies *when* it is endangered.

Defenders of Wildlife, 258 F.3d at 1144.  The definition speaks of any DPS

"which" is in danger.  Nothing in the term "endangered species" suggests the DPS

is only endangered where it is in danger throughout a significant portion but not

all of its range.  Second, even if the definition of endangered species could be read

so that "significant portion of its range" controlled where a species was

endangered, the argument still fails because it requires the term "species" to have

two different meanings within the definition itself.  An "endangered species," is

"any species" that is in danger "throughout a significant portion of its range."  The

definition thus refers to species in terms of (1) the entity to be determined if

endangered ("any species"), and (2) what range ("its range").  Defendants

mistakenly interpret the definition of "endangered species" to mean "any [wolf in

the DPS]" that is in danger "throughout a significant portion of the [DPS's]

range."  "Since there is a presumption that a given term is used to mean the same

thing throughout a statute, a presumption surely at its most vigorous when a term

is repeated within a given sentence, it is virtually impossible to read" species as

meaning DPS at one part of the sentence but then something less than DPS at

another.  Brown, 513 U.S. at 118.  Neither the Court nor the agency is free to add

or subtract words, phrases, or otherwise change what Congress has written, yet

that is what the Service's reading of the term endangered species requires.

Arizona State Bd. for Charter Schools v. U.S. Dept. of Educ., 464 F.3d 1003, 1007

(9th Cir. 2006).

    Federal Defendants take issue with Plaintiffs' plain reading of the statute as

being contrary to the rule of statutory interpretation which holds that no language in a statute should be rendered superfluous when trying to ascertain the meaning of the law. United States v. Novak, 476 F.3d 1041, 1048 (9th Cir. 2007). The government contends that under Plaintiffs' reading of the definition of endangered species the word "or" is rendered superfluous in the phrase "in danger throughout all or a significant portion of its range." 16 U.S.C. § 1533(6) (emphasis added). This argument reasons that the Service would never have to determine if a species is in danger throughout "all" of its range because it could stop its analysis once it found such danger across a significant portion of its range. The Ninth Circuit has discussed this phrase and addressed the claimed concerns over rendering a part of the statute superfluous. In Defenders of Wildlife v. Norton, the Secretary interpreted "significant portion of its range" to be tantamount to the threat of extinction throughout the species' entire range. 258 F.3d at 1141-42. Such a reading of the phrase was found untenable because it rendered "significant portion of its range" "superfluous" and "redundant." Id. at 1142. That is not a concern here. In that same opinion, the Ninth Circuit noted "or a significant portion of its range" was added to the statute by Congress in 1973 to ensure a species receives protection even if the species is not threatened with worldwide extinction. Id. at 1144. This amendment to the statutory definition, including its "or," does what

-27-

Congress intended: a species must be protected if it faces worldwide extinction, or

something less than that.  The listing depends on when a species is endangered in

all or in a significant portion of its range.  Defendants' reasoning is like saying an

orange is an orange only when it is hanging on a tree.  Wolves can be endangered

wherever they are within the range of the DPS.  Plaintiffs' reading of the plain

language of the statute does not render a part of the term "endangered species"

superfluous in light of the history of the term as recognized by the Ninth Circuit.[2]

_____

[2]Defendants also rely on case law to argue the Service is authorized under the ESA to
partially list or protect a DPS. Idaho, for example, argues Defenders of Wildlife provides that the
Service has the flexibility "to limit the listing of a species to that portion of the species range in
which it is actually endangered or threatened." Idaho Br. 27.  In that case, the Service
determined a lizard did not need to be listed under the ESA.  That conclusion turned on a finding
that, "however serious the threats to the lizard on private land, '[l]arge blocks of habitat with few
anticipated impacts exist on public lands throughout the range of this species . . . .' " Defenders
of Wildlife, 258 F.3d at 1140 (quoting 62 Fed. Reg. 37,860).  The issue the court faced was
whether the Service had to consider "whether the lizard is or will become extinct in 'a significant
portion of its range,' as that term is used in the statute." Id.  In finding the answer to be yes, the
Ninth Circuit did not address how the lizard must be listed or protected.  The case says
populations of a species may be protected differently, but it does not say whether this is through
the "significant portion of its range" language or the definition of "species" to include something
less than the taxonomic species.  Based on the fact that the case provides examples of the Service
protecting populations of a species differently than the taxonomic group, id. at 1145, and those
examples involve the agency listing and protecting something at the level of the DPS or larger,
the case does not support Idaho's argument that the ESA allows for partial listings or protections
of a DPS. See, e.g., 57 Fed. Reg. 45,328 (Oct. 1, 1992) (identifying a DPS of marbled murrelet
in California, Oregon and Washington as threatened).
    Idaho and Montana also cite Trout Unlimited, 559 F.3d at 961-62, and California State
Grange v. Nat'l Marine Fisheries Serv., 620 F. Supp. 2d 1111, 1152 (E.D. Cal. 2008), for the
proposition that partial listings of a DPS are permitted under the ESA.  Those cases, however,
dealt with the distinct issue of whether different portions of a DPS could be weighted differently
when determining whether to list the entire DPS.  Trout Unlimited, 559 F.3d at 961 (noting the
ESA does not prevent an agency from analyzing the contributions of different populations within
a DPS when making its listing determination).  Both cases still required that the statutorily
defined species be listed as an entire unit, and protected accordingly.

The final piece of Defendants' argument is that the publishing requirement of the ESA shows the Service can remove species protections from part of a DPS. Section 4(c)(1) of the ESA requires the Secretary to "specify with respect to each such species over what <u>portion of its range</u> it is endangered or threatened." 16 U.S.C. § 1533(c)(1) (emphasis added). The government reads this provision to mean the language is ambiguous if an entire endangered species, or DPS, must be protected as such. The argument is faulty for two reasons. First, it tries to create an ambiguity by ignoring the provision's "place in the overall statutory scheme." <u>Davis v. Michigan Dep't of Treasury</u>, 489 U.S. 803, 809 (1989). The publishing requirement comes only after the Service determines if a species is endangered or threatened. Once that determination is made, the species must be afforded the requisite legal protections. <u>See</u> <u>Trout Unlimited</u>, 559 F.3d at 949, 962 n.11. It makes no sense to read the publishing requirement as altering the substantive determination of when a species is endangered, or what protections the species must be given.

---

Finally, Idaho argues <u>Trout Unlimited</u> allows for different levels of protection within a listed species. In that case, the Ninth Circuit found the agency's decision to protect parts of a listed DPS differently to be compatible with the terms of the statute. However, there the DPS was listed as threatened–not endangered. The ESA authorizes the Service to issue regulations deemed "necessary and advisable . . . for the conservation of [the threatened] species." <u>Trout Unlimited</u>, 559 F.3d at 946. There is no equivalent authorization for the Service to tailor protections for an endangered species. <u>See</u> <u>id.</u> at 962 n.11 (noting species listed as "endangered" cannot be subjected to taking under § 1533(d)).

Second, the statutory inclusion of range serves a purpose that does not

contravene the plain language requiring an endangered species be granted

protections under the Act. The publishing provision does require the Secretary to

list for each such species its "scientific and common name" and then to list over

"what portion of its range it is endangered or threatened."[3]  16 U.S.C. §

1533(c)(1). If the statute did not include "range" there would be no way to

identify a species below its taxonomic level. At the same time, if range is read to

suggest protections for the endangered species can be limited below the level of

the listed species, the reading would also prevent the Service from being able to

list something below the taxonomic level. This problem is made clear by

examining how the Service listed the northern Rocky Mountain DPS in the Final

Rule. For the wolf's scientific name, the service listed *Canis lupus*. Then, for the

wolf's common name, it listed "wolf, gray [Northern Rocky Mountain DPS]."

Then in identifying the range where the wolf is endangered it listed Wyoming. 74

Fed. Reg. 15,187. The only way the Service was able to identify the species below

the taxonomic level was through misconstruing the species common name to

---

[3]Notably, the Secretary is required to identify the portion of its range where it is
"endangered," not the "significant portion of its range" where it is "in danger of extinction." 16
U.S.C. §§ 1533(c)(1); 1532(6).

include the DPS designation.[4]  That is not what the law requires.  If the Secretary

had applied 16 U.S.C. § 1533(c)(1) in a straightforward manner, the listing would

only have included *Canis lupus*, gray wolf, and Wyoming.  To do that would not

have listed the species, in this instance the DPS.  The range where the species is

"endangered" is the contours of the northern Rocky Mountain DPS.  It is only

through the prestidigitation of shifting that qualification of the endangered species

into the common name of "wolf" that the Service was able to "remove" protections

from a portion of the listed species.

The ESA requires the agency to "determine whether any <u>species</u> is an

endangered species or threatened species."  <u>Trout Unlimited</u>, 559 at 957(emphasis

in original) (internal quotation marks omitted).  The words used in the ESA make

clear that "species" excludes distinctions below that of a DPS, 16 U.S.C. §

1532(16); <u>Trout Unlimited</u>, 559 F.3d at 957, and this definition of "species"

applies not only when defining a species, but to all sections of the ESA.  <u>See</u> 16

U.S.C. § 1532 (defining the term species "[f]or the purposes of this chapter").

When this analysis is applied the endangered species is then afforded legal

---

[4]Nothing in the statute suggests "common name" means the artificial name created by the Service for the purpose of listing or delisting.  Scientists would refer to the species as *Canis lupus*.  Non-scientists would call it a gray wolf.  Neither, however, would refer to it as a northern Rocky Mountain DPS.

protections. 16 U.S.C. §§ 1536, 1538. There is no statutory interstice to fill.

Defendants' readings of the ESA requires the term "species" to mean different

things at different places in the same statute. Moreover, Defendants have offered

no reason to reject Congress' intent to give "species" the same meaning[5]

throughout the statute.[6] By listing and/or protecting something less than a DPS,

the Service violated the plain terms of the ESA.

## B. Permissible Construction of the Statute

The above finding that the ESA unambiguously prohibits the Service from

listing or protecting part of a DPS resolves the matter. See Chevron, 467 U.S. at

842. However, to provide greater context and understanding to the Service's

novel interpretation of the ESA, it is worth analyzing whether the Service's action

is deserving of deference under Chevron, and if so, whether the Service's

---

[5]This is not to say species can only mean species, subspecies or DPS. For instance, regarding any endangered species, 16 U.S.C. § 1538(a)(1) prohibits the take of any such species, where take means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." Id. § 1532(19). It would be untoward to read species to mean only a DPS cannot be killed.

[6]Federal Defendants argue that defining the species and determining whether the species is endangered in all or a portion of its range are legally distinct questions. In support, they cite Trout Unlimited, 559 F.3d at 955. That case, however, was discussing the appropriateness of the agency taking into account the "effects, positive or negative, of hatchery salmon on natural fish to determine whether the [DPS] is endangered." Id. The case does not suggest in any way that the identified species is distinct from the species to be determined endangered or threatened. In fact, Trout Unlimited cuts against Federal Defendants' argument that the defined species is distinct from the species to be listed. The Ninth Circuit notes that "after deciding whether a population . . . constitutes a 'species' or a '[DPS],' [the agency] must decide whether to 'list' the species or [DPS] as either 'endangered' or 'threatened.' " Id. at 949.

construction is a permissible one.

### 1. Is the agency action deserving of deference?

Plaintiffs insist the agency's interpretation of the ESA here does not deserve

deference under <u>Chevron</u>.  They reason the Service in past final rules involving

wolves has stated "[d]elisting can occur only when a species (or subspecies or

DPS) is recovered," and "[t]he DPS boundaries" cannot be subdivided.  68 Fed.

Reg. 15,825-26 (Apr. 1, 2003).  The Service has also stated in a final wolf rule that

wolves cannot be "delisted on a State-by-State basis."  70 Fed. Reg. 1,286 (Jan. 6,

2005).  These statements were based on the "Vertebrate Population Policy" ("DPS

Policy").  68 Fed. Reg. 15,825.  The argument holds that because the Service has

adopted what it has previously determined to be an unauthorized approach, the

convenient switch to its current interpretation should receive little deference.

<u>Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.</u>, 524 F.3d 917, 928 (9th

Cir. 2008) (noting a novel approach completely at odds with past approaches by

the agency receives little deference).  Plaintiff Greater Yellowstone also argues

that deference can only exist if the agency changes policy in a reasoned

interpretation that it adequately justifies, and that here the Service did not even

explain whether it is delisting or simply removing protections for part of the DPS

in Montana and Idaho.  <u>Nat'l Cable & Telecomms. Ass'n v. Brand X Internet</u>

Servs., 545 U.S. 967, 1001 (2005).

Like the old legal saw characterizing argument when the facts are not helpful, Federal Defendants counter that any agency is free "within the limits of reasoned interpretation to change course if it adequately justifies the change." Brand X, 545 U.S. at 1001. The change in course is then rationalized by reference to a memorandum from the Office of the Solicitor on the meaning of "In Danger of Extinction Throughout All or a Significant Portion of its Range" ("Significant Range Policy"), a document in the administrative record.[7] Dept. of the Interior Office of the Solicitor, Memorandum, Mar. 16, 2007; AR2009_039216.[8]

There is no legal need to defer to an agency's interpretation of a statute that conflicts with the same agency's earlier interpretations of the statute. Nat'l Wildlife Fed'n, 524 F.3d at 928 (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n.30 (1987)). At the same time, agency inconsistency alone does not mean Chevron deference is avoidable. "For if the agency adequately explains the

---

[7]Idaho argues prior statements by the Service that a DPS cannot be partially listed were informal statements that did not amount to a course of action, and thus the Court should defer to the agency's current action. In Exxon Corp. v. Lujan, 970 F.2d 757, 762 (10th Cir. 1992), the Tenth Circuit noted that a regional office decision does not preclude deference to a subsequent declaration of national policy because a prior, informal opinion followed by declaration of national policy is not a change of course. Id. Idaho does not explain how statements in final rules, based upon a national policy, are tantamount to informal opinions made by a regional office. As such, Idaho's argument appears to be misplaced.

[8]Citations to the Administrative Record (AR xxxxx) refer to the Bates-stamped number in the lower right-hand corner of each page.

reasons for a reversal of policy, 'change is not invalidating, since the whole point of Chevron is to leave the discretion provided by the ambiguities of a statute with the implementing agency.' " Nat'l Cable & Telecomms. Ass'n, 545 U.S. at 981. The Agency's reasoned explanation must explain the change in interpretation of the statute, not whether the new interpretation is "consistent with the statute." Id. at 1001 n.4. Where there is a novel interpretation of a statute that does not explain the change in course from prior readings of the same statute, the newly discovered statutory meaning is entitled to no deference.

In prior rules involving gray wolf DPSs, the Service noted that it "has the discretion to list, reclassify, or delist at the subspecies, species, or DPS level," 68 Fed. Reg. 15,825, but it recognized the ESA "does not allow wolves to be delisted on a State-by-State basis." 70 Fed. Reg. 1296. Such determinations were based upon the Service's DPS Policy and its reasoned opinion that the statute did not allow any other view. That earlier policy and interpretation guides the Service's "evaluation of [DPSs] for the purposes of listing, delisting, and reclassifying under the ESA." 61 Fed. Reg. 4725.

In this case, the Service claims it listed the entire species but only applied protections to part of the DPS. It justified the decision to partially protect the DPS by citing a 2007 memorandum opinion by the Solicitor of the Department of

-35-

Interior.  That memorandum analyzed the phrase "significant portion of its range"

in the statute's definition of endangered species, and concluded the Secretary

should list and protect a species–or here the DPS– only insofar as it is "in danger

of extinction throughout . . . a significant portion of its range."  AR2009_039216.

The reasoning of this solution is plainly at odds with the Service's historical

reading of the law, a reading that matched what Congress said and intended in the

statute.

The Service has not adequately explained this change of course.  The

newfound interpretation fails for at least two reasons.  First, under the earlier DPS

Policy the Service could not delist a DPS at the state level.  This meant it could not

remove protections for a part of a DPS while at the same time leaving the

protections in place for a different part of the DPS.  The change is essentially

doing that, but in doing so the Service failed to discuss the DPS Policy and its

guidance on "listing, delisting, and reclassifying" a DPS.  61 Fed. Reg. 4725.  To

argue that delisting and removing protections are distinct undertakings that do not

need to be squared with each other is disingenuous.  The Service has left

unexplained what it means to list (or delist) a species that does not receive

protections under the ESA.  See Nat'l Cable & Telecomms. Ass'n, 545 U.S. at

1001 n.4 ("Any inconsistency bears on whether the [agency] has given a reasoned

explanation for its current position, not on whether its interpretation is consistent with the statute.").

There is yet another reason to reject the Service's course change. Previously, the Service noted the DPS could not be delisted on a state-by-state basis. 70 Fed. Reg. 1,286. Now, the Service says it is not delisting wolves in Montana and Idaho in violation of the DPS Policy, yet the Rule itself takes the opposite view. See, e.g., 74 Fed. Reg. 15,144 ("[W]e are delisting most of the NRM DPS."). This ambiguity of action is confusing, even to some of the parties to this case. The State of Montana, for instance, filed its initial brief in support of the Final Rule under the presumption that the Final Rule delists wolves on a state-by-state basis. E.g., Montana Cross Motion for Summary Judgment 23 ("The gray wolf is a listed species in Wyoming and a delisted species in Montana and Idaho."). The Service has "left in doubt as to the reason for [as well as the existence of any] change in direction." Morales-Izquierdo v. Gonzales, 486 F.3d 484, 493 (9th Cir. 2007) (en banc). Because it has, the Service is not entitled to Chevron deference to its new interpretation.

### 2. The Service's Interpretation of the Statute

Even though the Service's new interpretation of the ESA is not deserving of deference, it is illustrative to analyze whether its interpretation is permissible.

An agency interpretation that receives Chevron deference must be upheld if it is based on a "reasonable construction of the statute." Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Serv., 475 F.3d 1136, 1143 (9th Cir. 2007). An agency's interpretation is reasonable when it "reflects a plausible construction of the statute's plain language and does not otherwise conflict with Congress' expressed intent." Rust v. Sullivan, 500 U.S. 173, 183 (1991).

Plaintiffs claim the Service's interpretation of the ESA is unreasonable because it (1) renders the concept of the DPS superfluous, (2) allows for plants and invertebrates to be protected in a manner explicitly against Congress' intent, and (3) overall thwarts the purpose of the law.[9]

To begin with, in 1973 the ESA defined species as "any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." P.L. 93-205, § 3(11), 87 Stat. 886. In 1978, Congress amended the definition to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when

---

[9]In addition to countering Plaintiffs' arguments, Federal Defendants contend that its interpretation is more reasonable than Plaintiffs because it makes use of the word "or" in the phrase "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1533(6). As discussed above, this argument is not well taken.

mature." P.L. 95-632; 16 U.S.C. § 1532(16). The 1978 change removed

"taxonomic categories below subspecies from the definition as well as distinct

populations of invertebrates." H.R. No. 95-184 at 17. The purpose of this change

was to preserve the Service's ability to "provide [] different levels of protection

for populations of the same species," while preventing the Service from abusing

this flexibility by listing a species population at the level of a "city park." S.Rep.

No. 96-151. The key to the analysis here is that "[t]he ability to designate and list

DPSs allows the [Service] to provide different levels of protection to different

populations of the same species." Nat'l Ass'n of Home Builders v. Norton, 340

F.3d 835, 842 (9th Cir. 2003) (citing DPS Policy, 61 Fed. Reg. at 4725; and

S.Rep. No. 96-151). Plaintiffs thus contend the Service's interpretation of the

ESA allows them to selectively apply protections to parts of a species, which

would make the DPS concept redundant.

Federal Defendants dance around Plaintiffs' argument by contending that

the "[i]dentification of the 'species' " is not superfluous because it "frames [] the

inquiry by defining the entity under consideration and by requiring [the Service] to

consider the status of the entire entity."[10] Fed. Def.s' Br. 8. Defendants fail to

---

[10]Federal Defendants have not explained how the DPS as a mere framing tool squares
with its prior, still valid, DPS Policy. In that Policy, the Service recognized Congressional
guidance that "the authority to list DPS's be used '* * * sparingly' while encouraging the

explain how their interpretation of the Act does not undermine Congress' intent in adding DPS to the definition of species. If the DPS concept was intended to allow "different levels of protection for populations of the same species," the Service's current interpretation of the Act displaces that intent. The necessary result is that Congress created a redundant policy, or the Service reads the act in such a way as to render the DPS concept superfluous.

Plaintiffs carry the argument further and challenge Defendants' interpretation of the ESA insisting it would allow the Service to list and protect groups of plants, invertebrates and fungi against Congress' expressed intent. Congress defined DPS to include only "vertebrate fish and wildlife." 16 U.S.C. § 1532(16). In doing so, Congress precluded the Service from being able to "address" non-vertebrate species at the DPS level. 61 Fed. Reg. 4,722, 4,724. Plaintiffs maintain that given the Service's interpretation of the ESA, nothing would prevent it from identifying a subspecies of plant, and then protecting only a portion of it, something less than a subspecies. In response to this argument the Service insists that its interpretation allows it to identify the "species"–with plants, this would be nothing less than a subspecies–and then apply protections to the

_____

conservation of genetic diversity." 61 Fed. Reg. 4725. However, if the DPS only frames the inquiry, there is no reason to list DPSs sparingly. Instead, the Service should partially protect a listed species or DPS sparingly.

-40-

necessary portion of its range. The response ignores the Plaintiffs' assertion.

Initially the question arises as to why Congress would have been concerned about

listing less than a subspecies of plant if this is only a "framing" device. Because

the purpose of the DPS was to allow for more narrow protections of wildlife and

vertebrate fish, see Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 842

(9th Cir. 2003), it is necessary to ask how that intent is honored if the same result

can now be reached by the Service listing a subspecies of plant, and then applying

protections to only a part of it.

The argument continues against the Service's assertions by holding that to

allow piecemeal protections thwarts the purpose of the law and it unnecessarily

exposes a species to risk of extinction. The response here is that the issue is not a

concern because the species is protected to the extent it is at risk of endangerment.

The Service contends it need only protect wolves where it considers them to be in

danger, here, Wyoming. So the protection of wolves in Wyoming plus the health

of wolves and state regulations in Montana and Idaho serves to ensure wolves in

no portion of the DPS will go extinct.

The Service's interpretation of the ESA produces a strained application of

the Act. The ESA requires the monitoring of "all species . . . which, in accordance

with the provisions of this section, have been removed from the [Lists of

Endangered and Threatened Wildlife and Plants]." 16 U.S.C. § 1533(g)(1). The
Service describes this requirement as "post-delisting monitoring." 74 Fed. Reg.
15,184. Federal Defendants unequivocally claim that wolves in Montana and
Idaho are listed on the List of Endangered Wildlife and Plants. Fed. Def.s' Br. 3
n.2 ("Plaintiffs assert that [the Service] carved up a DPS and 'listed' a portion of a
DPS. This is factually incorrect, as [the Service] 'listed' the entire [northern
Rocky Mountain] DPS." (emphasis in original)). This faulty analysis leads to the
untenable conclusion that the ESA requires "post-delisting monitoring," and
because wolves in Montana and Idaho are "listed," wolves in Montana and Idaho
need not be monitored. Even so, the Final Rule discusses and details "post-
delisting monitoring" for Montana and Idaho wolves. No explanation is offered as
to why such monitoring is needed in light of the fact that those wolves remain
"listed."

Because the Service's interpretation renders the DPS concept superfluous
and would allow the Service to protect invertebrates and plants at a level Congress
did not intend, the Service's interpretation is unreasonable.

## C. Legislative History

Defendants, especially Defendant Intervenors, rely heavily upon legislative
history to argue that a species can be partially delisted and/or protected only in

-42-

part.

In 1973, Congress made numerous changes to the ESA. Some of those changes are important to the argument about the meaning of the statute. Congress changed the definition of "endangered species" to include any species "in danger of extinction throughout" any "portion of its range." H.R. Rep. 93-412 at 10. At the same time, it changed the definition of "species" to include "any subspecies of fish or wildlife or plants, or any population of such species." Id. at 11. The report accompanying the 1973 amended ESA describes the changes as a response to "the need for greater flexibility" and management of endangered species. H.R. Rep. No. 93-412 at 1. In addition, a senator in 1973 explained the changes to the ESA as allowing an agency to protect a species as endangered in one state while removing it from the list in another.[11] 119 Cong. Rec. 25,662, 25,669 (July 24, 1973). Defendants presume, without support, that such flexibility stems from the phrase "significant portion of its range."[12]

The ESA definition of species was changed in 1973 to include populations

---

[11]Ironically, this is different than what the Service is doing here, which involves listing the species in all states, but only protecting it in one.

[12]Defendants' argument would make sense if the senator said the changes to the ESA allow different levels of protection for a statutorily defined species. Defendants presume without showing that the congressman was using the same definition for species in the legislative history as used in the statute. Notably, Defendants are not willing to apply the statutory definition of species within the statute itself.

-43-

of "smaller taxa in common spatial arrangement." P.L. 93-205 § 3(11). The 1973

legislative history is silent about the reason for the change. However, a 1979

congressional committee report illuminates the Congress's reasoning. While

discussing potential changes to the definition of species, the committee noted that

prior to 1973 the Act did not allow the Service to "adopt different management

practices for healthy, threatened or endangered populations." S.Rep. No. 96-151.

The committee went on to note that changes to the definition of "species" could

threaten the Service's ability to provide "different levels of protection for

populations of the same species." Id. Accordingly, the definition of species

allows the agency to target its listing and protections on a discreet population.[13]

See Nat'l Ass'n of Home Builders, 340 F.3d at 842 ("The ESA definition of

species . . . allows the [Service] to provide different levels of protection to

different populations of the same species.") (citing S.Rep. No. 96-151).

In 1978 Congress discussed changing the definition of species to include

only "taxonomic species." Doing so would have excluded subspecies and distinct

populations. 124 Cong. Rec. 38,1355 (Oct. 14, 1978). The amendment was

rejected, however, out of concern that the Secretary would then be forced to list a

---

[13]In fact, in the 1970s the GAO expressed concern that the definition of "species" would allow the Service to target protections too narrowly. S. Rep. No. 96-151. This would be an empty concern if the Service could nevertheless protect only a portion of the species in its range.

species in one state even though it was only endangered in others. Representative

Dingell noted that such a change to the definition of species would mean eagles in

Alaska would be listed as endangered despite their abundance there. Id. The issue

over such a listing was not meaningless. Representative Dingell expressed

concern that if alligators had to be listed at the taxonomic level then state

management through hunting would not be allowed in states with healthy

populations. Id. This discussion on the definition of species makes two things

clear. Of primary concern is the notion that in 1978 Congress reasoned that if the

definition of species excluded subspecies and populations the Service would have

to list an entire species even if the species was not in danger of extinction in

certain geographical areas. Additionally, broad listings would be intrusive and

harmful to state management practices because with listing came the requisite

protections that would ban hunting in those states.

The legislative history undermines Defendants' argument, as does the

application of the statute in this case. The Final Rule points to a 1978

reclassification of wolves in Minnesota as an example that the Service can apply

"differential levels of protections for species facing differential levels of threats in

different parts of their range." 74 Fed. Reg. 15,152. That reclassification of the

timber wolf, however, was not based upon the "portion of its range" language the

-45-

Service now relies upon, but rather it was based on the definition of "species."  In

the early 1970s the eastern timber wolf was listed as endangered.  See 43 Fed.

Reg. 9607.  In 1978, the Service reclassified wolves in Minnesota to be threatened

rather than endangered.  Contrary to the Final Rule's suggestion, this differential

level of protection for Minnesota wolves occurred through the Service

reclassifying those wolves as an entire DPS–thus identifying it as a separate

species under the ESA.  The Service then downlisted the entire "species" (here

DPS) as threatened.  43 Fed. Reg. 9610 ("For purposes of this rulemaking, the

gray wolf (Canis lupus) group in Mexico and the 48 conterminous States of the

United States, other than Minnesota is being considered as one 'species,' and the

gray wolf group in Minnesota is being considered as another 'species.' ").

Congress altered the definition of species in 1973 to allow the Service the

flexibility it now seeks to find elsewhere in the statute.  The statutory conundrum

remains why did Congress add  "significant portion of its range" to the phrase

"endangered species."  The answer is contrary to Defendants' novel interpretation.

Congress described the addition of "significant portion of its range" to be a

"significant shift" in "when" a species is endangered.  Prior to 1973, a species was

considered endangered only "*when* it [was] threatened with worldwide extinction."

H.R. Rep. 93-412 at 11; see also Defenders of Wildlife, 258 F.3d at 1136 (citing

-46-

Endangered Species Conservation Act, Pub.L. 91-135 § 3(a), 83 Stat. 275 (Dec. 5, 1969))(emphasis added).  The legislative history shows that the addition of the "portion of its range" phrase alters *when* a species can be listed, but in no way suggests that the phrase changes what must be listed and protected.[14]  That managerial and statutory flexibility stems from the definition of "species," not from the "where" portion of the species' range.  Nothing in the legislative history of the statute lends credence to the idea that the Service can list a DPS, subdivide it, but then provide the mandated protections to only part of the DPS.  The new Final Rule, to the extent that it partially lists or only protects part of a DPS does not comply with the law.  5 U.S.C. § 706(2)(A).

## VI.  Remedy

A reviewing court should "set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Plaintiffs seek to have the Final Rule vacated and set aside.  Defendants counter that a remand

---

[14]Federal Defendants point to language in the legislative history that describes the change as allowing the Service to "declare a species endangered within the United States where its principal range is in another country, such as Mexico or Canada, and members of that species are only found in this country insofar as they exist on the periphery of their range." H.R. Rep. 93-412 at 11.  At most, this suggests a taxonomic species need only be listed within the United States, but such history in no way implies that the Service can list the species throughout the United States, but only protect it within limited parts of its range there within, or list a DPS that covers three states but only protect it within the boundaries of one state.

without vacating the rule is an appropriate remedy.[15]

Because the Rule is unlawful for failing to list and to protect the entire DPS, the Rule should be vacated as invalid.  Alsea Valley Alliance v. Dep't of Commerce  358 F.3d 1181, 1185 (9th Cir. 2004) ("Although not without exception, vacatur of an unlawful agency rule normally accompanies a remand."). Montana argues that vacatur is unnecessary because the only difference between state management and federal management of wolves is wolf hunts, and such hunts have not impacted the population.  See dkt #146-2 (noting Montana's wolf population only decreased by 4 wolves from 497 to 493 after allowing hunting to occur in 2009).  While the argument has practical appeal, it misses the mark.  If the Rule is invalid, the harm occurs from wolves being taken contrary to the terms of the ESA.

## VII.  Conclusion

In 2008 there was a legal determination that the Service's then final rule to delist the entire northern Rocky Mountain DPS did not meet the mandate of the ESA for delisting.  Wyoming's regulations were deficient, and there was insufficient proof of adequate genetic exchange.  Following that determination the

---

[15]Federal Defendants also request the opportunity to further brief the issue if appropriate. They did not offer a reason why they could not have briefed the issue in the first place, or otherwise why further briefing is necessary.

Service asked the Court to vacate the Rule. The Court did so. The record in this case implies that the Service tried to find a pragmatic solution to the legal problem raised by the inadequacy of Wyoming's regulatory mechanisms, and Wyoming's choices about meaningful participation in a collective delisting agreement like that engaged in by Montana and Idaho. Even if the Service's solution is pragmatic, or even practical, it is at its heart a political solution that does not comply with the ESA. The northern Rocky Mountain DPS must be listed, or delisted, as a distinct population and protected accordingly. The issues of the adequacy of the regulatory mechanisms of Montana and Idaho, population size, connectivity and genetic exchange are subsumed by the determination that the Final Rule is contrary to the law and as such are not decided here.

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motions for Summary Judgment (dkt ## 105, 106) are GRANTED in part and DENIED in part as moot. They are GRANTED as to Count I of Plaintiffs Defenders of Wildlife, et al.'s Complaint and Count III of Plaintiff Greater Yellowstone Coalition's Complaint, and DENIED as moot in all other aspects.

IT IS FURTHER ORDERED that Defendants' Motions for Summary Judgement (dkt ## 113, 118, 121, 125, 128, 129) are DENIED in part on the merits as to Count I of Plaintiffs Defenders of Wildlife, et al.'s Complaint and

-49-

Count III of Plaintiff Greater Yellowstone Coalition's Complaint, and DENIED in part as moot in all other respects.

Finally, IT IS ORDERED that the April 2, 2009 Final Rule to Identify the Northern Rocky Mountain Population of Gray Wolf as a Distinct Population Segment (74 Fed. Reg. 15,123) is VACATED and set aside.

The Clerk of Court is directed to enter judgment in accordance with this Opinion.

Dated this _____ day of August, 2010.

14:43. p.m.

_____
Donald W. Molloy, District Judge
United States District Court